```
 1                UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF OHIO
 2                     WESTERN DIVISION

 3    UNITED STATES OF AMERICA,      Docket No. 3:20CR208

 4              Plaintiff,

 5    v

 6    MANISH RAJ GUPTA,              June 23, 2020

 7              Defendant.

 8    -------------------------------------------------

 9              TRANSCRIPT OF DETENTION HEARING, VOLUME 1
                BEFORE THE HONORABLE JAMES G. CARR
10                 UNITED STATES DISTRICT JUDGE

11    APPEARANCES:

12    For the Plaintiff:

13    Tracey Ballard Tangeman
      Carol Skutnik
14    Office of the U.S. Attorney
      Four SeaGate, Suite 308
15    Toledo, Ohio 43604
      (419) 241-0753

16

17    For the Defendant:

18    Ian N. Friedman
      Eric F. Long
19    Madelyn J. Grant
      Friedman & Nemecek
20    1360 East Ninth Street, Suite 650
      Cleveland, Ohio 44114
21    (216) 928-7700

22

23    Court Reporter:

24    Angela Nixon, RMR, CRR

25
```

```
 1          COURTROOM DEPUTY:  The Court is now in session

 2    before the Honorable James G. Carr, Judge of the United

 3    States District Court.  The case before The Court is USA

 4    versus Manish Raj Gupta, case number 3:20CR208, matter is

 5    called for detention hearing.  The government is

 6    represented by AUSA Tracey Tangeman and Carol Skutnik.

 7    Defendant is represented by attorney Ian Friedman and Eric

 8    Long.

 9          Mr. Gupta, can you raise your right hand so I can

10    swear you in, please?

11                    MANISH RAJ GUPTA,

12    was herein, called as if upon examination, was first duly

13    sworn, as hereinafter certified, and said as follows:

14          THE COURT:  Okay.  Counsel, I've read the

15    materials that have been submitted.  Quite candidly, I'm

16    very concerned.  I realize that the therapist has indicated

17    that there is a lower or lesser risk of suicide, but I'm

18    very concerned about that in light of the comments made at

19    the time of his arrest.  The case will probably be a year

20    or so before it gets resolved.  And Ms. Tangeman, if you'll

21    sort of briefly summarize the evidence that the government

22    would be prepared to admit at a trial, and, also, have you

23    done a guideline range?  I assume the defendant has a zero

24    criminal history category, or one, but nonetheless, let us

25    know the various sentencing consequences.  I do think I
```

1   have to take into consideration the weight of the

2   government's evidence and also the consequences amongst

3   them.

4          MS. TANGEMAN:  Your Honor, the facts are set

5   forth in the government's response to the motion.  In

6   summary, they are that the defendant, while working as a

7   doctor, and having the right to dispense controlled

8   substances with the exception of outside of his

9   professional medical practice or for illegitimate purposes,

10  in fact, traveled to a conference in Los Angeles and had

11  arranged to meet with an escort prior to that time via some

12  online application, and at that time he not only drugged

13  her, but proceeded to engage in sex acts on her while she

14  was unconscious.  This occurred in September of 2016.  The

15  defendant admitted that he was not at this medical

16  conference to treat any patients, and we confirmed that the

17  victim was not a patient of his.

18          The defendant had several sort of habits, if you

19  will, of how he went to these conferences.  He would Fed Ex

20  his bag, for example, and we found Fed Ex records that

21  corroborated him sending this bag back around the exact

22  same date that he checked out.  We confirmed his

23  reservations with the hotel that the victim identified.

24          And of course when we did -- we executed search

25  warrants in March of this year on his Central Avenue

1    office, we found, in his private office that was kept

2    locked with only him and his office manager having a key to

3    the office, that he had an office filled with sex toys,

4    cameras, hand-held cameras, loose SD cards.  He had Valium

5    suppositories, he had narcotics that should have been in a

6    locked storage bin, including a narcotic that was almost

7    never used in the practice.

8           And of course our victim went to a rape clinic

9    shortly after she fled the hotel room and tested positive

10   for a Benzodiazepine, and she had not taken any

11   Benzodiazepine prior to the appointment with the defendant.

12          The defendant had, like I said, several

13   electronic devices.  They were analyzed, and we actually

14   located the video of the victim in this case in which it

15   appears that the defendant is performing sex acts on her

16   while she was unconscious.  He even recorded her driver's

17   license.  And he did the same for another victim in San

18   Francisco during his recording of the sex act after

19   drugging her.

20          To date, we would note that we have over 20 woman

21   who are depicted in videos on the defendant's devices

22   (phonetic).  The earliest dates back to 2006, the most

23   recent was September of 2019, which, of course, was just

24   three months before we arrested him.  So we're talking

25   about a criminal conduct, a relevant conduct time frame

1    that spans almost 15 years.

2            And we would note that the defendant, when he was

3    arrested and he was found at home, we did note that there

4    were some statements that he made.  He essentially made the

5    comment that doctors are three times more likely to die in

6    single vehicle crashes.  The agent was not speaking -- was

7    not speaking about anything related to how people die or

8    doctors.  There was no conversation or topic at hand about

9    that, and the agent was so concerned that he contacted our

10   office because he said he was concerned about the defendant

11   committing suicide.  I should note that the defendant had a

12   sports car at the time, an Audi R8, and they -- the agent

13   urged our office to act faster on the complaint, which we

14   were planning on issuing if we found the videos of the

15   women, but at that point he had just gone to the home.  And

16   we actually expedited the complaint as a result of this

17   information.  And, in fact, there were several times during

18   the interview where other agents, not just this agent, but

19   other agents even said to the defendant, because of sort of

20   his despondent reaction, that he was going to be okay and

21   that he was going to get through this.  So this is

22   something that they were concerned about on the day that

23   they arrested him.  This is not something that they are

24   saying as a result of a request for a detention hearing.

25   This is something that was brought up to our office on the

1    day -- day of in March.  And in fact, the defendant did go

2    down to his lawyer's office that day.  The agents actually

3    followed him because they were concerned that he was going

4    to crash his car.

5          And we would note that the Ohio Pharmacy Board

6    also went in at the same time and had done some audits of

7    the defendant's controlled substances, which they have a

8    right to do, frankly, without any probable cause.  They can

9    do so routinely if you carry a DEA number in which you can

10   prescribe.  And I would note that the audit revealed that

11   he received a shipment of Ketamine on September 12th, 2016,

12   just two weeks before he drugged and raped our victim in

13   this case.  They found significant unaccounted losses for

14   Diazepine/Valium and Ketamine in the drug purchases from

15   2016 to 2019.  And there was a vile that was partly

16   empty of Ketamine that was found in his private locked

17   office of his Central Avenue location.

18          I would also note that even prior to this his

19   employees reported to the agent that they had found videos

20   of the defendant having sex with what they described as

21   women who looked like they were escorts.  He instructed

22   these women to wear certain things like corsets and high

23   heels and black hose.  They did not report it to the

24   police, but one employee later copied four of those videos,

25   and those were later turned over to the FBI.

1          I would also note that in 2013 the office

2    received -- the defendant's office received a phone call

3    from an individual, a female, saying that the defendant had

4    drugged and raped her and video recorded her.  And she even

5    accurately described his wooden cell phone case that had

6    his Artisan Cosmetic Surgery logo on it, and accurately

7    described the vehicle he owned at that time.

8          And shortly after that, employees at his practice

9    discovered his black medical bag that was filled with all

10   of the same items that agents later found in 2020 when they

11   raided his medical office and the items in his private

12   office, and those included sex toys, anal lubricants,

13   plastic syringes.  At that time when the employee found it,

14   it also included women's lingerie, a tripod with a camera,

15   and a black blindfold, the anesthesia bottle, and that

16   would be consistent then with what we found.

17         The employees advised that the defendant would

18   ship this medical bag to the conferences in advance, which

19   the government would note would certainly be logical in

20   lieu of going through airport security with an x-ray

21   machine of these items.

22         And we would note that in at least some of the

23   videos, it is also visible that the defendant actually

24   inserted what we would call sort of an anal tube to insert

25   something into the anuses of these women.  The employees

```
1    confirmed that they had absolutely no use for anal
2    suppositories in the practice.  It is a plastic surgery
3    practice, it's not a G.I. practice.  And they confirmed
4    that there would be no reason for the -- for the defendant
5    to have those items in the office or to use them.  And we
6    would note that the anal suppositories, the Valium
7    suppositories that were found in 2020, were actually
8    prescribed by the defendant to another individual, but one
9    employee said they thought that was the exact same
10   suppositories that were found in the medical bag just a few
11   years earlier.
12            THE COURT:  Okay.  If I can interrupt, a couple
13   things.  What was submitted later from the victim, candidly
14   I kind of discount that because I can understand what she
15   wants and why.  I also know you're able to properly submit
16   victim statements at this stage; however, she is a very --
17   she's available to be a witness?
18            MS. TANGEMAN:  She is.
19            THE COURT:  Okay.  You mentioned in an earlier
20   proceeding that you were attempting to locate other victims
21   to the extent that you could identify them.  What's going
22   on in that regard?
23            MS. TANGEMAN:  Those efforts are still ongoing,
24   Your Honor.  Like I said, we do have the driver's license
25   of another woman, and that investigative lead has been
```

1    forwarded on to the agency.  Obviously Covid has not helped

2    our cause.  But those efforts are ongoing, and we do

3    believe that we have identified another woman, not the one

4    that -- whose ID was photographed, but another woman who

5    does appear in some of the videos.

6         THE COURT:  Okay.  I believe you mentioned in an

7    earlier session, but not in your materials, that the wife

8    had called the victims, is that -- are you --

9         MS. TANGEMAN:  Yes.  Your Honor, shortly after

10   execution of the search warrant in March, the case agent,

11   Erin Marciniak, who is present as the government's

12   representative, received a phone call from one of the

13   employees expressing some grave concerns about being

14   contacted by the defendant's wife.  The defendant's wife

15   essentially told the employee --

16        THE COURT:  I see, the wife called an employee.

17        MS. TANGEMAN:  The wife called an employee

18   basically saying we need to find out who the traitors are.

19   And the employee felt intimidated and contacted the agent

20   basically saying that this -- the defendant's wife was

21   firmly in the defendant's corner and attempting to find out

22   who had cooperated with police.

23        THE COURT:  So once again, counsel, it's my

24   custom, I don't think you've been in front of me before, to

25   let you know what's on my mind.  I'd rather have you know

1  what I'm thinking about rather than sort of sit blindly

2  here, and then when the talking is done to wait until then.

3  So I am concerned.  We have, it seems to me -- what's the

4  guideline range?

5          MS. TANGEMAN:  The guideline range, Your Honor,

6  for Count 1 is 188 to 235 months before acceptance, and for

7  Count 2 it's 135 to 168 months after acceptance.  Noting,

8  however, that there's a mandatory minimum of 15 years up to

9  life on Count 1, and noting that Count 2 is up to 20 years

10  imprisonment.

11          THE COURT:  And I assume they can run

12  concurrently?

13          MS. TANGEMAN:  We would argue that they would

14  not, that they are separate offenses, but that would

15  certainly be the subject of --

16          THE COURT:  I would have the discretion to --

17          MS. TANGEMAN:  Yes.

18          THE COURT:  There's no mandatory consecutive --

19          MS. TANGEMAN:  Correct.

20          THE COURT:  -- like you do on some gun counts and

21  so forth?

22          MS. TANGEMAN:  Correct.

23          THE COURT:  And after acceptance on Count 1, what

24  would the guideline range be?

25          MS. TANGEMAN:  One moment, Your Honor.  That

1   would be, I believe, 135 to 168 after acceptance.

2              THE COURT:  Okay.  So the mandatory minimum, if I

3   compute correctly, would exceed the guideline range post

4   acceptance?

5              MS. TANGEMAN:  No, Your Honor, it's 180 months,

6   so it's actually below -- I take that back, it's below the

7   guideline range before acceptance, you are correct, it is

8   above the guideline range after acceptance.  So the

9   guideline range after acceptance basically would be --

10  would not apply because the mandatory minimum --

11             THE COURT:  That includes the relevant conduct

12  compensation?

13             MS. TANGEMAN:  It does not include any

14  considerations of relevant conduct.  Obviously if we have

15  additional victims, then there could be additional counts,

16  and we would certainly argue that the relevant conduct

17  would result in either an above guideline sentence or

18  additional counts.  But that's just the offense conduct.

19             THE COURT:  Well, quite candidly, because I do

20  want to know what the guideline range is, it would seem to

21  me, you have plenty of videos, the fact that you don't know

22  who 18 of those women are, it would seem to me that under

23  the lower standard of proof of sentencing that the relevant

24  conduct would include 20 victims, well 20 events.  Do you

25  know what effect that would have -- if that were so, what

1    effect that would have on the guideline range?

2             MS. TANGEMAN:  Every count would be the same.  It

3    would be the mandatory minimum of 15 years to life.  And

4    then The Court would not be able to group those because

5    they would be different victims on different occasions.  I

6    believe The Court would be able to run those concurrent if

7    it so chose.  I don't know of a requirement that they run

8    consecutively.  But essentially the offenses would -- would

9    be the same guideline calculation.  Carol Skutnik has

10   advised that it would add six points to the guidelines.  So

11   then you would be -- in addition to those additional counts

12   that would have the same mandatory minimum, you would be --

13   you would be at basically 360 to life before acceptance,

14   and 262 to 327 after acceptance if that would --

15            THE COURT:  You answered my question.  In other

16   words, were I to take the additional victims into account,

17   that would add six points?

18            MS. TANGEMAN:  Correct.

19            THE COURT:  That was my question, that would

20   increase the guideline range accordingly?

21            MS. TANGEMAN:  Correct.

22            THE COURT:  Mr. Friedman, I'm sure you understand

23   why I asked my questions.  Obviously serious offense.  I

24   realize that the defendant retains, of course, the

25   presumption of innocence.  The government still has to

1   prove all of this.  But I also think that under the Bail

2   Reform Act, it's not only appropriate, but I need to take

3   into consideration the likelihood of conviction, and as

4   well the consequences upon conviction and how that might

5   induce someone to flee, or in this case, quite candidly, to

6   commit suicide.  The defendant's a 50 year old man.  He has

7   lost permanently his -- his medical license and lucrative

8   remuneration.  If convicted, he'll spend at least 15 years

9   in prison, which would mean by the time he gets out he'll

10  be about 62 1/2 or whatever for good time.  And that is if

11  I were to sentence him only on the mandatory minimum on

12  both counts and run the sentences concurrent.  I have no

13  idea what I would do.  The government's evidence is --

14  obviously it seems to be both strong and compelling at this

15  stage.

16          And so anyway, those factors and also the wife,

17  who is a proposed custodian, has not conducted herself in a

18  way that would suggest that, necessarily during the period

19  of this proceeding, she would understand that her

20  obligation's to The Court and not to her husband or her

21  family.  So I'm disinclined to grant you request for

22  release.  I understand you are posting very substantial

23  assets.  I don't know, I mentioned this before, I assume

24  that I could seize those assets, and thereby undertake what

25  I could to deprive the family of the benefit of those.  And

1   that, of course, is at least an inducement to them to see

2   to it that he appears, which, quite candidly, is my

3   principle -- principle consideration.  But on the other

4   hand, adding it all up, I'm just not sure that they are

5   reason -- sufficient reasonably to ensure that he will, in

6   fact, appear at trial.  We can take his passport, of

7   course, and limit his freedom of movement to the extent

8   that he would be electronically monitored.  But of course

9   the problem there is it's post hoc, and the time it would

10  take to get a response into gear, though not substantial,

11  nonetheless seems to me he would have ample opportunity,

12  for somebody who's so inclined at least, to get underway

13  with an effort to flee.  Those are my concerns, I'm sure

14  you know that.  It's very foreseeable.  They are concerns I

15  think with any judge, and including one whose, as

16  Ms. Tangeman knows and argues often, that I should not

17  follow this default, but my default generally is out.  But

18  I think the government has presented a pretty persuasive

19  case for continued detention, on really three sorts,

20  potential penalty -- I mean, the guideline range is 360

21  months.  That's 30 years.  He would be almost my age, I'll

22  be 80 in November.  He'll probably be 82, 83 by the time he

23  came out.  For all practical purposes, his life as he's

24  known it and the life as we all like to live it, will be

25  gone.  And -- and I just think that you add that up, you

1  add my concerns about the wife, and then also the suicide,

2  you put those three together, I'm just concerned about the

3  risk of flight or the risk of nonappearance one way or the

4  other.

