1                    UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF OHIO
2                        WESTERN DIVISION

3    UNITED STATES OF AMERICA,        Docket No. 3:20CR208

4              Plaintiff,

5    v

6    MANISH RAJ GUPTA,                June 26, 2020

7              Defendant.

8    -------------------------------------------------

9              TRANSCRIPT OF CONTINUED DETENTION HEARING
                  BEFORE THE HONORABLE JAMES G. CARR
10                   UNITED STATES DISTRICT JUDGE

11   APPEARANCES:

12   For the Plaintiff:

13   Tracey Ballard Tangeman
     Carol Skutnik
14   Office of the U.S. Attorney
     Four SeaGate, Suite 308
15   Toledo, Ohio 43604
     (419) 241-0753

16

17   For the Defendant:

18   Ian N. Friedman
     Eric F. Long
19   Madelyn J. Grant
     Friedman & Nemecek
20   1360 East Ninth Street, Suite 650
     Cleveland, Ohio 44114
21   (216) 928-7700

22

23   Court Reporter:

24   Angela Nixon, RMR, CRR

25

```
 1            COURTROOM DEPUTY:  The Court is now in session

 2   with the Honorable James G. Carr presiding.  The case

 3   before The Court is USA versus Manish Raj Gupta, case

 4   3:20CR208, matter call for continued detention hearing.

 5   Government is represented by Tracey Tangeman and Carol

 6   Skutnik.  Defense is represented by Eric Long, Ian Friedman

 7   and Madelyn Grant.

 8            THE COURT:  Mr. Friedman, I think the matter was

 9   with you, and we both had noon time commitments when we

10   adjourned; is that correct?

11            MR. FRIEDMAN:  That is correct, Your Honor.

12   Thank you.

13            THE COURT:  Okay.  Go ahead.

14            MR. FRIEDMAN:  Eric, do you have any of the

15   family in the waiting room?

16            COURTROOM DEPUTY:  None of the family is in the

17   waiting room, but I can put them in one if you'd like.

18            MR. FRIEDMAN:  Eric, is mom --

19            MRS. GUPTA:  Yeah, mom's here.

20            MR. FRIEDMAN:  Okay.  All right.

21            THE COURT:  Excuse me, if we can have the witness

22   sworn please.

23                      LATA RANI GUPTA,

24   was herein, called as if upon examination, was first duly

25   sworn, as hereinafter certified, and said as follows:
```

```
 1              COURTROOM DEPUTY:  Thank you, ma'am.

 2              MR. FRIEDMAN:  Thank you.

 3                         DIRECT EXAMINATION

 4    BY MR. FRIEDMAN:

 5    Q.        Ms. Gupta, I don't know if you can see me or not.

 6    A.        I can see you.

 7    Q.        All right.  So Ms. Gupta, are you aware of the

 8    nature of these allegations against your son?

 9    A.        Yes.

10    Q.        Okay.

11    A.        Yes, I am.

12    Q.        All right.  And not perhaps the specific

13    evidence, but we have spoken about what this case is about,

14    haven't we?

15    A.        Yes.

16    Q.        Okay.  So this hearing only deals with whether or

17    not your son should be detained or released during this

18    time.

19              How old are you?

20    A.        I was born in '43 so I have to be 76.  Yes, 76,

21    almost 77.

22    Q.        Okay.  And where do you live?

23    A.        I live in Michigan on West Shore Drive in Orchard

24    Lake.

25    Q.        And should -- how far is that from your son and
```

1  daughter-in-law's house?

2  A.          About hour and a half.

3  Q.          Okay.  And prior to this case, did you go over to

4  their house at times?

5  A.          Yes, I -- we go each other places, you know, over

6  the weekend, not every weekend, but we go quite -- we visit

7  each other.  We are on a lake, and summer they come here,

8  and other times we go there.

9  Q.          So Ms. Gupta, you said you would go there on the

10  weekends.  And we know your husband drives.  Do you drive?

11  A.          Yes, I do drive.  I drive better than him.

12  Q.          And are you working now, not working?

13  A.          I'm not working anymore.

14  Q.          Okay.  So let me ask you, you know, prior to this

15  case, you were not aware of any of the alleged conduct

16  that's accepted for purposes of this hearing?