5          Quite candidly, I'm not too concerned about

6  danger of the community.  I think he would be safeguarded,

7  would be on the family to see to it that nothing of this

8  sort alleged against him possibly –– I'm not concerned

9  about that.

10          So all that being said, and having laid a bunch

11  of duces, the government trumps, it seems to me.  By all

12  means go ahead.  If you want to consult with your client,

13  as I said before, you and your client can be sent to the

14  breakout room where we would not hear what you're saying.

15  It would be as confidential as if you were in the office

16  and closed the door.

17          And the other thing I should determine is that

18  your client is willing to let me conduct this proceeding by

19  video rather than in person.  Quite candidly, our court is

20  opening in August.  I've notified those who are appearing

21  in front of me that my present intention is not to return

22  to The Court until this COVID-19 crisis has passed or

23  there's an effective immunization and I've been immunized

24  against it.  I've mentioned my age.  I'm in very good

25  health for my age, but, quite candidly, I'm much more

1    concerned, my family's made very clear for the duration I'm

2    not going anywhere.  I have to abide by their wishes.  You

3    may proceed.

4              But before I do, let me talk to Mr. -- to the

5    defendant.  Sir, if you'll say something, I just want to

6    discuss with you your willingness to have me proceed in

7    this matter.  If not, what I would do is I would refer it

8    to our Magistrate Judge or another Magistrate Judge in the

9    event that -- in the meantime, our current Magistrate Judge

10   is awaiting Senatorial confirmation on nomination to become

11   a District Judge.  You do have the right to have this occur

12   in open court with your attorney next to you.  But whoever

13   that would be, myself or another Judge, in your presence.

14   This is not a 100 percent solution.  It's the best we can

15   do under all the circumstances.  What would happen is I

16   would refer it to a Magistrate Judge, that Judge would

17   conduct the hearing that I'm conducting today, prepare

18   what's called a report and recommendation, and if that

19   Judge recommended release, the government would appeal, and

20   it would come to me on the basis of the record.  At that

21   point no further hearing would be held unless I

22   determine -- unless I hold one, I don't know what I would

23   do then.  But of course if you were detained, you would

24   have the right to appeal that order to me as well.  And you

25   also have the right to appeal any order that is not

1    acceptable to you and your lawyer to The Sixth Circuit.

2    And if you aren't able to afford counsel, then counsel will

3    be appointed for you and a record of these proceedings will

4    be prepared.  Let me ask you, first of all, do you

5    understand what I've just said?

6                THE DEFENDANT:  I believe I do, yes.

7                THE COURT:  Okay.  Would you like to talk to your

8    lawyer about it?  You're welcome to do so.  I would do so

9    in your situation.  The government has laid out pretty

10   unattractive circumstances for you, and I wouldn't feel

11   right if you didn't take the opportunity to talk to your

12   lawyer and get the benefit of -- express to him your own

13   views and feelings and get the benefit -- you get the

14   benefit from him of his own advice and counsel.

15               As I said, through this technology, you can be

16   sent into what's called a breakout room, and it's as if you

17   would be in your lawyer's office with nobody present and

18   the door closed.  Your conversation would be totally

19   confidential.  Do you understand that?

20               THE DEFENDANT:  Yes.  Could I please request --

21               THE COURT:  If you do not consent to proceeding,

22   that's fine with me.  If you do consent, that's fine with

23   me.  Doesn't matter to me one way or the another.  Do you

24   understand that?

25               THE DEFENDANT:  Yeah.

         1              THE COURT:  It really doesn't.  If, after

         2    consulting with your attorney, you decide you want to

         3    proceed this morning, and if not, then I would simply refer

         4    this matter to a Magistrate Judge and suggest that he hold

         5    a hearing early next month once The Court is open in open

         6    court, okay?  So --

         7              THE DEFENDANT:  May I briefly confer with Mr. --

         8              THE COURT:  I couldn't hear you, sir.

         9              THE DEFENDANT:  May I briefly confer with my --

        10              THE COURT:  Of course.  It need not be brief.

        11    Take as much time as necessary.  It's very important.  It's

        12    extremely important, and I want to emphasize how important

        13    this proceeding is.  Take as much time as you want.

        14              And then, Mr. Friedman, may I suggest that you

        15    call -- perhaps call my law clerk, if that's okay, or --

        16    how do you want to do this, Tina, have them call you or

        17    what?

        18              MS. DYBALA:  Judge, this is Melissa, the law

        19    clerk.  I can just give him my phone number, and he can

        20    call or text when they're ready to come back.

        21              THE COURT:  That's good.  Let's put Mr. Gupta in

        22    the breakout room, and then, Mr. Friedman, wait a moment

        23    before we put you in the breakout room, Melissa will give

        24    you her phone number so that when you're ready to come

        25    out -- there's no door for you to knock on.

```
 1          MS. DYBALA:  Mr. Friedman, who else would you

 2   like in the breakout room?

 3          MR. FRIEDMAN:  Attorney Eric Long.  And also with

 4   us appearing today is also co-counsel attorney Madelyn

 5   Grant.  Both of them.

 6          THE COURT:  Who?

 7          MR. FRIEDMAN:  Eric Long and Madelyn Grant, Your

 8   Honor.

 9          THE COURT:  Okay.  Fine.  Good.  Send Ms. Grant

10   and Mr. Long into the breakout room, and then,

11   Mr. Friedman, if you'll just wait a moment Melissa will

12   give you her phone number.  Take as much time as you want.

13                (A brief recess was taken.)

14          THE COURT:  Okay.  Mr. Friedman, how would your

15   client -- how does your client want to proceed?

16          MS. DYBALA:  Mr. Friedman, you're on mute.

17          MR. FRIEDMAN:  Your Honor, we are going to

18   proceed this morning.

19          THE COURT:  Okay.

20          MR. FRIEDMAN:  Attorney Long just indicated a

21   moment ago that he's going to get the family on the call

22   and probably put them --

23          THE COURT:  That's fine.  Yeah.

24          MR. FRIEDMAN:  And so let me, first off, thank

25   the government for its presentation and Your Honor for the
```

1   opportunity to address your concerns.  There's no question
2   that when hearing the recitation of the government's case,
3   it appears to be a difficult case, and that it is.  And so,
4   without minimizing it or trying to -- let's just accept it
5   as it is, and that is exactly why, at this point, Mr. Gupta
6   needs the highest level of lawyering.  Now, that is not to
7   say the highest level of lawyering means the best lawyers,
8   that's not what we're saying.  But what we're saying is it
9   would enable a lawyer to provide the most effective
10  representation.  So in that vein, I would simply say we all
11  know how difficult it is right now to confer with our
12  clients that are incarcerated.  We know that to be an
13  issue.
14          THE COURT:  Excuse me, if I understand correctly,
15  at least for the time being, you can't enter the
16  institution?
17          MR. FRIEDMAN:  That's correct, Your Honor.
18          THE COURT:  Has to all be by video?
19          MR. FRIEDMAN:  That's correct, Your Honor.
20          THE COURT:  Which is not -- go ahead.
21          MR. FRIEDMAN:  I apologize.  So it's very
22  difficult.  For instance, yesterday Attorney Long needed to
23  speak with Mr. Gupta but could not because we were unable
24  to get it scheduled in that amount of time.  Now, had he
25  been home under the conditions that Your Honor can impose,

```
 1    including that of electronic monitored house arrest, we
 2    obviously could do that.  But these are just the realities
 3    of Covid today.  And, frankly, while I had hoped that we
 4    would be nearing an end and with the transition back to
 5    court, I know that, Your Honor, in the Northern District
 6    we've been looking at an August start date, but with
 7    yesterday's spike being one of the highest numbered days of
 8    registered infections, I don't have any confidence that
 9    we'll be going back anytime soon.
10             THE COURT:  Excuse me, was that in Ohio?
11             MR. FRIEDMAN:  Yes, Your Honor.  I read this this
12    morning, it's nationally, but an uptick in Ohio.  It just
13    is what it is.  It's frustrating for many reasons, but as
14    it relates to Mr. Gupta, as Your Honor has recognized,
15    which, as you said you were going to have concern for
16    personal health until, you know, there was some milestones
17    with the recovery from this, I too have to do that as
18    someone who's very high risk because of an -- I'll just say
19    Crohns Disease and I'm on an immunosuppressant.  So I'm one
20    of those lawyers who's stuck home, and it's making it
21    incredibly difficult to confer.  So even if the institution
22    were to open up for some limited purpose, it still makes it
23    difficult --
24             THE COURT:  Apologize for interrupting, but where
25    are your offices, where's your home?
```

1          MR. FRIEDMAN:  Your Honor, we're in Cleveland.

2          THE COURT:  That's what I thought.  And -- okay.

3    You are closer to the facility, the Northeast Ohio whatever

4    it's called.  I'm just saying, as a practical matter, if I

5    were to deny your request, I could recommend to the

6    Marshals that he be detained there, or if possible in the

7    Cuyahoga County Jail.  I have no idea whether they take

8    federal inmates.  That's not -- it cuts the time in half,

9    but it still doesn't address the problem that you are

10   speaking to, I understand that.  The problem is in

11   detention it's going to be a lot more difficult to meet,

12   consult, confer and advise your client as things go along.

13   There's some things that may be shared, I assume whatever

14   videos might not be, but reports and so forth and so on.

15         The good thing, Mr. Friedman, is that I trust

16   you've already experienced in our division we do things

17   differently in terms of discovery.  Basically you will have

18   access, except the videos, you'll have to abide by the

19   descriptions of those I assume, at least if you -- if

20   that's -- if the government draws that line and you want to

21   try to cross it, by all means approach me.  I'm just saying

22   I assume that the government's not going to allow them to

23   be used, but maybe they'll let you view them if you want to

24   see one or two just to see -- or all 20 of the things.  But

25   aside from that, basically whatever the government's got

1  you're going to get.

2          MR. FRIEDMAN:  Yes, Your Honor.  And I will say

3  that the -- Your Honor's screen's not there, so I want

4  to --

5          THE COURT:  I understand.  I can hear you.  I

6  don't know what the problem is.

7          MR. FRIEDMAN:  I just wanted to make sure you can

8  hear me.

9          THE COURT:  I can hear you.  But before we get to

10  the hearing itself -- but go ahead.

11          MR. LONG:  Sorry to interrupt, but housekeeping,

12  Shraddha just entered, she's in a waiting room.  Whoever is

13  the host --

14          THE COURT:  Melissa, my screen is blank.  Is

15  there anything I can do about it?

16          MS. DYBALA:  Let's see, Judge.

17          THE COURT:  I haven't touched the screen.

18          MS. DYBALA:  Did a prompt come up to start your

19  video?

20          THE COURT:  It says low battery, that's my

21  problem.  I better hook up my battery.  Wait a minute.  I'm

22  going to have to move my location a bit.  Can you see me?

23          MS. DYBALA:  I can, Judge.

24          THE COURT:  I've got to plug in my cord.  I

25  thought I had plenty of battery on the IPad.

```
 1                Okay.  Tina, am I back in business?

 2                COURTROOM DEPUTY:  Yes, Judge.

 3                THE COURT:  If not, I'll switch to my computer.

 4      Go ahead.  Go ahead, Mr. Friedman.  Go ahead.

 5                MS. DYBALA:  If we can keep Mr. and Mrs. Gupta in

 6      a waiting room as well.  Thank you.

 7                THE COURT:  They're welcome to hear what's being

 8      discussed.

 9                MR. FRIEDMAN:  We may want to do that just so --

10                THE COURT:  I think that they should, so if

11      that's possible, Melissa, I mean, can you put audio into a

12      waiting room, or not?

13                MS. DYBALA:  Judge, you want them to be able to

14      hear but not necessarily see?

15                THE COURT:  They can see too.

16                MR. FRIEDMAN:  I'm okay with them coming in,

17      Melissa.

18                MS. DYBALA:  I will just put them in from the

19      waiting rooms.

20                THE COURT:  That's fine.

21                MS. DYBALA:  It looks like whoever was named Lata

22      has dropped out, so they'll need to resign in.

23                MR. FRIEDMAN:  Okay.  We're okay with going

24      forward.  Your Honor, who we have is Shraddha Gupta, so

25      this is our defendant's wife who has joined us this
```

1    morning.

2            THE COURT:  In an effort to replicate this the

3    best we can, by all means they're welcome to be present by

4    video as well as audio.  If you can, you can call upon them

5    to testify.

6            MR. FRIEDMAN:  So, Your Honor, just to reiterate

7    what I said briefly just for the -- so that Ms. Gupta also

8    knows where we are.  So in order to provide the most

9    effective representation, as we said, it would be helpful

10   to have access to our client.  And Your Honor's suggestions

11   or thoughts as to where he could be relocated, I don't know

12   whether or not -- I'm not familiar whether Cuyahoga County

13   Jail takes Federal prisoners.  In my experience I've not

14   seen that, but perhaps Assistant U.S. Attorney Skutnik

15   knows where the Federal -- it used to be in Euclid, but

16   they changed around with the contract, but I don't know

17   where locally they can be housed.  Ms. Skutnik, are you

18   aware of any local housing?

19           THE COURT:  What's the closest facility to

20   Cleveland where Federal detainees are presently held?

21           MS. SKUTNIK:  Your Honor, the U.S. Marshals have

22   a contract with the Cuyahoga County Sheriff's Office, so

23   the county jail, which is located at the Justice Center in

24   Downtown Cleveland is one location.  And there are also, I

25   believe, two local jails in addition to the main facility

1    in Youngstown.

2         THE COURT:  Okay.  One thing I would like to find

3    out from the Marshal Service, I have them doing that here,

4    I get daily updates on the Lucas County Jail and weekly

5    updates on the Covid situation at CCNO.  And were I to --

6    not to release him, I would want to, you know, find the

7    place that seems to have the best, quote, track record.  I

8    don't know whether he has any particular -- particular

9    medical needs.  I do not believe that he does according to

10   my recollection and the materials that I've read.  But if

11   they've got a problem in one facility but not another, if

12   it's an indication that one seems to be doing a better job

13   than the other, Mr. Friedman, I certainly would, to the

14   extent I'm able to do so, direct the Marshal Service to

15   place him in the place that's most convenient to you as

16   possible.  Realizing that, under the circumstances, until

17   they open up and allow visitors, it doesn't really matter

18   where he is.

19        MR. FRIEDMAN:  That's what I was going to say,

20   Judge.

21        THE COURT:  I understand that totally, and it's

22   not easy.  I do understand that.  Other lawyers have

23   expressed problems in our own county jail, you have to call

24   a recording and try to get a date and a time.  CCNO has

25   been pretty good with Federal prisoners, at least in terms

1    of accommodating our requests, even when they're

2    unexpected.  There's been one or two that's been pretty

3    short notice and they've been very cooperative, but that

4    may not be so elsewhere.  I understand.  Go ahead.

5          MR. FRIEDMAN:  Thank you.  I appreciate AUSA

6    Skutnik letting me know.  I've not been familiar with it,

7    but I think you're exactly right, Your Honor.  I appreciate

8    The Court's consideration should you determine that release

9    is not likely at this time, it may be best to keep him

10   where he is until it really matters as far as the

11   transfer's concerned.  I would say that as it relates to

12   The State prisoners anyway, Cuyahoga County Jail, we're not

13   going in there now or utilizing the new phone system, and

14   that's just been littered with problems also.  So at least

15   right now, once we can get the scheduling done we're able

16   to have communications.  It doesn't seem that there would

17   be an advantage to moving him –– at least to the county

18   jail now.  I'm not familiar with the other institutions,

19   again, what the contracts are, but we can certainly speak

20   with the government and address that should this motion be

21   denied.