17  A.          No, I can't even believe now unless I, you know,

18  he's not that boy.

19  Q.          All right.  But accepting what the allegations

20  are now, would you be willing, if The Court were to release

21  him to his home, would you be willing to, if The Court

22  imposed a responsibility on you, would you agree to comply

23  with all of those requirements and orders by The Court?

24  A.          Yes, I do.

25  Q.          Okay.

1   A.        I --

2   Q.        So -- okay, so let me ask you, Shraddha is home

3   now, but should there be times that she has to leave the

4   house and you have to be there to supervise your son, is

5   there anything that would prevent you from doing that?

6   A.        No.  I have nothing going -- it's just me and my

7   husband.  We live here, and I can go any time.  Nothing

8   here to hold me from not going there.

9   Q.        Okay.  All right.  And I think that -- let's just

10  do a hypothetical for the moment.  If The Court stated to

11  you that you have an obligation to contact The Court or

12  someone at the court if your son was doing anything

13  violative of a court order, would you be willing to do

14  that?

15  A.        Sure.  I would respect The Court.  I don't want

16  anymore trouble.

17  Q.        All right.  Thank you very much.

18            THE COURT:  Okay Ms. Tangeman, any questions of

19  Mrs. Gupta?

20            MS. TANGEMAN:  Yes, Your Honor.

21                       CROSS-EXAMINATION

22  BY MS. TANGEMAN:

23  Q.        Good morning, ma'am.

24  A.        Good morning.

25  Q.        You were just asked about your age, and you said

1    you were born in what year?

2    A.        '43, 1943.

3    Q.        So that makes you 77; is that correct?

4    A.        My birthday is next month.

5              THE COURT:  She's still 76.

6    BY MS. TANGEMAN:

7    Q.        Thank you.  Ma'am, you -- you stated that you do

8    not work at this time.  Did you work at one time?

9    A.        Yes, I worked with my husband.  Whenever there

10   was need, I would go in.

11   Q.        Okay.  Kind of help with the office?

12   A.        Yes.

13   Q.        And you are originally from India; is that

14   correct?

15   A.        Yes, I was born there.

16   Q.        And do you still have family there?

17   A.        My family, everybody's gone except my one brother

18   who's 82 something, he's alone there, so that's all.

19   Q.        Did you and your husband travel there with your

20   son over the years?

21   A.        Yes.  Not -- we went there, I think, four years

22   ago.  There was a wedding, and because they didn't assume

23   Shraddha, his wife, in my family because -- didn't get

24   around, they live there too, and both of us are here, and

25   the two -- my sister-in-law died, they wanted to meet, so

1  we all went so that they can see my son and his family.

2  Q.        Understandable.

3  A.        After that my sister-in-law died, and so my

4  brother is alone now, and we went.

5  Q.        And fair to say that your son's wife, your

6  daughter-in-law, also has family in India still; is that

7  correct?

8  A.        I -- yes.

9  Q.        Okay.  And prior to all of this, your son did a

10  bit of international travel, do you recall him traveling to

11  Italy and China in 2019?

12  A.        Yes, Italy I know, yes.

13  Q.        And do you recall him traveling to Cambodia in

14  2017?

15  A.        We were not with him.

16  Q.        Okay.  And do you recall him traveling to Costa

17  Rica in 2016?

18  A.        We were not with him again.

19  Q.        And then do you recall that he would often travel

20  to medical conferences across the country on an annual

21  basis?

22  A.        Yeah.  My husband does it too, sometimes they

23  both will go.  Sometimes I'll join them.

24  Q.        Ma'am, you mentioned that -- that you had no idea

25  about the allegations in this case.  Did you ever know your

1    son to own a gun?

2    A.          No, it was news to me.  There are so many things

3    I didn't know about him.  You really don't know what he

4    could do when you're not --

5            THE COURT:  Excuse me, Mrs. Gupta, Mrs. Gupta --

6    A.          Yes.

7            THE COURT:  -- just answer the question that's

8    asked, okay?

9    A.          Okay.  Thanks.

10           THE COURT:  If it's anything that you and your

11   son may have discussed or whatever, we understand, but just

12   Mrs. -- Ms. Tangeman's questions will be pointed and

13   direct, and so just answer the question.