22          But I will say, Your Honor, that, again, when I

23   hear the recitation of the facts by the government, it is a

24   difficult matter.  I don't want to get into more and

25   contend that the defense is complete right now.  We've just

1    started on all of that, and we're not willing today to say

2    that -- to accept the facts alleged as -- as those that

3    will be proven at trial, of course.

4          And, you know, I will say that the morning that

5    this happened there were a couple of very specific concerns

6    that you had.  And the government raised the issue of the

7    comments that led the agents to -- to express concerns over

8    his safety, his self-proclaimed statements as to whether or

9    not he was going to harm himself.  I think what's important

10   to notice is after the search, both he and his wife were in

11   the car headed to an attorney's office.  Their resolve has

12   always been to fight this case.  There has not been any

13   sort of mental health history or any documented attempts at

14   any self harm.  Now, of course, this being the first time

15   anything like this has happened, that morning there were a

16   good number of agents that came through very early in the

17   morning.  And -- and the concern -- at that point there was

18   more kind of a shock and awe effect on him.  These are the

19   things that were said, but these are not concerns that the

20   family has, and that's why we have them here today.

21   Attorney Long is prepared to have questions posed to them

22   and also open to The Court and the government because,

23   number one, they are aware of the nature of the charges.

24   And Your Honor did state a moment ago as to the policy as

25   to the evidence that will be exchanged typically in these

1    cases with video.  I will say that to date the government

2    has provided quite a bit, and I apologize, I just don't

3    know at this time.  That might be a conversation with the

4    government and Attorney Long, I want to be very clear I'm

5    making that comment from the side.

6         But the family is aware of the nature of this

7    evidence, and, yet, still support him.  He does not have a

8    passport.  There's no other domicile.  There's no evidence

9    that he's any greater risk of fleeing, as you said.  Your

10   concern, however, was with suicide.  You know, it's -- we

11   can argue that, you know --

12        THE COURT:  Well, it's also, quite candidly, it

13   is the mandatory minimum, and the potential for a guideline

14   range begins at 360.  I think as you shop around you'll

15   find out -- find out my attitude towards the guidelines.

16   That's all I'll say.

17        MR. FRIEDMAN:  Understood.  And Your Honor, when

18   you have a case like that, there's decisions that need to

19   be made at a later time as to whether to proceed to trial,

20   continue negotiations, enter a plea.  We know -- any

21   defense lawyer knows that you're not only going to need

22   consultation with counsel, but you're also going to need

23   consultation with your family.  When someone has to make

24   those sorts of decisions, one of the critical issues is

25   speaking with their wife, speaking with their kids, how is

1    this going to affect their kids.  Yesterday I did have the

2    opportunity to speak with their son, and the questions that

3    were asked are only questions that the father can answer in

4    getting his family prepared.

5            The sale of the practice, they've been trying to

6    do that but there are a lot of outstanding issues, business

7    issues that need to be dealt with if they're to get a fair

8    sale for that.  We're not handling that.  Civil counsel is.

9    We've been working with civil counsel.  The person that can

10   answer all of those questions obviously is on this call

11   here.  So there are certain things that, should this case

12   resolve prior to trial, there are certain things that need

13   to be taken care of to ensure that his family is left in

14   the best financial setting -- standing that they can.  He's

15   the one that's able to do it and cannot do it now near as

16   effectively as he could if he were out.

17           This case, Your Honor, I don't know where we're

18   going to go.  It's very frustrating because I did mention

19   the spike.  And in answer to your question, you had asked

20   me if it was Ohio, and in the very short break that we just

21   took, we did pull up the Cleveland.com article from today.

22   And this was our own -- so we had 729 new cases reported

23   Monday, which is the highest single day increase since 731

24   cases on May 21st.  I just wanted to make sure I got you

25   those numbers.

 1          THE COURT:  After a number of months a -- the

 2     potential upward trajectory is starting off, as it were,

 3     where we left off.

 4          MR. FRIEDMAN:  It is, and that's frustrating, but

 5     we can talk about that for days because I certainly am

 6     frustrated with it.

 7          But that said, Your Honor, I would also like to

 8     talk about Shraddha, which is his wife on the call.  And

 9     again, I understand the concern the government has with

10     what was perceived by an employee as intimidating.  With

11     the facts that were known that morning, and not really

12     knowing the facts that were there, she was not really

13     talking about the facts that we're dealing with here today.

14     And I think the question that -- Mr. Long will talk about

15     that here this morning as to what this was all about, but

16     at the end of the day we have wife, mom and dad accessible

17     here today to talk about the location, their commitment to

18     supervising, their added responsibilities that they would

19     be taking upon themselves, what they know about the

20     allegations at this point.  Sometimes we all know that

21     someone walks into court and kind of shake their head when

22     they hear what the real facts are.  But we've had these

23     discussions with the wife, and the kids are there, and this

24     is, frankly, something that's going to facilitate the

25     resolution of this case should it be warranted, or, if not,

1    it will allow counsel to effectively prepare for a trial.

2    So that's really where we are.

3         Difficult allegations, and that's why it requires

4    that much more attention in this case.  And right now if

5    you were to say to me, Mr. Friedman and counsel, are you

6    guys confident that you can be ready, the -- well, we can

7    certainly be ready, any experienced counsel can be ready,

8    but I'm not confident that we would be ready to the extent

9    necessary.  We could sound fine and he'd get a trial, but

10   am I confident that it's the trial that he and every other

11   defendant deserves, no, not under these circumstances.  And

12   that's no one's fault, we're just where we are.

13        THE COURT:  Of course the problem with even

14   contemplating trial, you do not want to be in a situation

15   where even if we could accommodate 14 jurors, socially

16   distanced in our courthouse, which is not, I believe,

17   geographically spatially possible.  I don't know if you've

18   been to the courthouse in Toledo, but opened in 1934, it's

19   the last probably of the great classic designs, but we have

20   one courtroom.  It's a one Judge court, and we now have --

21   we're about to have six or seven judges, but we have one

22   courtroom.  And it's not like the courtrooms in Cleveland.

23   It's smaller than a magistrate's courtroom is today.  And

24   the other thing, what defense lawyer wants to have a

25   witness who's sitting with a mask on --

```
 1            MR. FRIEDMAN:  You can't.

 2            THE COURT:  -- or jurors sitting with a mask on.

 3     And who knows, I mean we are opening August 1st, but as you

 4     say, I know that at least one of my colleagues has a very

 5     substantial reservation -- former defense attorney Judge

 6     Helmick, very substantial reservation about conducting even

 7     civil jury trials, much less criminal cases.  And I should

 8     mention that were the case to go to trial, I would not try

 9     it because, as you may or may not know, I do not live in

10     Toledo anymore.  I haven't for three-and-a-half years.  I

11     return a week a month, have been returning a week a month.

12     That's been since March.  I haven't been there since the

13     first week of March.  And I've notified both -- both my

14     colleagues in our court that I would -- and also note to

15     prosecution and defense bar of my intention not to return

16     until it's either contained, controlled or available -- but

17     in any event, if this case went to trial, it would take a

18     lot longer than two or three days that I might otherwise

19     have.  So I would be -- it would go either to Judge

20     Helmick, Judge Knepp or Judge Zouhary, I just wanted to let

21     you know down the road.  And even then -- situation is such

22     that I don't feel comfortable going back.  You might not

23     feel comfortable going into a courtroom, especially one

24     that is as contained as ours is, fairly antiquated HVAC

25     system, so forth and so on.  So there are just looking
```

1    ahead, I don't know what we'll do.  Maybe consider changing

2    the venue to Cleveland, grand jury meeting there, much more

3    spacious courtrooms.  I think they're better able to

4    accommodate a 14 person jury, panel of venire, case like

5    this it would probably be quite large.  I would estimate at

6    least 60, maybe more.  Just given the nature of the charges

7    and the concerns we're going to have picking a jury to get

8    jurors who truly can only hear the evidence and nothing but

9    the evidence, and get past what some of it might portray to

10   be to determine whether or not the government's met its

11   burden.  So I'm just thinking those concerns through right

12   now as we talk.

13        In any event, go ahead.  To return to the topic

14   at hand, basically it's an impediment -- substantial

15   impediment, impediments that detention would cause to your

16   ability to do your job as an attorney.  Very substantial, I

17   understand.

18        MR. FRIEDMAN:  So Your Honor, when I hear you say

19   that, the one principle that really leaps out to me is that

20   which you raised at the onset of this call, which is the

21   presumption of innocence.  And where we are right now, it's

22   going to -- potentially it could -- I mean, we're already

23   at an extended period, but this could go on for quite some

24   time.  Whether it's a year, two years, whatever it is, we

25   have someone that's presumed innocent sitting there right

```
 1    now who has every right to get prepared the best he can.
 2    And a person presumed innocent should be entitled to have
 3    the access that we've all envisioned since the beginning of
 4    justice and jurisprudence.
 5            I will say in response to your concerns of the
 6    courtroom, every Wednesday we have all of the judges hold,
 7    at our levels of court, including Chief Judge Patricia
 8    Gaughan, talkings about The Court, so -- and I know that
 9    The Court is set to open at the beginning of August;
10    however that's at the earliest, as I understand it, because
11    you and the other judges are going to consider that.  And
12    we just don't know where we're going to be with this --
13    with this subject.
14            I will tell you that you raised an excellent
15    point as to whether or not the trial can really be done
16    honoring all of the protections that are to be afforded all
17    parties in a courtroom, not just the defendant.  Back a
18    number of months ago I was brought in to study a case --
19    the first trial that was brought forward in Ashland, Ohio.
20    It was a state case.  And they took all of the precautions
21    that they thought were necessary.  However, in just being
22    there for the short while with N95s and neoprene and
23    everything else, we saw the trial could not be conducted to
24    keep people safe and honor the rights of everyone in the
25    courtroom, and everyone includes prosecutors, defense
```

1   lawyers, court reporter, deputies, everyone.

2           And so we authored a report, which is 92 pages,

3   at the time that talks about everything from being able to

4   see faces, getting clear masks, plexiglass, everything, and

5   putting jurors in different rooms, I don't see this

6   happening anytime soon.  You're talking to me, Ian

7   Friedman, that's my personal opinions, certainly the

8   closest I get to being a doctor is my J.D.  But I've

9   watched it now, and I just don't see it.

10          And it comes back to Mr. Gupta at this point.

11  This could be a long time that this is going on, and to no

12  fault of anyone's.  He does deserve access to counsel in a

13  way that allows him to prepare, not just mere access, but

14  effective access.  But he is as innocent as anyone else at

15  this moment in time.

16          THE COURT:  Let me ask you one thing that's of

17  significant concern.  If I take as security, to assure his

18  appearance, the assets that have been offered, and if he

19  were -- obviously if he would flee I can seize them.  If,

20  however, he were to commit suicide, I would like

21  confirmation that I can seize those -- that -- I mean, I

22  assume -- I mean, it stands to reason a nonappearance is a

23  nonappearance.  When it comes to one's own hand, does that

24  somehow eliminate the security?  I don't think it does, but

25  I would like to have that confirmed either by the

1   government or yourself at some point along the way.

2          MR. FRIEDMAN:  I believe that that began to be

3   addressed, and Assistant U.S. Attorney Tangeman sent an

4   email Sunday that I did review, and perhaps those questions

5   are posed better for Attorney Long and Attorney Tangeman as

6   they were addressing the issue.

7          THE COURT:  Let me hear from her first and then

8   from your colleague.

9          MS. TANGEMAN:  Your Honor, I did send an email to

10  all parties.  We did research the issue, per The Court's

11  request.  It does not appear to the government that you

12  would be able to seize these properties in the event of

13  suicide.  There aren't many cases on this issue, but the

14  one case that we did find, The Court actually had only

15  ordered $35,000 of the 75,000 posted to be seized, and they

16  were reversed by The Fifth Circuit finding that forfeiture

17  in excess of $10,000 was an abuse of discretion because the

18  defendant's body was discovered less than a day later on

19  his ranch.  In other words, the government didn't have to

20  expend a lot of resources to locate him.  And that's what

21  the analysis tends to revolve around is how long or how

22  many resources it takes for the government to find the

23  defendant.  Again, most of the time that's because they've

24  taken off.  And so spending months and months trying to

25  locate someone is why that test was created.  But what

```
 1    these cases have reiterated is that bond is not punitive.
 2    So in the event that there is a suicide, I think that The
 3    Court would be reversed if it tried to seize all of these
 4    properties.  I mean, it may be that you could seize a
 5    little bit, 10,000 would seem to be reasonable in the Parr
 6    case, The Fifth Circuit case.  But I don't -- I don't
 7    believe that The Court would be on solid footing with an
 8    Appellate Court if -- if this Court operated under the
 9    assumption that all properties, or even an entire
10    residential or business property, could be seized.
11              THE COURT:  Okay.  Well, Mr. --
12              MR. LONG:  Your Honor, if I can --
13              THE COURT:  Mr. Friedman, you've heard about this
14    yesterday, and I've heard about this now, and obviously I
15    want to give you plenty of time to respond or be heard
16    further on it, as expeditiously as possible.  I just don't
17    know.
18              MR. LONG:  Your Honor, if I may on that
19    particular issue.  Ms. Tangeman certainly did send over --
20              THE COURT:  And just for the court reporter --
21              MR. LONG:  I'm sorry, Your Honor.  This is
22    Attorney Eric Long on behalf of Dr. Gupta.  Your Honor, I
23    reviewed the cases that were sent over by the government.
24    It's our position, we agree with the analysis, and that The
25    Court, based purely on his own action, probably is limited
```

1    in what can be forfeited.  However, I did some research to

2    determine whether or not that's an issue that's waiveable

3    by somebody that's set to inherit those assets.  I have not

4    found anything to prohibit the family from entering into

5    some sort of an agreement or an acknowledgment

6    understanding that if there were to be a suicide that they

7    would waive the ability to challenge the forfeiture.  I

8    think that under the law they would be able to do that,

9    and, again, that could serve as significant motivation for

10   Dr. Gupta who, again, we'll get into later, has not shown

11   any personality traits along the lines of suicidal

12   ideations.  But that may give The Court some comfort, and

13   it would take some time to determine how to execute a

14   waiver of that forfeiture issue.  But I anticipate that the

15   family would be comfortable in consenting to that.  If The

16   Court were inclined, we'd be able to hash that out.

17          THE COURT:  Candidly that possibility occurred to

18   me.  I just don't know the answer to either of those

19   questions.

20          MR. FRIEDMAN:  Your Honor, if I may, this is Ian

21   Friedman for the record.  It is something that -- however,

22   I think it would be prudent that if that were something

23   that The Court were willing to -- or would encourage us to

24   look further into, I would recommend that Mr. Gupta's wife

25   and parents consult with outside counsel who only have

```
 1    their interest at hand.  I would not like for any sort of
 2    waiver to later be challenged because there was some sort
 3    of duel representation alleged by outside counsel.  So it's
 4    something we can do quickly.  They do have civil counsel.
 5    I don't expect that that would take more than a day or so
 6    to advise them on.  I do know that they would be willing to
 7    do that.  I just don't feel comfortable with our firm
 8    making that representation.
 9              THE COURT:  Let me ask you this, how old are the
10    children, do you know, are they all adults?
11              MR. LONG:  They're adults.  Both adults, college
12    age.
13              THE COURT:  Okay.  And how many are there?
14              MR. FRIEDMAN:  There's two children, Your Honor.
15              THE COURT:  Okay.
16              MS. TANGEMAN:  And Your Honor, just so the
17    record's clear, not all of these properties are in the
18    defendant's name.  So just so we're clear, the defendant
19    does not own the majority of the properties that he's
20    putting up, his house, his business, and all of the rental
21    properties are -- I believe his business is 1 percent in
22    his name, so --
23              THE COURT:  Well, but, you know, it's -- it's --
24    at least it's been my custom if grandma wants to post the
25    house, the fact that it's not owned by the -- candidly
```

1    where a custodian is putting up -- accepting not only

2    responsibility to do all they can to see to it that

3    defendant will appear and not be a danger, where there is a

4    financial stake, that, after all, is the original concept

5    of bond.  I'd put up my money as a pledge that he will

6    appear, even though bonds barely get forfeited in state

7    court, but I certainly have, as I think you're well aware.