14   A.          Okay.

15   Q.          Did you ever know him to be diagnosed with

16   depression?

17   A.          No.

18   Q.          So if I were to tell you that he reported to

19   Pretrial Services being diagnosed with depression four

20   years ago, you would not -- you would not have been aware

21   of that?

22   A.          No.

23   Q.          So then, therefore, I take it you never knew that

24   he had been prescribed medication for depression and was

25   seeing a counselor at one time?

```
 1   A.          (Nonverbal response.)

 2   Q.          Is that a no for the record?  Now, you were asked

 3   about the allegations, and you said, and I quote, I can't

 4   even believe it now, he's not that boy.  Fair to say it

 5   would be difficult for any mother to be in this situation,

 6   wouldn't you agree?

 7   A.          Uh-huh.

 8   Q.          Is that a yes for the record?

 9   A.          Yes.

10   Q.          Okay.  And you obviously love your son very much,

11   don't you?

12   A.          Yes.

13   Q.          Okay.  And obviously, as a mother, you would hate

14   to see him put in harm's way, wouldn't you?

15   A.          State again.

16   Q.          You would hate to see him put in harm's way?

17   A.          What does that mean?

18               THE COURT:  That means you would hate to see him

19   be in trouble or --

20   A.          Oh yes.

21               THE COURT:  -- or encounter something extremely

22   difficult.

23   A.          Yes.

24   Q.          Now, in a jail phone call you told your -- you

25   were talking to your son and he apologized to you, do you
```

1   remember that?

2   A.        Yes.

3   Q.        And you told him not to ever apologize.  Do you

4   remember saying that?

5   A.        Yes.

6   Q.        Can you tell me why you said that to him?

7   A.        Yes.  Because what good apology is?  He should

8   not do it if he did -- if he think he did something, which

9   he would --

10            MR. FRIEDMAN:  Objection, Your Honor, I think

11  we're getting outside the scope.

12            THE COURT:  I would agree.

13            MS. TANGEMAN:  And Your Honor, I would submit

14  that it goes to The Court's determination as to whether or

15  not a violation would be reported.

16            THE COURT:  I understand.

17            MS. TANGEMAN:  And Your Honor, I have no further

18  questions.

19            THE COURT:  Okay.  Mr. Friedman, anything

20  further?

21                      REDIRECT EXAMINATION

22  BY MR. FRIEDMAN:

23  Q.        Just one question Ms. Gupta.  So you were not

24  aware of any alleged conduct, you're aware of the

25  allegation now, and my question simply is if The Court

1  asked you to report anything that was in violation of the

2  rules, would you do that today?

3  A.       Yes, I would.

4  Q.       Okay.  Thank you.

5          MR. FRIEDMAN:  Nothing further, Judge.

6          THE COURT:  I have no questions.

7          MR. FRIEDMAN:  Your Honor, with that last

8  witness, we do not have any further questions.

9          THE COURT:  Okay.  I'll hear from you first,

10  Mr. Friedman, and then Ms. Tangeman and perhaps yourself

11  and --

12          MR. FRIEDMAN:  Your Honor, I believe as we

13  left -- and Ms. Tangeman, maybe I'm recalling it

14  incorrectly or maybe it changed, did you have a witness you

15  were calling?

16          THE COURT:  I'm sorry, yes, you indicated that

17  you were anticipating calling a witness.  By all means, I

18  apologize.

19          MS. TANGEMAN:  That's okay, Your Honor.  I would

20  actually argue that the presumption has not been overcome,

21  and I would ask that maybe argument be heard on that

22  because if The Court finds that the presumption of

23  detention, consistent with the pretrial recommendation for

24  detention has not been overcome, then there would be no

25  need for me to call the agent.

1         THE COURT:  Okay, go ahead.

2         MS. TANGEMAN:  Your Honor, I would submit that

3    the presumption has not been overcome.  This family seems

4    like they are lovely people, but lovely people don't always

5    know what's going on with their own family members.  And it

6    is notable in this case that neither the defendant's wife,

7    nor his parents, ever knew, for example, the defendant was

8    in possession or owned a gun.  The defendant's family not

9    only didn't know about his criminal conduct -- well, his

10   parents that is, but they had no knowledge that he was sort

11   of engaged in this separate life that went on for 14 years.