8    In one instance $850,000 wound up --

9            MR. FRIEDMAN:  Judge, I'm sorry, Your Honor, but

10   that's the nature of the bond.

11           THE COURT:  Right.

12           MR. FRIEDMAN:  And then you want the pressure

13   being on the defendant not to violate, but the loved one,

14   who is the guarantor of the bond, is not deprived of their

15   home and money.  So the less interest he has, the stronger

16   his incentive to not flee or harm himself.

17           THE COURT:  And also it gives the custodians an

18   added measure, as it were, investment in seeing to it that

19   the defendant appears because their own welfare's at stake.

20           MR. FRIEDMAN:  So Your Honor, I think that we've

21   pretty much addressed the issues here.  However, the family

22   is here and Mr. -- if it please The Court, Mr. Long is

23   prepared to allow you to hear from them as to their

24   commitment to assure his appearance at court.  So thank

25   you, Your Honor.

1          So Eric, if you wouldn't mind, and Shraddha, if

2     you wouldn't mind taking yourself off of mute --

3          MS. TANGEMAN:  Your Honor, before we do that, I

4     would ask, actually, that the custodians, the remaining

5     ones go into a waiting room because the government would

6     like to question them, so we ask for the separation of

7     witnesses.

8          THE COURT:  That's a fair request.

9          MS. TANGEMAN:  Thank you.

10          THE COURT:  So Melissa, if you'll put the other

11    two family members into a waiting room.

12          MS. DYBALA:  Yes, I will.

13          THE COURT:  And also let me, if they can still

14    hear me, you should not discuss whatever your testimony is

15    likely to be between the two of you, okay.

16          MS. TANGEMAN:  Okay.

17          THE COURT:  You may proceed.

18          COURTROOM DEPUTY:  I've got to put Ms. Shraddha

19    under oath.

20                    SHRADDHA GUPTA,

21    was herein, called as if upon examination, was first duly

22    sworn, as hereinafter certified, and said as follows:

23          THE COURT:  Good morning.  I'm obviously The

24    Judge.  Can you tell me your name, please?

25    A.       My name is Shraddha Gupta.

```
 1              THE COURT:  How do you spell your first name for
 2   the court reporter, please?
 3   A.        S-H-R-A-D-D-H-A, last name Gupta.
 4              THE COURT:  And what is your relationship to the
 5   defendant?
 6   A.        I am his wife.
 7              THE COURT:  And how long have you been married?
 8   A.        We've been married for 23 years.
 9              THE COURT:  Okay.  And you have two children?
10   A.        I do.
11              THE COURT:  What are their names, if you can
12   spell them for the court reporter, and their ages, please?
13   A.        Sure.  My oldest is a son.  His name is
14   Kaartikeya Gupta, K, as in kangaroo, A-A-R-T-I-K-E-Y-A,
15   last name Gupta.  And my daughter is Ishani, I-S-H-A-N-I,
16   Gupta.  My son is 21 years old, and my daughter is 19.
17              THE COURT:  Okay.  Very well.  Mr. Long, you may
18   inquire.
19              MR. LONG:  Thank you, Your Honor.
20                        DIRECT EXAMINATION
21   BY MR. LONG:
22   Q.        Again, this is Attorney Eric Long.  Shraddha,
23   thank you for being here today.  I want to just talk with
24   you briefly about your knowledge, overall, of the charges,
25   and your commitment to serve as a custodian in this case if
```

1    Manish is to be released.  If you have trouble hearing me,

2    certainly let me know, okay?

3    A.        Sure.

4    Q.        Thank you.  Shraddha, are you aware of the nature

5    of the charges against your husband?

6    A.        Yes, I have discussed it with you and

7    Mr. Friedman.

8    Q.        Okay.  And are you aware of --

9              THE COURT:  Excuse me, Mr. Long.  Let me

10   interrupt.  Mrs. Gupta, I have to advise you, do not

11   discuss, say anything about anything that you've talked to

12   your -- to your lawyers about, okay, or your husband,

13   unless the lawyer says it's okay for you to answer.

14   A.        Okay.

15             THE COURT:  And I'm going to strike that last

16   portion of her answer so that there's no risk or danger --

17   was obvious an uninformed response, and I don't want that

18   to be an open accessory to -- breached everything else that

19   you've discussed as a lawyer, okay.

20   A.        Thank you.  I'm sorry, Your Honor.

21             THE COURT:  And I'm positive that the government

22   attorneys do not view that as a breach that would open the

23   door to them coming in and grilling you about everything

24   you told the lawyer and the lawyers told you.  Just -- do

25   you understand I'm trying to give you assurance, and us

1    assurance about that, and there is clearly uninformed or

2    uncounseled expression of what you may have discussed with

3    Mr. Friedman or your husband.  You can answer questions

4    that you are aware of without having to disclose how you

5    happen to be aware, okay?

6    A.        Okay.  Thank you.

7              MR. LONG:  Thank you, Your Honor.

8              THE COURT:  Mr. Long, go ahead.  No problem.

9    BY MR. LONG:

10   Q.        I'm not getting into how you learned or what

11   conversations you've had.  Are you aware of the nature of

12   the charges against your husband?

13   A.        Yes, I am.

14   Q.        And are you aware of -- that the potential

15   consequences include a long incarceration?

16   A.        Yes, I am.

17             THE COURT:  Let me also say, ma'am, that this

18   morning, I don't know if you were logged on or not, I had a

19   conversation with the government to determine what the

20   guideline range would be.  Sentencing guidelines are a

21   calculation of various factors and the starting point for a

22   sentence for a Judge to determine what sentence is suitable

23   and appropriate in a given case.  And as you probably are

24   aware, if your husband were convicted of either of these

25   charges, my understanding I would have no option, no

```
 1    alternative with the sentence, that it would be 15 years in
 2    prison, it would probably be 12-and-a-half years, or
 3    whatever, of actual time being spent in custody.  However,
 4    under the guideline range, the government, in my
 5    conversation with it, has indicated the guideline range
 6    could be as much as 360 months, 30 years, which would
 7    probably be about 25 years, both are a very long time,
 8    okay.  Unimaginable.  I simply want you to understand that,
 9    as it presently appears, there is a potential that I or any
10    other sentencing judge would have to take into serious
11    consideration a sentence at the low end of the 360 months.
12    I can decide, at my discretion, to go lower.  We cannot go
13    lower than 15 years, 180 months.  I just want you to
14    understand that situation, because, of course, that kind of
15    time for anybody at any age contemplating what that would
16    mean would be an inducement to flee.  To be honest with
17    you, if somebody told me -- I'm a bit older than your
18    husband, but nonetheless, if anybody is 25, 50 or 80 being
19    told potentially that's what could happen, that raises a
20    significant temptation, how am I worse off, if I flee
21    successfully, will I have that much freedom.  If I get
22    caught, well, the worst is a condition of five years on the
23    bond hearing plus the loss of everything that's been posted
24    as security.  Do you understand that?
25    A.        I do, Your Honor.
```

1           THE COURT:  I'm not trying to frighten you at

2     all.  I'm sure you're frightened enough as it is, anybody

3     would be in your situation.  I'm just trying to explain to

4     you so that you contemplate the responsibility that you

5     would be accepting as the custodian to assure his

6     appearance.  I want you to understand the potential

7     consequences of why anybody would be tempted to walk out

8     the door and give it a try, even abandoning his family or

9     potentially rendering them destitute.  So if you take the

10    fact of that into consideration, whether that's what you

11    want to put at risk by assuming the responsibilities as

12    custodian.  Do you understand what I've said?

13    A.        I do, Your Honor.  And thank you for explaining

14    that.

15          THE COURT:  That's the only reason I'm saying

16    that to you.

17    A.        Yes.

18          THE COURT:  Mr. Long, go ahead.

19    BY MR. LONG:

20    Q.        Thank you, Your Honor.  Mrs. Gupta, as The Court

21    advised just now, you understand that serving as the

22    custodian would require you to abide by the terms and

23    conditions of the release that could be imposed, as well as

24    doing your due diligence to assure that your husband is

25    complying with those rules as well, correct?

1    A.        Yes, I do.

2    Q.        And is that something that, knowing what is at

3    stake, both financially and potentially personal

4    consequences against you if you were to not abide by those

5    rules or inform The Court or the government if there was a

6    violation of those rules, you still want to move forward in

7    that capacity?

8    A.        Yes, I do.

9    Q.        Can you, very briefly, without breaking down the

10   numbers and whatnot, just describe the process as far as

11   the financial -- that you have offered, just categories of

12   property that you've offered to be secured and understand

13   that it could be forfeited if your husband were to not

14   appear for trial?

15   A.        Yes.  So the things that we've offered are in two

16   categories.  One is related to Manish, and one is related

17   to what may be joint.  They're under the business we have.

18   And I'm going from memory, so if you'd like me to look at

19   my notes, I can.  From memory, it is all of the assets that

20   are in his practice, his medical license, his 401K and --

21   and then his liabilities that he has.  So obviously the

22   assets are the ones that I described earlier.  And then

23   from a joint perspective, obviously it's the physical

24   assets of the building.  I've offered my home.  And then

25   the rest of it are the liabilities that we have in terms of

1   living expenses, so yeah.

2   Q.      And those assets and those liabilities and the

3   break down were provided to me?

4   A.      Yes, correct.  You're breaking up, Mr. Long, but,

5   yes, they were provided to you, and the details and all of

6   the documents that related to those numbers were also

7   provided, along with bank statements.

8   Q.      And you had an attorney assist you in preparing

9   those documents and reviewing the categories of assets and

10  the numbers?

11  A.      I did.

12  Q.      He's provided you with a letter indicating that

13  he has reviewed those documents and signed off to the

14  accuracy of those, correct?

15  A.      Yes, Mr. Long, he did.

16          MR. LONG:  And for the record, those were

17  provided to Ms. Mendoza through Pretrial Services as well

18  as to the government.

19          THE COURT:  And what is the proximate total

20  value, to the best of your understanding, Mrs. Gupta, just

21  an estimate?  I understand the market is fluctuating and

22  you can't be accurate to the penny, but your best

23  understanding conservatively?

24  A.      There's several million dollars on his practice.

25  There's the ER, which is 4.4 million assets and medical

1    license is about six or 700,000.  And his 401K is

2    1.1 million.  And then on the personal side, my house is

3    700,000.  The property that is the office building, along

4    with his -- his other office is 2.23 million.  Those are

5    his assets.

6              THE COURT:  And then there's rental property as

7    well as I understand it?

8    A.        That is correct, Your Honor.  That is

9    approximately 500,000.

10             THE COURT:  All of the rental properties?  I

11   understand that there is more than one.

12   A.        Yes.  Yes, Your Honor, there are three, and

13   they're valued in total at about 515,000 I believe.

14   Q.        Who owns the rental properties, Shraddha?

15   A.        They're owned by both my children.

16   Q.        Is that through an LLC or personally?

17   A.        Through an LLC.

18             THE COURT:  Let me ask you this, quite candidly,

19   if the husband were to commit suicide, it's an open

20   question in the law as to whether or not his nonappearance

21   would trigger the government's right to seize the

22   properties that would be put up, the ones you just

23   enumerated.

24   A.        Correct.

25             THE COURT:  And it's also an open question

1    whether or not you and any other beneficiary, anybody else

2    with an interest in those properties, within or outside the

3    family, would have to -- it's an open question whether you

4    can waive your right to contest seizure.  Are you following

5    what I've said so far?

6    A.        Yes, Your Honor.

7              THE COURT:  In other words, the government would

8    request a judgment of forfeiture, which, if I were to enter

9    it, would cause the property -- the ownership of the

10   property to come into the government's hands and cutting

11   off ownership right.  And that's the way it would work if

12   somebody fled, absconded, and that's quite clear.  But the

13   law is uncertain, at least as to whether or not the

14   government could seize that property following a

15   self-inflicted, you know, conduct on the part of the

16   defendant himself which could not be remedied by capture,

17   bond jumping or so forth, but if the defendant would commit

18   suicide, whether the government could request forfeiture of

19   all the property or only a portion of it.  It's my

20   understanding, more likely than not, it would just be a

21   portion of it.  But the question Mr. Long had raised in our

22   conversation earlier, and I indicated it had occurred to me

23   is, well, can the person who has -- those people who have

24   an interest of any kind whatsoever in the property agree

25   that they will not contest the forfeiture of it, the

 1   government's taking of it in the event that the defendant

 2   were to commit suicide.  In other words, give up whatever

 3   right you might otherwise have to say, oops, you can't take

 4   that.  You understand what I'm saying?

 5   A.          I do, Your Honor.

 6           THE COURT:  There'll be ample opportunity to

 7   discuss this with other counsel.  And Mr. Friedman and

 8   myself were talking about that, but you'll seek guidance of

 9   independent counsel if I were to release your husband that

10   a condition on release on a non-contestable, currently

11   binding -- you understand?

12   A.          I do, Your Honor.

13           THE COURT:  I'm not asking you for a decision on

14   that now.  I'm just making clear that that's a concern that

15   I have.  If I were to release your husband, I want the

16   financial security to be real, not sort of -- or not really

17   there no matter what -- okay.

18   A.          Thank you, Your Honor.  Thank you for taking the

19   time to explain it.

20           THE COURT:  Absolutely.  That's my job.

21   Mr. Long, go ahead.

22   BY MR. LONG:

23   Q.          Mrs. Gupta, I want to turn your attention now to

24   your understanding of this Court's admonishment to you and

25   other family members at the previous pretrial.  What is

1  your understanding of -- let me put it this way, you

2  understand that any attempts to reach out to victims or

3  witnesses in this case carries potential consequences,

4  including your own criminal activity if you're found to

5  have intimidated or interfered with the operation of

6  justice in any way, correct?

7  A.        Yes, Mr. Long, I do.

8  Q.        And if your -- let me put it this way, you would

9  agree then, whether your husband is released or not, that

10  you are not going to reach out to anyone involved in this

11  case other than lawyers, correct?

12  A.        Yes, I agree.

13  Q.        There's been some conversation -- strike that.

14        Again, going through, having discussed what's

15  been discussed here today, is it still your wish to move

16  forward, offer the property as security for the release and

17  to serve as the custodian to assure that your husband does

18  appear where he needs to appear and follows any rules

19  imposed by this Court?

20  A.        Yes, sir, it is.

21  Q.        Thank you.

22        MR. LONG:  Your Honor, I don't have any further

23  questions.

24        THE COURT:  Ms. Tangeman, the government may

25  inquire -- actually, let's take a very short break, okay.

1    I want to get some coffee, if you want to step out and do

2    the same.  Let's take a break.  Okay, so about five

3    minutes.  It will be pretty short.  If you need more than

4    that, just let Melissa know.

5                    (A brief recess was taken.)

6                    MS. TANGEMAN:  Your Honor, may I proceed?

7                    THE COURT:  Of course.  I apologize for the

8    delay.  I actually had a call come in that I had to take.

9                         CROSS-EXAMINATION

10   BY MS. TANGEMAN:

11   Q.        Good morning, ma'am.  You mentioned you've been

12   married to your husband for 23 years; is that correct?

13   A.        That's correct.

14   Q.        And that would be -- that 23 years, has that all

15   been spent in this Sylvania home as well?

16   A.        That is not correct.  We moved here from -- we

17   lived in different places.

18   Q.        Okay.  And the time that you have lived in

19   Sylvania in your home, you have been there even before 2006

20   and through up to today; is that correct?

21   A.        We were in Sylvania before 2006, but not in this

22   house, yes.

23   Q.        And how long have you lived in this particular

24   house in Sylvania?

25   A.        I don't remember the year, but it's been more

1    than ten years.