12   The defendant was able to deceive them actively.  His --

13   his parents, understandably, believe the best in him, and

14   the question is whether or not they would report a

15   violation, or would acknowledge even seeing a violation to

16   report it, or would they turn a blind eye to it, not with

17   any mal intent or intent to break The Court's rules, but

18   simply because that's what they did throughout the years

19   with this defendant.

20        So for example, when the wife received a letter

21   from a woman saying that -- and that woman being the victim

22   in this case, saying that he had drugged and raped her, the

23   defendant's wife took him at face value, took his denials

24   at face value and even said that is not the man he is.

25        The defendant's father acknowledges the defendant

1   at no time owned a gun, and then he noted that in college

2   he had a, quote, fascination with guns, and that the father

3   told him not to keep a gun in the house in case he is

4   depressed and he might use it against himself.  These are

5   very telling statements, and they are extremely alarming.

6        The Court would note that the parents didn't know

7   about any mental illness or depression or depression

8   medication.  His wife claimed it was just a year ago when

9   the kids left the house, but of course his son is 21, his

10  son left the house years ago.  And in fact, in the Pretrial

11  Services report, the defendant reported he was diagnosed

12  four years ago, not --

13       THE COURT:  I think the daughter just left a

14  year, she's 19 I think.

15       MS. TANGEMAN:  Yes, correct, but the son was 21.

16  And defendant reported to Pretrial Services that he had

17  been on this medication for four years and had even started

18  seeing a counselor during that time, and had stopped seeing

19  that counselor and that medication six months before his

20  arrest in March of this year.  The -- the defendant -- the

21  defendant and his wife, we would also note, did not -- they

22  claimed to not know about this firearm and ammunition that

23  was found in the house.

24       THE COURT:  And I believe that.  I do.

25       MS. TANGEMAN:  And correct, and that may very

1    well be true, but I guess it begs the question for The

2    Court that they didn't even know what their own son was up

3    to, and their son had a gun and ammunition hidden in his

4    parent's home, and, yet, he is being also proffered as a

5    proposed custodian.  I would just -- it's just a difficult

6    position for a 21 year old to be in to report his own

7    father who supports him.  So I would note that as much as,

8    again, the intent of a 21-year-old son may be all good, it

9    puts him in an awkward situation.  And of course we haven't

10   heard from the 21 year old.

11          And we would also note that the parents are not,

12   you know, they're not in the beginning of their lifetime.

13   They are a bit older, and they are willing to move in with

14   the defendant.  However, the government has some concerns

15   about the fact that the defendant was obviously more tech

16   savvy than them, and of course these dates were arranged

17   online.  And with the means, the financial means he has, we

18   appreciate that means he might be able to post property,

19   but it also means that he could afford, for example, a fake

20   passport and he could afford to travel.  And lastly, we

21   would note --

22          THE COURT:  That would be difficult under today's

23   conditions that they'll pass -- in terms of overseas

24   flight.

25          MS. TANGEMAN:  The government would also note

1    that while The Court has reviewed the victim's statement

2    and understands her position, we would note that the

3    defendant recorded her driver's license during the act,

4    during the drugging and the raping.  And we believe we

5    found all electronic devices, but an SD card, a thumb

6    drive, a Kodak memory card, those are very small.  If the

7    defendant did, in fact, copy the recordings that he made,

8    including our victim, he would not only have the victim's

9    identity, he would have her exact address.  And while we

10   understand that The Court may see this more as a

11   nonappearance issue, we would express our concern about the

12   risk to the community as well as his risk of flight or

13   nonappearance.

14          And Your Honor, I think for all of those, we

15   would note, again, that the recommendation is for

16   detention.  And we would advocate that the presumption has

17   not been overcome.  Thank you, Your Honor.