2    Q.        And how much money do you still owe on the house?

3    A.        About 270,000.

4    Q.        You work; is that correct?

5    A.        That is correct.

6    Q.        And you work at -- is it Owens or OI?

7    A.        Owens Corning.

8    Q.        And what is your position there?

9              THE COURT:  Ms. Tangeman, may I interrupt, maybe

10   put it this way, Mrs. Gupta, now that your husband is,

11   whether released or not, not likely to have an income,

12   certainly nothing as he had before, what are your monthly

13   mortgage, principle, interest and tax payments; and how

14   certain are you that you are going to be able to maintain

15   those and other living expenses that you and your family

16   are going to encounter?

17   A.        Yes, Your Honor.  Obviously it is -- it is a big

18   change, and I have lot to figure out.  I just refinanced my

19   house, so my monthly payment's a lot lower, 2,700 a month.

20             THE COURT:  Turned into a 30 year mortgage or

21   whatever?

22   A.        I'm sorry, can you please repeat your question?

23             THE COURT:  Thirty year mortgage or whatever it

24   was, to reduce the payments?

25   A.        Correct.

```
 1              THE COURT:  What is your own income where you

 2   work?

 3   A.         I earn 173,000 a year.

 4   Q.         I'm going to ask you quite directly, are you

 5   confident that, barring other unforeseen circumstances,

 6   this situation -- what, if any, consequence upon your own

 7   employment do you anticipate might be possible from the

 8   fact of your husband's arrest and so forth, the charges?

 9   A.         I'm sorry, Your Honor.  Let me repeat what I

10   understood.

11              THE COURT:  Let me restate --

12   A.         Are you asking -- okay.

13              THE COURT:  What sort of jeopardy would you be

14   in, so far as you are aware, as a result of the charges

15   against your husband?

16   A.         I am not aware, Your Honor, of any repercussions

17   to me as a result of this.

18              THE COURT:  Do you know those with whom you work,

19   or those with whom you report are aware of your husband's

20   situation?

21   A.         Yes, Your Honor.  There are a few people who are

22   aware.  It was pretty public.

23              THE COURT:  I can understand.  So with that

24   income I gather that you can maintain the household?

25   A.         Yes, Your Honor, that's my intent.
```

```
 1              THE COURT:  Okay.  Ms. Tangeman, go ahead.  You
 2   may have been headed there.
 3              MS. TANGEMAN:  Thank you.
 4   BY MS. TANGEMAN:
 5   Q.        And ma'am, what is your actual work schedule for
 6   OI (sic)?
 7   A.        I work full time.  I work, you know, the typical
 8   hours are 8:00 to 5:00.
 9   Q.        Monday through Friday?
10   A.        That is correct.
11   Q.        And obviously once the Covid situation resolves
12   itself, you would actually be reporting to work Monday
13   through Friday 8:00 to 5:00; is that correct?
14   A.        We -- Ms. Tangeman, we have not been told when we
15   would return to work, or if we ever will return to work in
16   the way it was normal before.  Currently I work outside the
17   home one day a week.
18              THE COURT:  Excuse me, Ms. Tangeman.  Just
19   curious, what do you do, what is your job, what do you do?
20   A.        My responsibilities are in supply chain, so I
21   manage the supply chain for our business.
22              THE COURT:  Go ahead, Ms. Tangeman.
23   BY MS. TANGEMAN:
24   Q.        And ma'am, if and when you are to leave the
25   house, would it be fair to say that there would be no one
```

 1   else present then in the home; is that correct?

 2   A.        Ms. Tangeman, we have -- we have my mother-in-law

 3   and father-in-law and my son all as custodians if you would

 4   be willing to grant, Your Honor, so there will always be

 5   somebody at home.

 6   Q.        And I -- and I guess, going back to my question,

 7   though, in terms of who resides in the home, it would just

 8   be you and your husband; is that correct?

 9   A.        That is correct.  For the summer my son is home

10   as well.

11   Q.        And when you say the summer, where will he be

12   going back to in the fall?

13   A.        To Chicago.  He goes to school there.  However,

14   we don't know if it will be online or not yet.

15   Q.        And your -- your other child -- so both of your

16   children would not -- they are not, at least under normal

17   circumstances, residing in the home year round; is that

18   correct?

19   A.        That is correct.

20   Q.        In fact, they're not even residing year round in

21   Ohio; is that correct?

22   A.        That is correct, yes.

23   Q.        Now, you told agents when they came to your home

24   in March of this year that, in fact, your husband had been

25   on anti-depressants just last year; is that correct?

```
 1   A.        Yes, he -- he was on some medication I believe.

 2   Q.        Well, not just medication, but anti-depressants,

 3   is that right?

 4   A.        I don't know the medication name so I -- I know

 5   that he was on something.

 6   Q.        I guess my point is, you described him as being

 7   quiet and sad and stating that he did not know why he felt

 8   sad all of the time, and you urged him to go talk to

 9   someone about it.  Do you recall telling the agent that?

10   A.        Yes, I do.

11   Q.        So fair to say you then told the agents that he

12   began taking Lexapro, which is an anti-depressant.  Do you

13   recall telling the agent that?

14   A.        I did tell the agent that he took Lexapro, but I

15   am sorry I did not know that it was an anti-depressant or

16   anti-anxiety, yes, ma'am.

17   Q.        Well, you obviously knew it was because he was

18   sad and quiet all the time, correct?

19   A.        That is correct?

20             THE COURT:  Excuse me, but you did not -- you did

21   not tell the agents specifically Lexapro, comma, an

22   antidepressant, period; is that correct?

23   A.        That is correct, Your Honor.

24             THE COURT:  That's what I understood.

25   BY MS. TANGEMAN:
```

1    Q.        And you described it as being a combination of

2    situations that were occurring back then.  You had a

3    stroke, your kids had both left the house, would that be

4    fair?

5    A.        Yes, that is correct.

6    Q.        So fair to say his depression, his -- his sadness

7    was significant enough that you encouraged him to seek

8    professional help, correct?

9    A.        That is correct.

10   Q.        Now, when the agents came to your house in March

11   of 2020, they found some guns in your home.  Did you know

12   anything about those guns being in your home?

13   A.        No, ma'am, I was not aware of it.

14   Q.        You had no idea that there were weapons in your

15   house, firearms in your house?

16   A.        No, ma'am, I was not aware.

17   Q.        Were you aware that there was also ammunition in

18   your house for those guns?

19   A.        No, ma'am, I was not aware.

20   Q.        Have you talked to your children since then, do

21   you have any idea whether they were their guns?

22   A.        Yes, I have.

23   Q.        Okay.  Has anybody claimed that those are their

24   guns?

25   A.        Yes, it is my son that had bought them.

1   Q.        And so fair to say your son had hidden firearms

2   in your home, correct?

3   A.        I don't know if he -- I wouldn't say hidden them,

4   but he didn't feel it was necessary to tell me.  So, yes, I

5   was not aware.

6   Q.        And this would be the same son who is a proposed

7   custodian?

8   A.        That is correct.

9   Q.        Now, your husband did own a gun when you all

10  lived in Cleveland, didn't he?

11  A.        I am not aware of that, ma'am.

12  Q.        You're not -- you're not aware of whether or not

13  your husband's ever owned a gun?

14  A.        That is correct.

15  Q.        You're -- are you also not aware that he actually

16  kept a gun in your house at one time in Cleveland?

17  A.        I am sorry, ma'am, I'm not aware of that.

18  Q.        So if he had kept a gun in your home, he did that

19  without your knowledge, is that fair?

20  A.        Ma'am, I do not remember any such thing.

21  Q.        Okay.  You're from India; is that right?

22  A.        Correct.

23  Q.        Are you a U.S. citizen?

24  A.        I am.

25  Q.        Okay.  How often do you go back to India?

1  A.        I try to go back once a year.

2  Q.        And your family has gone with you, haven't they?

3  A.        That is correct.

4  Q.        And you have family still there, right?

5  A.        That is correct.

6  Q.        And you stay with them when you go to India?

7  A.        Yes, ma'am.

8  Q.        And your husband has stayed with them when he's

9  gone to India?

10  A.        Yes, ma'am.

11  Q.        Now, do you recall receiving a letter from a

12  woman back in 2016?

13          THE COURT:  Ms. Tangeman -- Ms. Tangeman, may I

14  interrupt on that line of questioning.  And Mrs. Gupta,

15  does your -- does your husband have family also in India?

16  A.        His family is all here.

17          THE COURT:  So they -- they come here wherever.

18  In other words, he doesn't have aunts, uncles, cousins or

19  whatever, or at least anybody that's he's in regular

20  contact with; is that correct?

21  A.        Not anybody he's in regular contact with, but, of

22  course, there's always extended family.

23          THE COURT:  Pardon me?

24  A.        There's always extended family, you know.

25          THE COURT:  Sure.  But how often, to your

1    knowledge, does he have contact with any family -- any

2    family member regularly, you know, by e-mail, letter, phone

3    call or whatever, if you know?

4    A.          I would say very rarely, Your Honor.  Not --

5                THE COURT:  In other words, is it -- would you

6    describe them as being close, moderately close, distant, or

7    simply hardly in contact at all?  On that spectrum where

8    would you put that contact with family members?

9    A.          I would say hardly in contact.

10               THE COURT:  Okay.  And your family members in

11   India, how are they -- if I may ask, your mom and dad are

12   in this country?

13   A.          No, it's my mom that's in India.

14               THE COURT:  Okay.

15   A.          And my siblings.

16               THE COURT:  Okay.  Go ahead.

17   BY MS. TANGEMAN:

18   Q.          Ma'am, do you recall receiving a letter from a

19   woman back in 2016 saying that your husband had drugged and

20   raped her?

21   A.          Yes, ma'am.

22   Q.          And that was sent to you at your place of work;

23   is that correct?

24   A.          Yes, ma'am.

25   Q.          And do you remember discussing that with agents

1   in March of this year?

2   A.      Yes, ma'am.

3   Q.      And do you recall telling agents that you didn't

4   believe it?

5   A.      Yes, ma'am.

6   Q.      And that, quote, my husband would never do that,

7   do you remember saying that?

8   A.      Yes, ma'am.

9   Q.      And you never reported that to the police, did

10  you?

11  A.      I confronted Manish, but I didn't -- I did not

12  believe it to talk to the police about it.

13  Q.      He denied it, is that fair?

14  A.      Yes.

15  Q.      Okay.  And you believed him, correct?

16  A.      Yes, ma'am.

17  Q.      Now, you have since told him, since all of this

18  happened, that everyone makes mistakes, is that right?

19          THE COURT:  Again -- again --

20          MR. LONG:  I'm going to object.

21          THE COURT:  I think you're getting into a marital

22  privilege.

23          MS. TANGEMAN:  I'm not asking what he said, Your

24  Honor.  I'm just asking her statements for you to judge the

25  appropriateness of her as a custodian and, frankly, the

1    issue of whether or not a violation would be reported if it

2    were observed.

3              THE COURT:  Let me ask you this, how do you know

4    that she made that statement, according to your --

5              MS. TANGEMAN:  Because it was in a jail call.

6              THE COURT:  Okay.  I think, Mr. Friedman, that

7    given the fact that there's no protection against

8    monitoring those inmates conversations, I would also

9    assume, because it's customary and common place almost

10   universally, places of detention provide notice to that

11   effect to inmates when they come in.  There's also a

12   handbook, there's usually a notice posted.  And she may not

13   have been aware of that because even if no -- no

14   expectation of those conversations were not being

15   intercepted, but the defendant, having been on notice, as I

16   assume he was, you can inquire in that regard, would have

17   quietly consented to the interception, so --

18             MS. TANGEMAN:  And Your Honor, I would note that

19   both parties are advised that the call is recorded.

20             THE COURT:  And that's typical too.  It's a

21   bit -- Mr. Friedman, in the article of which it appears,

22   I'm the author of The Law of Electronic Surveillance, as

23   Ms. Tangeman knows, that's why the lengthy comments about

24   that.  I would think -- you can be heard fully, obviously,

25   but it's my understanding that there's no -- no privacy,

 1   statutory privilege under Title 3 or Constitutional

 2   privilege or marital privilege.

 3           MS. TANGEMAN:  May I proceed, Your Honor?  Thank

 4   you.

 5   BY MS. TANGEMAN:

 6   Q.        And ma'am, you told him that, quote, everyone

 7   makes mistakes, is that right?

 8   A.        My comment was just to keep him in a different --

 9   he's in jail, just to keep him going, so --

10   Q.        I'm not -- and forgive me, I'm not asking you why

11   you said it, I'm just asking if you did say something to

12   that effect?

13   A.        I might have, ma'am, I --

14           THE COURT:  Would you deny that if that were --

15   the government to represent this if they have you on

16   recording saying that?

17   A.        No, I would not deny it.

18           THE COURT:  But you said that you -- you just

19   said -- you said that was just to keep him going, if I

20   recall that statement a moment ago correctly.  What do you

21   mean by that?

22   A.        Well, I can't imagine what it is like to be in

23   jail, and I can only imagine that it is very difficult.  If

24   I would have -- probably would have talked to a dear

25   friend, I would have just been encouraging of, you know, to

1    keep head good and keep going.  Maybe it's cultural.

2    That's all my intent was.

3              THE COURT:  Okay.

4    BY MS. TANGEMAN:

5    Q.        And is that because --

6              THE COURT:  I don't think it's something

7    cultural, I think it's human nature.  Go ahead,

8    Ms. Tangeman.

9    BY MS. TANGEMAN:

10   Q.        And it would be fair to say that you are sticking

11   by him, is that right?

12   A.        Yes.

13   Q.        Now, you mentioned that your medical building,

14   the medical building is also one of the properties.  Which

15   medical building are you referring to, the one in the City

16   of Toledo on Central Avenue or the one in Oregon?

17   A.        Yes, the one on Central Avenue.

18   Q.        Is that not under -- under contract to be sold?

19   A.        It is.

20   Q.        So fair to say you wouldn't be able to put up a

21   property if it were sold to someone else?

22   A.        That is correct.

23   Q.        So in effect, any -- any documentation about the

24   medical building on Central Avenue would not be part of any

25   posted security, is that right?

1    A.        I -- I don't know how to answer that except it --

2    whatever The Court decides.

3            THE COURT:  Let me -- let me say this, as I sit

4    here now, this is all contingent on deciding to release the

5    defendant.  That's a decision I have yet to make.  However,

6    would you be willing to agree, pending -- what's the status

7    of that sale?  When is the closing and so forth?

8    A.        We don't have a date, Your Honor.

9            THE COURT:  Okay.  Is there a contingent

10   arrangement that they have to get financing or whatever?

11   What's the situation?

12   A.        We're waiting to hear back from them, the person

13   we met with last week.

14           THE COURT:  And would you be willing, pending a

15   decision by me, in the event that it were to -- the

16   transaction were to occur before I reach that decision,

17   which I would have hoped I would have reached a decision

18   before then, but to, you know, pay those funds into The

19   Court's registry as further security to assure the

20   proceeds -- as further security to assure your husband's

21   appearance?  Instead of posting property, you would simply

22   post proceeds that you reach --

23           MR. FRIEDMAN:  Your Honor, I'm just shaking my

24   head no to Mr. Gupta who was trying to speak at the moment.

25   I'm not shaking my head to Shraddha.

```
 1              THE COURT:  She can't see you unless you speak,
 2    and I didn't -- that's no problem.  And Mr. Gupta, I would
 3    agree you'll have ample opportunity to consult with your
 4    attorney before I conclude these proceedings today.  And I
 5    may not be able to -- we'll simply have to wait and see.  I
 6    would like to very much, as much as you would like to know
 7    what's going to happen to your family, but it's a -- it's a
 8    difficult decision, so you'll have ample opportunity to
 9    consult with your attorney.
10              Ms. Gupta, I don't need an answer to that
11    question now as to whether instead of the property
12    proceeds, but it's something I would probably want to
13    include, okay, just FYI.  And you would be heard further on
14    that issue, perhaps, before I make a decision, okay?  Do
15    you understand what I've said?
16    A.        Yes, I do, Your Honor.
17              THE COURT:  Thank you, ma'am.
18              Okay, Ms. Tangeman, as always, you know me well
19    enough, I apologize for the interruption.
20              MS. TANGEMAN:  Thank you.
21    BY MS. TANGEMAN:
22    Q.        And ma'am, you contacted an employee of your
23    husband's within a day or two of the FBI coming to your
24    home in March; is that correct?
25    A.        That is correct.
```

1    Q.        And your -- your home, is it's equipped with

2    internet service?