18          THE COURT:  Mr. Friedman?

19          MR. FRIEDMAN:  Thanks, Your Honor.  I listened to

20   the government's position.  And I'm not surprised that

21   Mr. Gupta's parents were not aware that these were -- we

22   talk about a gun, we're talking about college, 20, 30 years

23   ago that a discussion was had.  The language that is being

24   called upon, I think, is subject to cultural issues

25   certainly when his father says, no, we don't -- we don't

1  have guns and so forth and talked about the trouble one

2  could get into.  I think that's a generally-held belief

3  that was not specific because there was no diagnosis at

4  that time.  If the -- you know, to say that the parents

5  were not aware of any diagnosis, he's a grown man who, like

6  many, would not be talking to his parents about getting a

7  prescription for Lexapro.  While in jail he's not been

8  taking the Lexapro, and he's been perfectly fine.

9        The -- the thought about -- let me just pick up

10  on turning a blind eye.  You know, how many times have we

11  stood in court, all of us, when family said I didn't know.

12  I mean, more times than not the families are unaware of any

13  conduct alleged at that time, but even if it came to

14  fruition, they're not aware.  But the issue here is they

15  are aware, they've committed to counsel to fight this case.

16        He does not have a passport.  Your Honor properly

17  recognized that it is extremely difficult to travel at this

18  time.  And all three witnesses stated unequivocally that

19  they would do what they needed to do if this Court placed

20  any requirement upon them.  So, again, it goes back when we

21  talk about the need -- I hear on the one hand the

22  government say we believe we have everything but there

23  could be a thumb drive and an SD.  All of those things

24  could be solved, there's conditions that could be met to

25  stop all of that.

```
 1              But what's not changing, Judge -- actually, I
 2    take that back.  What is changing is the rates of Covid.
 3    We saw what happened yesterday, our largest spike, it's
 4    gone on even since we last spoke Wednesday.  How can
 5    counsel effectively prepare our client?  And I think --
 6    well, in my opinion it's just like every other person
 7    that's been speculating.  But at this point we're talking
 8    about a lengthy amount of time that a person presumed
 9    innocent is going to be sitting there unable to meet with
10    counsel, unable to effectively prepare his case while
11    presumed innocent.  And this could be a year, two years, we
12    don't know how long this is going to be.  There are certain
13    conditions that could be met.  I mean, if The Court felt
14    the only way to do that is to have a licensed security
15    guard at the house at all times, that's something we'd be
16    willing to do.  There are a number of conditions to address
17    any concerns that The Court has that we can meet, whether
18    that's installing surveillance in the house in certain
19    rooms in which he should stay, whether that's having
20    security present, there's so many things that can be done.
21    I don't think it's necessary, quite frankly, but the fact
22    of the matter is, it is so exceptionally important that we
23    have the ability to sit with our clients and not just have
24    calls.  And I know The Government's not listening to those
25    calls, but it's impossible to prepare a case as well with
```

1    someone in versus someone who is out.

2           And you know, The Court brought up having him

3    transferred and brought closer and closer and so forth.  It

4    doesn't solve any conditions.  It doesn't matter if he's in

5    Cuyahoga or Anchorage --

6           THE COURT:  In thinking about that, I'm not sure

7    that the government -- I can compel the government to --

8           MR. FRIEDMAN:  Right.

9           THE COURT:  -- put somebody someplace.  And also

10   it's not uncommon that we have defendants in Ohio who are

11   resident closer to other cities or whatever, so that

12   probably wouldn't work anyway.  I probably couldn't

13   accomplish that.

14          MR. FRIEDMAN:  But, again, it just goes back to

15   so now they're aware of the allegations, they've obligated

16   themselves, and all of the concerns that are shown can be

17   dealt with if they were to even occur.  I've not heard

18   anything that since that time he poses any greater threat

19   than anybody else frankly.