3    A.        Yes, ma'am, it is.

4    Q.        And how many electronic devices, laptops, cell

5    phones, IPads, do you have in the home?

6    A.        I have a computer and an iPhone and a phone.

7    Sorry, and there is one other tablet.

8    Q.        And if The Court -- go ahead.

9              THE COURT:  Excuse me, I apologize.  Do you have

10   a land line phone, a regular old fashioned land line phone?

11   A.        We do have a land line, yes.

12             THE COURT:  Go ahead, Ms. Tangeman.

13             MS. TANGEMAN:  Thank you.

14   BY MS. TANGEMAN:

15   Q.        And just so we're clear, when you contacted an

16   employee just a day or two after the raid on your home, do

17   you recall telling the one employee that you were trying to

18   figure out who the traitors were?

19   A.        Ma'am, if you'll give me a chance, I'd like to

20   help understand that conversation.

21   Q.        You contacted an employee, at which you just

22   admitted, just a day or two after the police raid on your

23   home, and you basically told this employee that you wanted

24   to figure out who had talked to the police, who the

25   traitors were, do you recall that?

1    A.        I do not believe I ever used the word traitor.

2    Q.        Well, what words do you recall using?

3    A.        I did contact the employee, the employee wanted

4    to go into the office on Sunday to clean up, and I was

5    concerned about her security.  And I asked her, who do you

6    trust that we can have in the office.  And I did ask her

7    that question, who do you trust, but it was simply for her

8    safety.

9    Q.        What were you afraid she was in jeopardy of?

10   A.        Well, ma'am, I had gotten followed by three cars

11   on Friday.  I had some neighbors harassing me.  And so I

12   just didn't know what to expect with this.  I've never been

13   through something like this, so I was just concerned about

14   safety for all of us.  And she was nice enough to go into

15   the office to help clean up before the staff came in on

16   Monday, and I just felt really uncomfortable.  I

17   volunteered to be there, but I said maybe it's better if

18   there's somebody that you trust that can be there.

19   Q.        And had you ever suspected your husband of what

20   he's accused of doing prior to receiving that letter from

21   that woman in 2016?

22   A.        No, ma'am.

23   Q.        You did know that he traveled to medical

24   conferences out of state, though; is that correct?

25   A.        Yes.

1  Q.        And did you share devices in the home, electronic

2  devices?

3  A.        I mean, the home computer was shared, yes.

4  Q.        As you sit here today, do you have any idea how

5  he -- if it were true, how he would have been able to

6  communicate, say, with escorts online without you knowing

7  it?

8            MR. FRIEDMAN:  Objection, she's getting outside

9  the scope, I believe, of this hearing.

10           THE COURT:  I would tend to agree with that,

11  Ms. Tangeman.  I mean, the relevancy.

12           MS. TANGEMAN:  So ma'am --

13           THE COURT:  It does seem outside the scope.  If

14  it appears relevant and pertinent, that's fine.

15  Otherwise -- go ahead.

16  BY MS. TANGEMAN:

17  Q.        Fair to say you had no idea that he was

18  communicating with escorts online much less meeting with

19  them, is that fair?

20  A.        Yes, ma'am.

21  Q.        And are you aware that this conduct could have

22  been occurring, or it's alleged to have occurred for the

23  past 14 years, were you aware of that?

24  A.        No, ma'am.

25  Q.        And ma'am, I know this must be a very difficult

1   situation for you to be in.  Would it be fair to say that

2   you love your husband very much, notwithstanding everything

3   that's happened?  Would that be fair?

4   A.      Yes, I do love him, but I don't necessarily -- I

5   don't know what that means in terms of the question.

6   Q.      Well -- and I guess my question is, you would

7   hate to see him put in harm's way, wouldn't you?

8   A.      But I would abide by The Court's orders.

9   Q.      When you were made aware from this letter that

10  you received from this woman in 2016, did you tell anyone

11  else about it?  You told us you didn't call the police.

12  Did you tell anyone else about it?

13  A.      I can't recall that I did.

14  Q.      And you obviously loved him as much then as you

15  do now, is that fair?

16  A.      Yes, ma'am.

17  Q.      I have nothing further.

18          THE COURT:  Okay.

19          MR. FRIEDMAN:  Your Honor, just some follow up.

20  Thank you, Your Honor.  Thank you.

21                    REDIRECT EXAMINATION

22  BY MR. FRIEDMAN:

23  Q.      So Ms. Gupta, just very quickly.  The question

24  that was left off was involving a letter back from 2016 and

25  conduct leading up to this day.  There was obviously a time

1   that you were not aware of what was going on, correct?

2   A.       Correct.

3   Q.       But the question now is different, you are aware

4   of what has occurred --

5            THE COURT:  Well --

6   BY MR. FRIEDMAN:

7   Q.       -- what's being alleged?

8   A.       Correct.

9   Q.       Okay.  And so that being said, with you being

10  aware of what has been alleged, would you agree to be

11  responsible for whatever -- whatever that responsibility is

12  that The Court would place upon you, would you agree to

13  adhere to any court orders that -- that -- in this matter?

14  A.       Yes, Mr. Friedman, I would.

15           THE COURT:  Mr. Friedman, if, perhaps, I can

16  interrupt.  I'm sure you -- and describe to her -- I'm sure

17  you have already.  Number one, your primary obligation

18  would be to The Court and not to your husband, yourself or

19  your family.  You understand that?

20  A.       Yes.

21           THE COURT:  Did you hear what I said?

22  A.       Yes, I did, and I do agree --

23           THE COURT:  Okay.

24  A.       -- and understand.

25           THE COURT:  And that you would be the one

1    principally responsible for assuring that he doesn't cause

2    any harm to himself, because that's a big concern.  But

3    also that he would not undertake to flee to avoid

4    prosecution and its potential consequences, that would be

5    your principle responsibility.  You understand that?

6    A.        Yes, Your Honor, I do.

7              THE COURT:  Among other things, I would not

8    permit your husband to have a cell phone.  I would not

9    permit him to use the land line, of which a device, I

10   believe, will be put on it to determine whether any calls

11   had been made, were those calls had been made.  I would not

12   permit him to either be in possession of or have access to

13   any car keys.

14             And with regard to his access to electronic

15   devices, I would hear from the government first before

16   those sorts of restrictions -- there might be other

17   requirements.  He could only leave the home for purposes of

18   receiving needed medical treatment and for purposes of

19   meeting with or consulting with his attorneys.  Do you

20   understand that?

21   A.        I do, Your Honor.

22             THE COURT:  Also, I would also consider --

23   consider, upon request, permitting him to attend any

24   religious services of any sort if that were desired, if

25   that desire appeared to be bonafide and didn't create a

1   risk of flight.  And an adult would have to convey him to

2   and from such services, such medical treatment and such

3   consultations with the lawyer, and that adult would have to

4   understand his or her duties to The Court to ensure that no

5   effort was made to flee or cause harm to himself, do you

6   understand that?

7   A.          I do understand that.

8           THE COURT:  The circle of responsibility would

9   extend beyond just yourself, but it would also be your

10  responsibility, as principle custodian, to see to it that

11  the other custodians, to the best of your ability and

12  knowledge, were performing their duties as well.  Do you

13  understand that?

14  A.          I do, Your Honor.

15          THE COURT:  That if you had any apprehension that

16  your husband might not comply with each and every one of

17  the conditions of release, particularly with regard to

18  fleeing or harming himself, even if that was simply an

19  apprehension, not a certainty, but something you

20  apprehended might occur, you would have to call the

21  pretrial services officer and the lawyer for the government

22  as well, do you understand that, to alert all of them?

23  A.          I do, Your Honor.  I do Your Honor.

24          THE COURT:  If either of those were to happen,

25  certainly if he were to flee, if that were to happen, you

1   could be called upon to show cause why you didn't warn The

2   Court.  Do you understand that?

3   A.        I do, Your Honor.

4           THE COURT:  And if I weren't satisfied with your

5   explanation, you would be charged with contempt of court

6   for not following my order.  You understand that?

7   A.        I do, Your Honor.

8           THE COURT:  It's a very serious responsibility,

9   and I believe that for now is what I can think of.  There

10  would be other requirements as well. You understand that?

11  A.        I do, Your Honor.

12          THE COURT:  Go ahead, Mr. Friedman.

13  Mr. Friedman, the transmission is -- there's some garble in

14  the transmission, I don't know if you changed your device

15  or whatever you're using, Mr. Friedman.

16          MR. FRIEDMAN:  I'm going to sign off and sign

17  back on.  I don't know why it's doing that.

18          THE COURT:  I'm sorry, I can't understand what

19  you said.

20          MS. DYBALA:  He said he's going to sign off and

21  then sign back on.

22          THE COURT:  Okay, very good.  Thank you very

23  much.

24                  (A brief recess was taken.)

25          MR. FRIEDMAN:  Judge, while you took a break for

1    a moment, I did blame it, and I think rightfully so, on my

2    two year old and five year old using the gadgets.

3                    (A brief discussion was had off the record.)

4    BY MR. FRIEDMAN:

5    Q.        All right.  So Ms. Gupta, thank you for your

6    patients on my technical issues.

7             So you're aware now of the allegations and the

8    question, in light of the government's question, you love

9    him now as much as you loved him then.  In light of that

10   background, if you saw a violation of any rule by your

11   husband, understanding that your obligation is to The

12   Court, would you then report it as instructed by The Court?

13   A.        Yes, Mr. Friedman, I would.

14   Q.        Now, your parents or your in-laws, I'm sorry, are

15   also living in Michigan, correct?

16   A.        Yes, sir.

17   Q.        And right now you're home at all times and your

18   in-laws live there with you or near you?

19   A.        They live near me in Michigan.  I mean, they

20   don't live here, but they would if -- if they were the

21   custodians.

22                    THE COURT:  What community, what town or

23   community?

24   A.        They live in Orchard Lake.

25                    THE COURT:  And how far is Orchard Lake from

```
 1   Toledo, about an hour or so?

 2   A.        Yeah, about an hour and 15 minutes.

 3             THE COURT:  If I may ask, how old are they?

 4   A.        75, 78, something like that.

 5             THE COURT:  Are they, either of them,

 6   currently -- either of them have an occupation outside the

 7   home?

 8   A.        Yes, my father-in-law works.

 9             THE COURT:  What does he do?

10   A.        He's a physician.

11             THE COURT:  Okay.  He has a full-time practice?

12   A.        No, not really.

13             THE COURT:  Okay.  And does your mother-in-law

14   drive?

15   A.        Yes, she does.

16             THE COURT:  And do you think she'd be willing to

17   either move to Toledo or simply undertake to commute, as it

18   were, to be there before you left in the morning or to

19   remain until you got home in the evening?

20   A.        Yes, she would.

21             THE COURT:  And she's physically, and so forth,

22   able to do so?  I assume so, I don't mean to insult her by

23   asking those questions.

24   A.        Good questions.  Yes, Your Honor, she is.

25             THE COURT:  And then your father-in-law would be
```

1    able to accompany her from time to time as well?

2    A.        Yes, Your Honor.

3              THE COURT:  Thank you.  Go ahead, Mr. Friedman.

4              MR. FRIEDMAN:  Thank you.

5    BY MR. FRIEDMAN:

6    Q.        And, in fact, Ms. Gupta, your in-laws have been

7    very involved in this matter, as they've accompanied you to

8    Toledo to meet with us, they've been engaged in phone

9    calls, both audio and video as well, correct?

10   A.        Yes, Mr. Friedman.

11   Q.        And it's your belief that they would assist you

12   in any way necessary to comply with any court orders?

13   A.        Yes, Mr. Friedman.

14   Q.        All right.  Now, the medical building itself, any

15   assets from the sale of it, and there are certainly

16   liabilities to it, but any assets at this point -- and I

17   would -- there will be other issues that we'll address,

18   perhaps when you confer with other counsel, but when you

19   talked about pledging proceeds, you would be talking about

20   the office, it would be the proceeds of that office, and,

21   yes, you would be willing to put up any proceeds of any

22   sale to -- as a guarantor in this case to assure your

23   husband's presence?

24   A.        Yes, Mr. Friedman, once I've conferred with civil

25   counsel.

1   Q.        All right.  Very good.  Now, have you -- the

2   question that was asked by the government about guns and

3   travel and so forth, you were not aware of that -- this was

4   not something you asked about, and this whole case came

5   about as a grave shock to you, would that be a fair

6   characterization?

7   A.        Yes, Mr. Friedman.

8   Q.        Okay.  But now that you're aware of the

9   allegations, would you take it upon yourself to be thorough

10  in searching the house?  Would you look through the house

11  to make sure these are no longer issues?

12            MS. TANGEMAN:  Your Honor, I'm going to object --

13  I'm going to object to the leading nature of this.

14            MR. FRIEDMAN:  That's fine, I was only doing it

15  for purposes of the -- I can ask five questions to one.

16  BY MR. FRIEDMAN:

17  Q.        So let me -- let me ask you this, were you -- at

18  this point, as far as whether or not there are any guns in

19  the house, have you taken any steps to determine if there

20  are any?

21  A.        Yes, Mr. Friedman.

22  Q.        Okay, and what steps have you taken?

23  A.        I've had conversations with my kids about the

24  seriousness of having something that is not shared with me.

25  That is the steps that I've taken.

1   Q.        And as a result of those discussions, are you

2   confident that there are no longer any guns in the home?

3   A.        Yes, Mr. Friedman, I'm confident there are no

4   guns in the home.

5             THE COURT:  Excuse me, Mr. Friedman, I have

6   another question that occurred to me, if I may.

7             To your knowledge, is that anti-depressant that

8   you mentioned that had been prescribed for your husband, is

9   he still taking that, if you know?

10  A.        I do not know that, Mr. Friedman.

11            THE COURT:  Well, would you undertake to

12  determine, through the therapist or anyone else, whoever it

13  was that prescribed that medication, or who might prescribe

14  a similar medication, to your knowledge, to determine

15  whether such medication had been prescribed, and then to

16  see to it that they were not at hand for your husband?  In

17  other words, you would have to keep possession of them, and

18  if he had to have it four times a day, you'd leave whatever

19  was necessary during your absence, and then when he had to

20  take it later when he was in your company, you would simply

21  give it to him at the prescribed time.  Do you understand

22  what I'm saying?

23  A.        Yes, Your Honor, I do.

24            THE COURT:  I would assume -- the concern

25  occurred to me that narcotics of that kind might have an

1   effect over -- if he took an overdose of them, it might be

2   a way of ending his life.  I'd actually be more concerned

3   about that than I would be about firearms.

4           But go ahead, Mr. Friedman, your inquiry may

5   continue.  Go ahead.

6   BY MR. FRIEDMAN:

7   Q.          I'd also like to now turn your attention to a

8   question that was asked of you about the contact you had

9   with an employee of the medical practice.  Do you recall

10  discussing that -- responding to U.S. Attorney Tangeman's

11  question?

12  A.          Yes, Mr. Friedman.

13  Q.          So the explanation that you provided, was that

14  the full explanation, or would you like to elaborate

15  further on your reasoning for contacting the employee at

16  that time?

17  A.          There's really nothing substantial other than

18  what I already explained.  Just to repeat a few things, I

19  was being followed, I was scared for my life.  I was

20  concerned that they might be people trying to harm people

21  that I knew.  The employee had been very nice enough to be

22  helpful, so I wanted to be protective of her and not have

23  an individual in the office by herself in case there was

24  somebody outside.  Obviously the mind goes different

25  places.  I don't know if that would have been true or not,

1    but that is the only reason which is -- I'm sorry, did I

2    say something?

3    Q.      No, no, no.

4    A.      Okay.  So my intent was really to make sure that

5    she was safe and that there wasn't anyone that she --

6    anyone that she trusted to be with her, to be with her.

7    Really that was my intent.

8    Q.      Did there come a time when you and I discussed

9    this after -- well, let me ask you that.  Did there come a

10    time when you and I discussed that issue of the employee

11    contact?