20          The ID, you know, there is nothing there, and

21   there's things that we can do to have the house completely

22   cleaned and so forth.  Like I said, we can go even as far

23   as bringing security there that would report directly to

24   The Court.

25          So with that said, Your Honor, when I think,

```
 1    coupled with the fact of the needs for this person to be
 2    able to prepare under the circumstances that we've only
 3    faced once in this lifetime, it is imperative that the
 4    person be out.  What if he were acquitted in this case?  He
 5    would have been sitting in jail now, it will go on two
 6    years sitting there unnecessarily.  So I'm -- sure, there
 7    is an indictment, and the government claims that the case
 8    is overwhelming, but that is certainly their opinion.  That
 9    is fine.  We've heard that before, and yet people are
10    acquitted.  Is it fair to keep him in, now presumed
11    innocent, with Covid going up placing him at risk and not
12    being able to fully prepare this case?  I think not, and I
13    leave that with The Court.  Thank you, Your Honor.
14         THE COURT:  Melissa, if you can send me and
15    Yvonne to the breakout room, please.
16         MS. DYBALA:  Judge, give me a moment.
17         THE COURT:  Yeah, please.
18              (A brief recess was taken.)
19         THE COURT:  Can you hear me?  Are we out of the
20    breakout room yet?  Okay.  Mr. Friedman, anything further,
21    Ms. Tangeman?
22         MR. FRIEDMAN:  Not at this time, Your Honor,
23    other than as I stated, we can meet any condition and
24    beyond that would address any of the government's concerns.
25         THE COURT:  Well, I understand that.  And
```

1  obviously I've given this a lot of thought, but I remain

2  troubled, deeply troubled, by the possibility that at some

3  point, typically given the guideline range, and, in all

4  candor, based on what I know about the case so far, the

5  evidence appears quite substantial, and I think that's

6  appropriate for me to take that into consideration, and to

7  balance the likelihood of a particular outcome against --

8  simply in terms of the impact on somebody, particularly of

9  his, you know, former stature, his accomplishments, I just

10  don't think the presumption's been overcome.  And I hope

11  you can understand that he, and especially his family can

12  understand, this is not an easy decision for me.  I think

13  recently -- Tracy can correct me, I know I've let someone

14  out who was looking at a 15 year minimum mandatory

15  sentence, and he's out.  Tracey, have I let somebody with a

16  20 year mandatory term out?  I can't recall.  It would

17  surprise me if I have.

18          MS. TANGEMAN:  I don't recall 15, but you did a

19  case with a mandatory ten years.

20          THE COURT:  Yes, but there was one that was 15 in

21  Alissa's drug case, Negrin case, actually a principle

22  defendant, mild actor, the brother of a main defendant.

23          But anyway, so Mr. Friedman, I want to be talking

24  to you so if you can just say something, I think that's

25  fair to see me as I pronounce -- Mr. Gupta, if you'll

1   please say something, I should be speaking to you and

2   explaining to you my reasons for what is a devastating

3   decision following a series of what I'm sure for your and

4   also for your family, it's been a devastating series of

5   events.  But I really am concerned about the history of the

6   diagnosis of depression, the prescribed medication, I

7   realize he's not taking it now.  I certainly would want him

8   to be taking it were he out.

9           But -- and it may be awhile, Mr. Friedman,

10  obviously until the case is resolved.  And I understand

11  exactly your contentions and your concern, but they're

12  common place.  Every defendant and every lawyer

13  representing that defendant, particularly under today's

14  dreadful conditions and circumstances, encounters the same

15  problem you do.  Whenever a man is in custody, a

16  defendant's in custody, it makes the defense, preparing for

17  the defense and presenting the defense much more difficult

18  than when that person is available and can truly assist in

19  the preparation of its own defense, meet with an attorney,

20  obviously easier to follow the attorney's advice and

21  directions about how and what he should do and how he

22  should go about it.  But I'm simply concerned, and there is

23  a principle reason for my decision, that despite the -- the

24  potential for serious and drastic financial consequences

25  upon his wife and children, nonetheless, as time passes and

1    the hour approaches at which a bell of some sort will ring,

2    and I don't think it's going to ring in a way that's

3    welcome to him or his family, just given what I understand

4    the evidence to be, that bears upon a man's mind.  And

5    looking potentially at spending the rest of one's life in

6    prison, that at some hour, dark hour in the middle of the

7    night doing something drastic, getting the car keys, going

8    in the garage and turning the motor on, or simply leaving

9    or whatever.  And I don't think -- and I think that there's

10   almost no way that that risk can be curtailed.  I realize

11   you have -- I've never heard that term proposed, but having

12   somebody literally there outside the family there 24/7,

13   which, on the other hand, even somehow some way within the

14   house, I don't think it's beyond the realm of possibility

15   to go down to the kitchen, take a knife, get in the

16   bathtub, turn on the water.  I really am concerned about

17   that.  That is my principal concern.