12    A.      Yes, Mr. Friedman, we did discuss it.

13    Q.      Okay.  And do you recall -- so since then, and

14    would it be fair to say that I had relayed to you what the

15    Assistant U.S. Attorney's concerns were?

16    A.      Yes, Mr. Friedman, you did.

17    Q.      Since that time, have you reached out to any of

18    the employees for anything other than business purposes?

19    A.      No, Mr. Friedman, I have not.

20    Q.      All right.  And should The Court grant the

21    opportunity for Manish to be at home to prepare his case,

22    would you agree that you would not -- not be talking to any

23    conceivable witness in this case, period, unless it was run

24    by counsel and approved by counsel?

25    A.      Yes, Mr. Friedman.

```
 1   Q.         All right.  The Court asked about internet

 2   service.  I think the government did as well.  Have you

 3   also discussed this with me, the internet service in the

 4   house?

 5   A.         Yes, Mr. Friedman.

 6   Q.         And in fact, any other relatives from your home

 7   engaged in that discussion with us?

 8   A.         Yes, Mr. Friedman, my in-laws were on that --

 9   Q.         Was your son on there?

10   A.         Yes, my son was on there as well.

11   Q.         And again, how old is your son?

12   A.         He's 21.

13   Q.         All right.  And if those -- so this call today is

14   not the first time that you have considered any sort of

15   modifications to internet service in the home.  Would that

16   be a fair statement?

17   A.         That is fair, Mr. Friedman.

18   Q.         Should The Court be willing to allow Manish to

19   come home to prepare his case, would you be willing to

20   eliminate all access points to the internet?  And that

21   would encompass everything from phones, to smart TVs, to

22   even Play Stations, hand-held phones or tablets?

23              THE COURT:  Mr. Friedman, if I can interrupt.

24   I'm not sure I would want to eliminate other person's

25   access to the internet.  It would seem to me that I would
```

1    assume -- the government can be heard on this, I don't know

2    that much about all of this -- that they would be password

3    protected and the passwords simply weren't shared.

4              MR. FRIEDMAN:  And that's where I was going, Your

5    Honor, as far as what her willingness to do, however the

6    practicality of it, but I'll combine the two.

7    BY MR. FRIEDMAN:

8    Q.        I guess the question would be, you need the

9    internet for work, is that a fair statement?

10   A.        That is correct.

11   Q.        Do you have the ability to utilize password

12   protected access?

13   A.        Yes, Mr. Friedman, I did.

14   Q.        Other than that, your password protected access

15   for your employment, would you be willing to eliminate any

16   access point or any internet connections accessible to

17   Manish should The Judge allow him to come home to prepare

18   his case?

19   A.        Yes, I would be in agreement to limit access from

20   Manish.

21   Q.        Okay.  My last question for you really deals with

22   the layout of your home.  Is this a free standing single

23   family home?

24   A.        Yes, it is.

25   Q.        And do you have a back yard?

1    A.        Yes, I do.

2    Q.        And if counsel needed to meet with Manish,

3    whether indoors or outdoors, is there enough space for one

4    or two lawyers to properly social distance either inside or

5    outside with him if we needed to prepare the case?

6    A.        Yes, Mr. Friedman.  Yes, that is possible.

7    Q.        Okay.  So you've got a fenced in back yard area?

8    A.        Yes, Mr. Friedman.

9    Q.        Is there a back deck?

10   A.        Yes, there is.

11   Q.        Okay.  All right.  And so if I were to suggest

12   that at a minimum of 6 feet between all participants, and

13   maybe even more as we learn more, is there that sort of

14   adequate room and privacy that would allow the lawyers to

15   meet with Manish as needed?

16   A.        Yes, there is adequate room.

17             MR. FRIEDMAN:  Your Honor, that's all I have on

18   this point.

19             THE COURT:  Ms. Tangeman, anything further?

20                       RECROSS-EXAMINATION

21   BY MS. TANGEMAN:

22   Q.        Ma'am, your father-in-law was not just a

23   physician, but he was also a plastic surgeon, is that

24   right?

25   A.        That is correct.

1    Q.        And he still has the authority to prescribe

2    medication, correct?

3    A.        Yes, he does.

4    Q.        And in fact, he worked with your son -- with your

5    husband, his own son, in the same practice, is that right?

6    A.        He was not part of the same practice.

7    Q.        So he worked --

8    A.        But he did --

9    Q.        Go ahead.

10   A.        He did do a case or two with Manish occasionally,

11   but, no, he was not part of the same practice.

12   Q.        He -- he was up at the Taylor, Michigan location,

13   your father-in-law, was he not?

14   A.        Yes, he is.

15   Q.        And isn't that a location that your husband would

16   occasionally go and take appointments in?

17   A.        No, he did not.

18   Q.        Okay.  Your father-in-law still works as a

19   doctor; is that correct?

20   A.        That is correct.

21   Q.        And he still maintains patients in the Michigan

22   office, correct?

23   A.        That is correct.

24   Q.        I have nothing further.  Thank you.

25             THE COURT:  Mr. Friedman, anything further?

1            MR. FRIEDMAN:  No, Your Honor, just --

2            THE COURT:  Ms. Gupta, I have nothing further

3     either.  Thank you very much for your attendance.

4            Your next witness is?

5            MR. FRIEDMAN:  Your Honor, we're not going to be

6     calling mom and dad.  They're available, but I don't think

7     there's any contentions at this point they're not going

8     to --

9            THE COURT:  I would still like to make sure, to

10    the extent that they're going to be custodians, that they

11    understand their obligations.

12           MR. FRIEDMAN:  Okay.  So Melissa, if you want to

13    bring them in, that would be great.

14           MS. DYBALA:  Judge, they're on the same device.

15           MR. FRIEDMAN:  We'll ask one to leave the room,

16    Judge.

17           THE COURT:  And I have no problems with

18    Mrs. Gupta participating in the video conference as well.

19    I'd like to --

20           MS. DYBALA:  Ms. Gupta, I was going to tell her

21    to mute herself.  She already did.

22           THE COURT:  Okay.  Okay.  Mr. Friedman, one of

23    the parents has been brought into the conference.  If you

24    will, I'll have you introduce that individual, and have --

25           MR. FRIEDMAN:  Your Honor, would you like one of

1   the parents to leave the room while we're doing the

2   questioning?

3           THE COURT:  Probably just as a -- we'd do the

4   same thing if we were in court.

5           MR. FRIEDMAN:  Dr. Gupta, if you wouldn't mind,

6   would you mind stepping out of the room because there's a

7   separation order right now.

8           MRS. GUPTA:  I'll leave my husband, and I'll go.

9           MR. FRIEDMAN:  Well, you're going to end up

10  speaking so doesn't matter who goes first.

11          MRS. GUPTA:  Okay, I will go.

12          DR. GUPTA:  Can I start first, please, if you

13  don't mind?

14          MR. FRIEDMAN:  Dr. Gupta, if you want to kind of

15  center yourself in the frame.  Thank you.  May it please

16  The Court, Your Honor --

17                    DIRECT EXAMINATION

18  BY MR. FRIEDMAN:

19  Q.         Dr. Gupta, if you would --

20          THE COURT:  Mr. Friedman, excuse me, I would like

21  to have the -- it's my custom to have all witnesses sworn.

22          MR. FRIEDMAN:  I'm sorry.

23                    RAJ KUMAR GUPTA, M.D.,

24  was herein, called as if upon examination, was first duly

25  sworn, as hereinafter certified, and said as follows:

```
 1          THE COURT:  Dr. Gupta, I'm James Carr.  I'm The
 2   Judge to whom your son's case has been assigned.  Just a
 3   couple questions for you.
 4          Do you understand the -- in other words, assuming
 5   you've been proposed as a supplemental custodian to assure
 6   two things -- well, three things, that your son would
 7   appear at all court proceedings?
 8          DR. GUPTA:  Yes.
 9          THE COURT:  Abide by all the conditions that I
10   would impose upon him, and that also -- I have a
11   substantial concern about your son's risk, that your son
12   might harm himself under all the circumstances of the
13   allegations that have been made against him.  Do you
14   understand that it would be your duty to The Court, not to
15   your son, but to The Court?
16          DR. GUPTA:  Yes, I do.
17          THE COURT:  And that you would have to comply
18   with all the conditions that I would impose upon you as
19   well, and if you had any apprehension that your son was
20   contemplating either flight or harm to himself, any
21   apprehension, something that he mentioned in the past that
22   might otherwise seem harmless?
23          DR. GUPTA:  None whatsoever, sir.
24          THE COURT:  But you would have no problem
25   complying with each and every condition imposed?
```

```
 1              DR. GUPTA:  Yes, sir.

 2              THE COURT:  It's my understanding you're still

 3    partially active in your professional practice; is that

 4    correct?

 5              DR. GUPTA:  Yes, sir, I do part-time work.

 6              THE COURT:  It's also my understanding that your

 7    wife is able to -- has a driver's license and still has the

 8    ability to drive; is that correct?

 9              DR. GUPTA:  Yes.

10              THE COURT:  So one of you would have to be at the

11    home in the morning before the defendant's wife, your

12    daughter-in-law, would be leaving for work, and that person

13    would have to remain there, or else be -- be replaced by

14    another suitable custodian and remain there before she

15    returned home for work.  Do you understand that?

16              DR. GUPTA:  I understand that too.

17              THE COURT:  You are aware, at least generally, of

18    the nature of the charges against your son?

19              DR. GUPTA:  Yes, I'm aware of it, sir.

20              THE COURT:  And that you're probably not aware

21    that, doing some computations about the potential sentence

22    that he might receive, this is not a guarantee at all, it's

23    simply a tentative calculation, for informational purposes

24    today only --

25              DR. GUPTA:  Yes, sir.
```

1          THE COURT:  -- that if convicted of either of the

2     two charges, both of which, to my understanding, carry a

3     minimum mandatory sentence imprisonment term of 15 years.

4     So if he's convicted of either one of these charges, the

5     sentence will be 15 years.  There's nothing I can do about

6     it.  And also that it is at least possible that the

7     sentence that will be indicated under the federal

8     sentencing guidelines, and Mr. Friedman can explain to you

9     what they are and how they operate, potentially could call

10    upon me to impose a sentence up to 360 months, 30 years to

11    life.  I would not be required to impose that sentence, but

12    if I did not impose that sentence, I would have to explain

13    my reasons for not doing so, which I often do, okay.  I

14    make no guarantee, I'm just trying to give you some sense

15    of the circumstances that, on the other hand, under the

16    guidelines, which I'm required to give serious

17    consideration and attention to, and to depart from varying

18    from those guidelines only if I believe that it's

19    appropriate for me to do so in light of certain factors

20    that I must take into consideration at the time of

21    sentence.  So it's at least possible, based upon what we

22    presently know about the government's case and its

23    evidence.  Obviously we do know that your son has no prior

24    criminal record, but I'm talking about based upon what the

25    government has projected as its evidence, the sentencing

1   guidelines would indicate a sentence of 360 months to life.

2   Not that that's what I would impose if your son were found

3   or pled guilty, but the minimum would be 15 years.  Do you

4   understand that?

5           DR. GUPTA:  I understand that, sir.

6           THE COURT:  Obviously that period of potential

7   time, even the lesser amount, 15 years, the man's, what, 50

8   years old, that would mean a sentence of probably about 12

9   1/2 years.  One's age and, under all the circumstances,

10  having lost the right to practice his profession and so

11  forth, I trust you can understand that I have a concern

12  about whether or not at some moment, some morning or night,

13  he might simply wake up and decide that suicide is a better

14  option.  Do you understand that?  I'm not saying that he

15  would, but do you understand how I would be concerned that

16  that might occur given all that has happened to him

17  already, the shame and professional consequences that go

18  from that?

19          DR. GUPTA:  I understand that, sir.

20          THE COURT:  Okay.  I just want you to be aware of

21  that because these are the matters I'm taking into

22  consideration in evaluating whether or not the various

23  conditions that have been proposed are adequate to make

24  sure that he will not voluntarily make it impossible for

25  him to appear, and also that he will not undertake to flee,

1    to abscond, figuring that a few days of liberty are worth

2    the chance against the possibility of basically spending

3    most of what remains of his life in a federal prison.  Do

4    you understand my concerns in that regard?

5              DR. GUPTA:  Yes, sir.

6              THE COURT:  And that's the consideration --

7    that's the issue I wanted to -- let me ask you this --

8              DR. GUPTA:  Yes, sir.

9              THE COURT:  -- and if you want to talk to

10   Mr. Friedman or take some time to talk to your wife about

11   this, you should, perhaps other family members, because I'm

12   so concerned I would be inclined to have you post some or

13   all of your own property, real and personal, as a security

14   to assure that your son does not harm himself or flee.  In

15   other words, if you have a residence, if you have a

16   professional building, whatever you have by way of assets,

17   it would be pledged to The Court.  Assuming he appears for

18   all proceedings, whatever they may be, they would all come

19   back to you in the same condition they were provided.  You

20   probably have not considered that position, maybe you have.

21   But I'm very concerned that your son, if he were to flee or

22   kill himself, the consequences would be not only what it

23   would have on upon his wife and children but also his mom

24   and dad.  Do you understand that?

25             DR. GUPTA:  Yes, I understand that.

```
1              THE COURT:  I'm not asking you right now because
2      I think you should talk to at least Mr. Friedman about
3      that, and perhaps another attorney, because it would be a
4      very serious undertaking, because what I would require you
5      to do is, in addition to pledging, that you would waive any
6      opportunity you might have to challenge the government
7      taking that property by way of what's called a forfeiture
8      in the event of your son's inability to appear because he
9      committed suicide.  Because the law says if the defendant,
10     his appearance has been secured by property or other
11     assets, commits suicide, a Court -- it appears that a Court
12     cannot seize that property.  In other words, makes it a
13     delusory (phonetic) as a security, as an assurance that he
14     would appear.  I believe that it's something that would
15     have to involve consultation with counsel, and your
16     consultation with counsel and my -- and my hearing from the
17     parties, I believe that you could probably waive,
18     prospectively, any right that you might have, in the event
19     your son committed suicide, to try to reclaim or regain any
20     part of the assets that you posted.  Do you understand
21     that?
22             DR. GUPTA:  I understand that, sir.
23             THE COURT:  As I say, I'm not asking for a
24     commitment right here and now.  It's something you have to
25     talk over with your wife, any family members, if any, and
```

1    perhaps an attorney.

2           All that being said, Mr. Friedman, obviously any

3    questions you have, by all means feel free to ask.

4           MR. FRIEDMAN:  I just really have one, max two

5    questions.

6                    DIRECT EXAMINATION

7    BY MR. FRIEDMAN:

8    Q.      Doctor, having heard what The Judge stated, is

9    there any sort of impediment or obstacle that would prevent

10   you from, in any way, complying with The Court's order

11   holding you, in part, responsible or obligating you to

12   report any violations or concerns that you may see to The

13   Court?

14   A.      None whatsoever, sir.

15          THE COURT:  I believe I mentioned this, Doctor,

16   but -- I think I did, if so I apologize.  If you -- you're

17   a doctor, even though you're not a psychiatrist or

18   counselor or whatever --

19          DR. GUPTA:  No, sir.

20          THE COURT:  -- detect whether your son is

21   displaying any indicia of possible suicide and -- and even

22   something that's insubstantial, your sense, your concern as

23   a father, you would have to call the pretrial services

24   officer, your lawyer and the prosecutor and say, you know,

25   I have this sense, I'm concerned, I'm worried.  Do you

1    understand that?

2            DR. GUPTA:  Yes, sir.

3            THE COURT:  Okay.  Fine, Doctor.  It sounds like

4    I've been beating up on you.  I don't mean to be that --

5            DR. GUPTA:  No, sir.  No, sir, none whatsoever.

6    You are asking me everything what I need to know, sir.

7            THE COURT:  Okay, very well.  Mr. Friedman, once

8    again, I apologize for interrupting.

9            MR. FRIEDMAN:  No, that's okay.

10   BY MR. FRIEDMAN:

11   Q.       I guess there was one question I just asked you

12   about your compliance.  You said there are no obstacles.