18          The risk of flight today certainly is less than

19   it might otherwise be.  I have no concern that he would be

20   able to get on a plane and, you know, go to India or

21   whatever.  The family ties are there, but they don't appear

22   to be the kind that people there would, you know, accept

23   what he would have done to his family and welcoming and

24   harboring.

25          So I do not believe the presumption has been

1  overcome.  The conditions are very substantial, but

2  nonetheless, bottom line, I don't think they are reasonably

3  sufficiently to assure you are going to appear.  I am less

4  concerned about risk of flight than, oh, say, look,

5  possibly 30 years and every day I'm home realizing that

6  that possibility becomes closer and closer, and that the

7  life that I have led, still leading in a small way, an

8  important way, is about to come to an end.  So the choice

9  then is to have it end one way, or simply being torn from

10  the life that remains to me after what has happened so far,

11  or simply let this be it.  I'm trying to be as honest and

12  candid with you as possible.

13       You know you have a right to appeal.  In your

14  situation I would encourage my client to have you file a

15  Notice of Appeal, which, as you know, you must do within 14

16  days.  I believe I stated my reasons on the record.  I have

17  considered all of the appropriate factors.  In fact, I

18  think I've gone beyond them.  I don't think I've ever found

19  a case in which the presumption has not been overcome.

20  Ms. Tangeman, we deal with this all the time, and I don't

21  think you've ever heard me say no, no, no, I find the

22  presumption overcome, now let's take a look at the

23  conditions.  But in this case, the past, the nature of the

24  evidence, the weight of the evidence, the likelihood of

25  conviction, the difficulty that you encounter, as I say,

1   are unfortunately common place, and I understand them.

2   It's among the factors that cause me, much more often than

3   not, and very often over the government's opposition to,

4   quote, take the chance.  And in 40 years of doing this job,

5   first as a Magistrate Judge and now District Judge, I've

6   had only three people, maybe four people, on pretrial

7   release fail to appear, and they were all apprehended.  But

8   in this case I'm not so much worried about risk of flight

9   as I am about the risk of suicide.  The risk of flight is

10  there, but I think it's a much less concern to me, and

11  under all the circumstances the risk of suicide -- and I'm

12  trying to be very poynant on that so that the record, I

13  would hope you would find sufficient, a sufficient basis

14  for purposes of appeal.  And if not, let me know if there's

15  anything else you want me to touch upon.

16          And I'm concerned, too, quite candidly, that from

17  all it appears, and I still maintain the presumption of

18  innocence, but I think I have to look at the record as it

19  comes to me now in making this decision, not any other

20  decisions down the road.  And certainly I hope you know my

21  reputation well enough that what I say today would not

22  affect what I do tomorrow in this case.  I feel very

23  strongly about the presumption of innocence, the right not

24  to testify, the right to counsel.  Ms. Tangeman can tell

25  you that when she stands up and says good morning, ladies

1    and gentlemen, I represent the United States of America,

2    when she's done I turn to the jury and I say, ladies and

3    gentlemen, Ms. Tangeman says she represents United States

4    of America, she does.  Who are the United States of

5    America?  We are, you and I.  She's our lawyer.  Well,

6    ladies and gentlemen, I'll point to the defense attorney,

7    say ladies and gentlemen, the defendant's lawyer, that

8    lawyer there, also represents all of us because he

9    represents the Constitution and the rights that we all have

10   to be presumed innocent, to a fair trial by an impartial

11   jury, a jury of people of a mindset that you would want to

12   be if you were in his place and sitting where he is.

13   That's how strongly I feel about the Constitutional rights.

14   I'm not sure many judges do that, but I try to make sure

15   that the jury understands the defense -- the defendant is

16   presumed innocent.  The government has the burden of proof.

17   He need not say or do anything.  That's a right we all

18   have.  And most importantly, his lawyer represents me just

19   as much as the government's lawyer.  Ms. Tangeman, you've

20   heard me say that, right?

21           MS. TANGEMAN:  Yes, many times, Your Honor.

22           THE COURT:  So I want you and your client and the

23   family to understand that what I say about the weight of

24   the evidence and the likelihood of conviction is fully for

25   these purposes and will not affect what I do going forward.