13           My only other question is, if asked by your son

14   for a prescription for any sort of pharmaceutical drugs, if

15   The Court were to instruct you that you were not able to do

16   that, what would you do?

17   A.       My understanding that even as a practitioner

18   right now I cannot write for narcotics for myself or my --

19   or for my wife even, or my children.  That has to go to a

20   separate practitioner.  That is my understanding.  It's

21   against the law.

22           THE COURT:  You can -- we have a daughter who's a

23   doctor and she's told us that as well, she can't write us a

24   prescription no matter how benign it might be.  So I think

25   you're telling Mr. Friedman, the government, and myself,

```
1   even though you're part time in practice, you're not about

2   to sacrifice your medical license?

3             DR. GUPTA:  No, I cannot do that.  I have

4   followed that all along.

5             THE COURT:  Of course.

6             MR. FRIEDMAN:  Your Honor, I have nothing

7   further.

8             THE COURT:  Ms. Tangeman?  Ms. Tangeman, the lady

9   who will be questioning you now, is the government's

10  counsel.  Go ahead, Ms. Tangeman.

11                        CROSS-EXAMINATION

12  BY MS. TANGEMAN:

13  Q.        Good morning, sir.  Can you tell me how old you

14  are?

15  A.        I will be 80 in September.

16  Q.        And how old is your wife?

17  A.        My wife is born 1973 -- 1943.

18  Q.        Okay.  So do the math for me, how old is she?

19  A.        She's 77.

20  Q.        Okay.  And you're still working as a doctor; is

21  that correct?

22  A.        I work part time, and I think I'm in good health.

23  I run every day, and I drive.

24  Q.        And sir, when you say part time, what hours are

25  you keeping?
```

```
1    A.         About 15 to 20 hours a week.

2    Q.         Is that in your practice in Taylor, Michigan?

3    A.         Yes, sir -- yes, ma'am.

4    Q.         And is that a location where your son would

5    occasionally see patients as well to assist you?

6    A.         He did not.  Initially, I would say 2004 he saw

7    some patients when he was potentially going to join my

8    practice.  And he was on staff at a couple of the hospitals

9    in Michigan, but then he got a better offer in Toledo, and

10   that's when he decided to leave.

11   Q.         Okay.  So fair to say he did, but that was back

12   in the early 2000s?

13   A.         2004, 2005 I would say.  And then he started his

14   practice about six months.

15   Q.         And your location, how far is that from Toledo?

16   A.         It's about 40 minutes from his house.

17   Q.         Okay.  And you talked about not prescribing for

18   family members, that's an ethical rule; is that correct?

19   A.         I don't know.  You know, I have not checked it,

20   but all I'm saying is I have never prescribed one for

21   myself or my family members.  If they need something, they

22   have to see somebody else.  I -- I think it is unethical as

23   far as I know.  I'm not sure -- I'm not sure whether it's

24   illegal.

25   Q.         And sir, are you -- do you consider yourself tech
```

1   savvy?

2   A.          No.

3   Q.          How about your wife, is she tech savvy?

4   A.          No, we are both dumb.

5   Q.          Right there with you, no criticism.

6   A.          We're both dumb.  We grew up in an age where

7   there was nothing -- I didn't even have a fax machine for

8   many years.

9   Q.          Forgive me, sir.  You have an accent.  Tell me

10  where you were born.

11  A.          I was born in India.

12  Q.          How long have you been in the United States?

13  A.          I've been here since 1967.

14  Q.          Do you still have family in India?

15  A.          My parents are dead.  I have two brothers, but

16  that's it.

17  Q.          And how about your wife?  And how about your

18  wife, is she also from India?

19  A.          My wife's parents are dead also.  She has two

20  brothers, one brother who's dead, two sisters who are dead,

21  one brother who's 80 plus years old.

22  Q.          She's also from India then?

23  A.          Yes.

24  Q.          And did you ever travel back to India with your

25  son either in his childhood or adulthood?

```
1   A.          Yes, we did.

2   Q.          And how often would you say your son has visited

3   India?

4   A.          How long?  I think he was there with us, I would

5   say about four or five years ago.

6   Q.          And was that something where you all would go

7   back to India with a certain regularity, once a year,

8   multiple times a year?

9   A.          If there are any -- if there was a wedding in the

10  family or something like that, that's it.  We don't stay

11  there long.  Might stay ten days.

12  Q.          I'm sorry, didn't mean to cut you off.  Is your

13  son bilingual?  Does he speak the language as well?

14  A.          He is little bit, not much.  Mostly -- he was

15  born and brought up here.  He can understand our language

16  and he can speak a few words of my language.

17  Q.          Are you contributing towards any of his attorney

18  fees?

19  A.          There is a potential.  We have not agreed to

20  anything yet, but if there's a need we will have to do

21  that.

22  Q.          And you would do that to help him out, is that

23  fair?

24  A.          That is correct.  He is my son.

25  Q.          Sir, I know this is difficult, and I don't ask
```

1  this to embarrass you, but did you have any idea about the

2  allegations about this -- about your son being alleged to

3  have drugged or raped women in the past?

4  A.       None whatsoever.

5  Q.       And since 2006, have you or your wife lived with

6  him or in their home?

7  A.       Yes, we have gone there many, many times.

8  Q.       But actually lived in the home?

9  A.       We've stayed over the weekend or something like

10  that, and then maybe times over the weekend they come to

11  our home.

12  Q.       So fair to say your relationship has been close

13  over the years?

14  A.       Extremely close.  Pretty much we talk every day.

15  Q.       And are your finances connected in any way with

16  his either personally or professionally?

17  A.       None.  None.

18  Q.       And when -- in the time that you have known your

19  son to be living in the Sylvania home, did you ever know

20  him to have guns in the home?

21  A.       No.

22  Q.       Did you ever know his son to have -- your

23  grandson, to have guns in the home?

24  A.       Not that I know of.

25  Q.       Did you ever know your son to have any guns at

```
 1   any time either in that residence or at a prior residence?
 2   A.         No.  I can tell you one thing.  When he was in
 3   medical school he asked me that he would like to have a gun
 4   and I told him no.  And he understood with me at that time
 5   that that is not a thing to do.  And I told him at that
 6   time that, listen, you don't know when you can get
 7   depressed and you might kill yourself with that gun, and he
 8   agreed with me, and he decided not to have it.  And that
 9   was in college.
10   Q.         You specifically decided not to keep a gun in the
11   house in case hard times might fall and he might use it
12   against him?
13   A.         Yes.  Yes.
14   Q.         And did you know that your son had been diagnosed
15   with depression and was seeing a counselor in the past?
16   A.         No.
17   Q.         He never disclosed that to you?
18   A.         No.
19              MS. TANGEMAN:  One moment, Your Honor.
20              THE COURT:  Of course.
21   BY MS. TANGEMAN:
22   Q.         And that statement that you had warned him about
23   not keeping the gun in the house in case he were to hit
24   sort of dark times and use it against himself, you said
25   that was back when he was in law school?
```

1   A.          That was when he was in pre-med at Boston

2   University.  And at that time -- and he was young, and he

3   had, you know, that fascination at that time, and I told

4   him that that is not what we do.

5   Q.          He had a fascination with guns back then?

6   A.          You know college kids, they talk about it, and I

7   said, no, we don't allow those things in our house.

8   Q.          And medical school is a stressful time, is it

9   not, you would know that personally?

10  A.          I would say so.

11  Q.          I have nothing further.  Thank you.

12              THE COURT:  Okay.  Mr. Friedman, anything

13  further?

14              MR. FRIEDMAN:  No, Your Honor.  I would just ask

15  if we could do a virtual side bar if possible?

16              THE COURT:  I guess -- probably the thing to do,

17  Melissa, is to put me, the prosecutors and Mr. Friedman in

18  the breakout room.  I think that's where we should go I

19  assume.

20              MS. DYBALA:  Judge, would you also like to have

21  Mr. Long?

22              THE COURT:  Of course.  The other lawyers as

23  well.

24              DR. GUPTA:  Will you be needing me anymore, sir?

25              THE COURT:  Doctor, let's just sit tight.  I

 1    don't think so, but if you can sit tight for a few minutes,

 2    okay.  This is the way -- if we were in a courtroom, which

 3    I'm sure you know when the lawyers have side bars come up

 4    and huddle together and talk privately.  And I'll simply

 5    mention that I'm following you by about two months when it

 6    comes time to hitting 80, and I don't run, I try to walk

 7    every day.  So one never knows about health.

 8          MS. DYBALA:  Judge, just to confirm the people

 9    going into the breakout room, I have Ms. Skutnik, Mr. Long,

10    Mr. Friedman, Ms. Grant, you and Ms. Tangeman.

11                (A side bar conference was held in the Zoom

12                 breakout room on the record.)

13          THE COURT:  Mr. Friedman, as I indicated, I have

14    a 12:00 as well.  And given the fact that we have no court

15    reporters, I'm afraid we probably have to adjourn this

16    until sometime tomorrow afternoon, depending upon your

17    availability and that of other counsel and any other

18    witnesses that you and the government would want to call,

19    but go ahead.  Sounds like we both have conflicts.

20          MR. FRIEDMAN:  Yeah, Your Honor.  Thank you for

21    your understanding.  So tomorrow we have a -- Mr. Long and

22    I have a 10:30 commitment, and then we have a -- and then

23    Ms. Grant and I have a 3:30 commitment.  The 1:00 is with

24    The Judges, as I had discussed with you earlier, that's the

25    Covid task force with Judge Gaughan and many others.

 1    Tomorrow's not wonderful, but this is important so we'll --
 2            THE COURT:  Absolutely.  So I believe -- Tina,
 3    what time is that -- is Mr. Schultz and Mr. Koharski
 4    (phonetic) and so forth on the Simmons case?  I can resume,
 5    I believe, whenever it was that you were done with your
 6    10:30.  And then with any luck, perhaps we would be done --
 7    let me ask Ms. Tangeman.  Tracey, do you have any witnesses
 8    you are going to call?
 9            MS. TANGEMAN:  Yes, the agent.
10            THE COURT:  Okay.
11            MS. TANGEMAN:  It would be pretty brief though.
12    It would be pretty brief.
13            THE COURT:  Okay.  Well, let's -- and
14    Mr. Friedman, what time are you done tomorrow with the
15    10:30?
16            MR. FRIEDMAN:  I would say probably 90 minutes,
17    so 10:30 --
18            THE COURT:  What time are you done with the --
19    with your session with Judge Gaughan, Chief Judge Gaughan?
20            MR. FRIEDMAN:  That's always from 1:00 to 2:00.
21    It's every Wednesday 1:00 to 2:00.  Whether she'll be on
22    it, I don't know, but it's with the other judges.  And then
23    we have a 3:30.  So tomorrow from 2:00 to -- 2:00 to 3:00.
24    I don't know, Tracey, you think an hour is adequate, I
25    don't know?

1              MS. TANGEMAN:  I would think it would be

2      sufficient with what we have remaining, but I also didn't

3      think we were going to use three hours.  This video thing

4      slows things down.

5              THE COURT:  But also, candidly, I would rather --

6      I would prefer to have sort of an open block of time.  I

7      know nobody wants to postpone this longer than necessary,

8      but maybe sometime Thursday or Friday?

9              MR. FRIEDMAN:  Friday would be fantastic, Your

10     Honor.  That whole day is open.

11                  (A brief discussion was had off the record.)

12             THE COURT:  Maybe we can proceed at 8:30, 9:00

13     Friday morning.  That might give you and Mr. Gupta and his

14     wife time to be in contact with a civil attorney so we may

15     have some information about that.

16             MR. FRIEDMAN:  Yeah, 8:30 Friday would be fine,

17     Your Honor.

18             THE COURT:  Okay.  Mr. Long, what about yourself,

19     what about the other lawyers on your team?

20             MR. FRIEDMAN:  I'm looking at our joint schedule,

21     they're okay also.

22             THE COURT:  Okay.  And what about the government?

23             MS. TANGEMAN:  I'm available, my agent is

24     available.  Carol, how are you for Friday?

25             MS. SKUTNIK:  I'm free Friday as well.

```
 1              THE COURT:  That will give you time to check on

 2    the question of waiver if you could.  If we need a little

 3    briefing on that, that's fine, move it along.

 4              Mr. Friedman, if you would mention to your

 5    client, or I can do it myself before we adjourn, were I to

 6    release him, he would be brought first to the Lucas County

 7    Jail, I believe, and be tested to see whether he's positive

 8    for COVID-19.  I believe what happens is even if he tests

 9    negative, he'd be held in quarantine for two weeks to make

10    sure that -- I just don't know how it would work.  Maybe if

11    he tests negative -- I guess if he tests negative,

12    arrangements could be made to have him picked up.  And if

13    he tested positive, then he'd be placed in quarantine for

14    two weeks in the Lucas County Jail, would be available

15    there.  I just want to emphasize, I don't know what I'm

16    going to decide.

17              MR. FRIEDMAN:  Understood.  We'll look into that,

18    Your Honor.

19              THE COURT:  Okay.  Yeah.  Okay.  So why don't we

20    resume at 8:30 on Friday morning.  And Angela, thank you so

21    much for making yourself available.

22              Tracey Tangeman, anything further from your part

23    now from the government?

24              MS. TANGEMAN:  No, Your Honor.

25              THE COURT:  Hold on, I've got to call and get us
```

1   out of the breakout room.

2           MR. FRIEDMAN:  Your Honor, is it okay if I can

3   leave the room so I can get on the other call?

4           THE COURT:  Yes.  I'm going to tell your client

5   the drill, okay?  Mr. Friedman, you may leave.  I'll see

6   you Friday morning.

7           MR. FRIEDMAN:  Thank you so much.  Have a good

8   day everyone.

9               (Side bar conference concluded.)

10          THE COURT:  Counsel, if -- I just want to tell

11  Dr. Gupta as well what's happened.  Mr. Gupta, can you hear

12  me?  We have to adjourn.  Mr. Gupta, are you on the phone?

13  Mr. Friedman had a 12:00 matter.  We have to adjourn for

14  the day because we don't have a court reporter.  I have

15  something at noon that everybody is waiting on me for.  The

16  earliest we can get back together is 8:30 on Friday

17  morning.  We will resume then.  I don't know how long it

18  will last.

19          As I assured your lawyers and the government's

20  attorney, I don't know what I'm going to do, just have to

21  wait and see.  In the meantime, that's basically what I

22  want to let you know, okay.  We'll be adjourning now, and

23  we'll reconvene on Friday at 8:30.  I don't know if your

24  attorneys want to discuss anything with you further.  If

25  so, Melissa can put you into a breakout room, and then you

1   can communicate with her when you're ready to go.

2            Counsel, if you want to spend a few more minutes

3   with your client, you're welcome to do so.

4            MR. LONG:  I think I'd appreciate a couple

5   minutes with my client just for a housekeeping matter.  I

6   believe, Tracey, I don't want to answer for you, but I

7   believe Dr. Gupta's father, we've completed his testimony

8   so he would no longer be resuming.  We pick up with Dr. --

9   the defendant's mother and then the agent on Friday, is

10  that correct?

11           MS. TANGEMAN:  Agreed.  That's my understanding,

12  yes.

13           THE COURT:  Dr. Gupta, you're free to go.  Thank

14  you for your willingness to participate and the testimony.

15           DR. GUPTA:  Thank you very much, sir.  I

16  appreciate your help.  Thank you.

17           THE COURT:  It's just my job, Doctor.  That's all

18  it is.

19           DR. GUPTA:  Thank you, sir.

20           THE COURT:  Okay.  So I'm going to jump off.

21  Dr. Gupta, you may jump off.  Tracey and government counsel

22  can jump off as well.  Thanks folks.

23

24

25

```
1                    C E R T I F I C A T E

2

3          I certify that the foregoing is a correct transcript

4    from the record of proceedings in the above-entitled matter.

5

6    s:/Angela D. Nixon              July 14, 2020

7    --------------------------               -----------

8    Angela D. Nixon, RMR, CRR        Date

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```