1    He stands innocent until proven guilty by a jury that

2    returns a unanimous verdict.

3            On the other hand, just to complete -- to

4    conclude, I just am too concerned about the risk of suicide

5    and nonappearance in that means to have that reasonable

6    satisfaction.  I don't have to be convinced, but a

7    reasonable satisfaction that the conditions that are

8    proposed are substantial and, to some extent, as unique as

9    they are, simply are not sufficient to assure his

10   appearance.

11           That being said, Mr. Friedman, is there anything

12   further you would like me to stay with regard to my reasons

13   or reasoning for purposes of appeal?

14           MR. FRIEDMAN:  No, Your Honor.  Thank you for the

15   time you've afforded us.  That's all I can do.  You've

16   obviously listened to everything, and we appreciate that.

17           THE COURT:  That's my job.  There are few easy

18   decisions, and this certainly has been one of the most

19   difficult decisions.  It really is.  I balance what, in my

20   core, is so important to me.  My default is out.  And even

21   in a case -- I've given it a lot of thought, I've discussed

22   it with the terrific Pretrial Service Officer, but she has

23   not made my mind up, and she will tell you in a heartbeat

24   they don't make my mind up.  I consult them, I listen to

25   them, I take their considerations and viewpoints into

1    consideration, their concerns into consideration, but I

2    make my own mind up.

3          So Mr. Gupta, you do have a right to appeal this

4    decision.  I urge you.  You have very competent counsel.

5    Undertake to do so if that's your choice and his choice.

6    If you want to appeal my decision, you have 14 days within

7    which to file a Notice of Appeal, or you will lose forever

8    whatever right you might otherwise have to challenge what

9    I've done here today.

10         Ms. Tangeman, is there anything further that you

11   would want me to do with regard to stating my reasons in

12   considering the various factors under the Bail Reform Act?

13         MS. TANGEMAN:  No, Your Honor.  Thank you.

14         THE COURT:  And unless counsel think it

15   otherwise, I believe that I have stated sufficiently on the

16   record my reasons.  If desired, I will, you know, transform

17   those into a short opinion, but I think I've been as clear

18   as I would be otherwise.

19         COURTROOM DEPUTY:  Your Honor, this is Tina.

20   Judge, could you ask the defendant if he consents for

21   today's hearing by video?

22         THE COURT:  Yeah, Mr. Gupta.  Mr. Gupta, you have

23   to speak.

24         THE DEFENDANT:  Yes.

25         THE COURT:  It's my understanding that you signed

 1    a waiver to have these proceedings conducted in this

 2    manner, and that was your decision; is that correct?

 3              THE DEFENDANT:  Yes, Your Honor.

 4              THE COURT:  Okay.  Mr. Gupta, I don't know what

 5    to say, but I am sorry.  I gave you and the proposed

 6    conditions and everything that your family and your

 7    remarkable lawyer -- I don't believe he's been in front of

 8    me, but his reputation precedes him.  I'm delighted to have

 9    him in this case, and you've chosen well to have someone

10    represent you.  I'm sure he'll do a very, very good job.

11    But I've tried to be as honest and as direct with you

12    because you're the one to whom this matters the most.  I

13    know what the consequences are.  I've given it every

14    consideration, but I've stated my reasons.  So you do have

15    a right to appeal, and I hope you take it because three

16    judges may see it otherwise, two judges may see it

17    otherwise.  So I would exercise that right if I were in

18    your situation.  Ms. Tangeman?

19              MS. TANGEMAN:  Yes, Your Honor.

20              THE COURT:  Okay.  Once again, anything further?

21              MS. TANGEMAN:  No, Your Honor.

22              THE COURT:  Mr. Friedman?

23              MR. FRIEDMAN:  No, Your Honor.  Thank you very

24    much.

25              THE COURT:  Of course.  Thank you, counsel.  That

```
 1   will conclude this proceeding.  Thank you very much.

 2                           - - -

 3                     C E R T I F I C A T E

 4

 5            I certify that the foregoing is a correct transcript

 6   from the record of proceedings in the above-entitled matter.

 7

 8   s:/Angela D. Nixon              July 14, 2020

 9   --------------------------              -----------

10   Angela D. Nixon, RMR, CRR      Date

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```