## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CRIMINAL NO.: 3:20-CR-208 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE JAMES R. CARR |
| vs. | ) | MAGISTRATE JAMES R. KNEPP II |
| | ) | |
| MANISH RAJ GUPTA, | ) | **DEFENDANT'S MEMORANDUM IN** |
| | ) | **SUPPORT OF SENTENCING** |
| Defendant. | ) | |
| | ) | |
| | ) | |

Now comes the Defendant, Dr. Manish Raj Gupta, by and through undersigned counsel, Friedman & Nemecek, L.L.C., and hereby respectfully submits the instant Memorandum in Support of Sentencing for this Honorable Court's consideration in determining an appropriate disposition in this matter. The instant Memorandum contains information pertaining to Dr. Gupta that is relevant to this Court's determination of a sentence that is sufficient, but not greater than, that which is necessary to satisfy the principles and purposes of federal sentencing.

Respectfully submitted,

/s/ Ian N. Friedman_____
IAN N. FRIEDMAN (0068630)
ERIC F. LONG (0093197)
MADELYN J. GRANT (0098165)
Counsel for Defendant
Friedman & Nemecek, L.L.C.
1360 East 9th Street, Suite 650
Cleveland, OH 44114
P: (216) 928-7700
F: (216) 820-4659
E: inf@fanlegal.com
E: efl@fanlegal.com
E: mjg@fanlegal.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing Memorandum was filed on the 1st day of November, 2021 by CM/ECF, which will send a notification of electronic filing (NEF) to the following: Assistant United States Attorney, Four Seagate Building, #308, Toledo, Ohio 43604.

/s/ Ian N. Friedman____
IAN N. FRIEDMAN
ERIC F. LONG
MADELYN J. GRANT
Counsel for Defendant

## MEMORANDUM IN SUPPORT

### I.     FACTUAL HISTORY

On April 27, 2021, Dr. Gupta stood before this Honorable Court and entered a plea of "Guilty" to one (1) count of Sex Trafficking of Adult by Force, Fraud, or Coercion, in violation of 18 U.S.C. §§ 1591(a) and (b)(1); and one (1) count of Illegal Dispensing a Controlled Substance (without the victim's knowledge), in violation of 21 U.S.C. §§ 841(a)(1) and (b)(7). At the present time, Dr. Gupta stands before this Honorable Court for the imposition of sentence. Dr. Gupta respectfully requests that the Court consider the information set forth in the instant pleading, as well as additional evidence and arguments to be presented at the sentencing hearing, in determining a fair and appropriate disposition of this case.

It is respectfully submitted that a person cannot be judged – nor their character defined – by a series of isolated acts or bad decisions. Indeed, Dr. Gupta broke the law. However, since these offenses, Dr. Gupta has been diligent in his efforts to understand the underlying reasons for committing these offenses and, more importantly, the means to ensure that he does not find himself in a similar predicament in the future. He has accepted responsibility and is remorseful for his actions. Dr. Gupta has taken a hard look in the mirror over the last year and a half and made it his mission to drastically change the man he sees looking back at him. He knows his conduct was unacceptable, and he is devastated for the harm he has caused to others, including the victims, as well as his family, friends, and the community at large.

## II. **AT THE TIME OF SENTENCING, IT WILL BE THIS HONORABLE COURT'S DUTY TO IMPOSE A SENTENCE SUFFICIENT, BUT NOT GREATER THAN NECESSARY, TO COMPLY WITH THE PURPOSES OF FEDERAL SENTENCING SET FORTH IN 18 U.S.C. § 3553(a).**

In light of *United States v. Booker*, 543 U.S. 220 (2005), this Honorable Court is required to engage in a multi-step analytical process at sentencing. First, the Court must determine, after making appropriate findings of fact, the applicable Guidelines range. *United States v. Grossman*, 513 F.3d 592, 595 (6th Cir. 2008). After making appropriate findings of fact, the Court must then determine whether a sentence within that range serves the factors set forth in § 3553(a). *Id*. Finally, the Court must articulate the reasons for the sentence imposed in light of the factors set forth in 18 U.S.C. § 3553(a). *Id*.

### A. **Calculating the Appropriate Guidelines Range**

As an initial matter, counsel reiterates that Dr. Gupta accepts full responsibility for his offenses. Dr. Gupta's life has been forever changed as a result of his choices and the repercussions of his illegal conduct. Dr. Gupta recognizes the severity of this situation and is dedicated to separating himself from the behavior that gave rise to the instant matter. He is remorseful and contrite for his misconduct and desires the opportunity to continue his efforts of being a productive and law-abiding citizen after the disposition of this case. As set forth in the Plea Agreement, the parties have stipulated to the following Guideline calculations:

| 18 U.S.C. §§ 1591(a) and (b)(1): Sex Trafficking of Adult by Force, Fraud, or Coercion | | |
|---|---|---|
| Base offense level (because § 1591(b)(1) offense) | 34 | §2G1.1(a)(1) |
| Use of special skill (Defendant used his position as a medical doctor to facilitate this crime) | +2 | §3B1.3 |
| The offense involved more than 10 victims (approximately 20) warranting an upward departure | +3 | §2G1.1, App. Note #6 |
| Subtotal before acceptance of responsibility: | 39 | |
| **Anticipated offense level after acceptance of responsibility:** | **36** | |

| 21 U.S.C. §§ 841(a)(1) and (b)(7): Illegally Dispensing a Controlled Substance (without the victim's knowledge) | | |
|---|---|---|
| Base offense level (less than 1K units of Ketamine or Schedule III or less than 16K units of Schedule IV substance) | 6 | §2D1.1(c)(17) |
| Use of special skill (Defendant is doctor) | +2 | § 3B1.3 |
| **Subtotal** | **8** | |
| **With § 2D1.1(d)(2) cross-reference to § 2X1.1 as applied to §2G1.1 (Sex Trafficking of Adult by Force, Fraud, or Coercion)** | | |
| Cross-reference for 21:841(b)(7) offense pursuant to § 2D1.1(d)(2) → apply § 2X1.1 regarding the offense of violence committed (Sex Trafficking of Adult by Force, Fraud, or Coercion) if resulting offense level is greater than that determined above | | §2X1.1(a) §2D1.1(d)(2) §2G1.1 |
| Base offense level + applicable enhancements from § 2G1.1 (see above chart) | 39 | § 2X1.1(a) |
| Total offense level before acceptance of responsibility: | 39 | |
| **Anticipated offense level after acceptance of responsibility:** | **36** | |

As this Honorable Court is aware, independent of the above referenced Guideline calculations, Dr. Gupta is facing a mandatory minimum sentence of fifteen (15) years (180 months), which is 8 months short of the low end of the 188-235 months that is stipulated to by the parties. District courts are required to engage in a multi-step analytical process at sentencing. See *Booker*, 543 U.S. 220. Post-*Booker* opinions make clear that, although a sentencing court must "give respectful consideration to the Guidelines, *Booker* permits the court to tailor the sentence in light of other statutory concerns as well." *Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (internal quotation marks and citation omitted). Accordingly, although the "Guidelines should be the starting point and the initial benchmark," district courts may impose sentences within statutory limits based on appropriate consideration of all of the factors listed in §3553(a), subject to appellate review for "reasonableness." *Pepper v. United States*, 562 U.S. 476, 131 S. Ct. 1229, 1241 (2011), quoting *Gall v. United States*, 552 U.S. 38, 49-51 (2007).

The Supreme Court has expressly directed that an "individualized assessment" of the case "based on the facts presented" is required. *Gall*, 552 U.S. at 50. Such analysis should be guided by "reasonableness" and an "individualized application of the statutory sentencing factors." *Id.* at

46-47.  A sentencing judge retains "wide latitude to decide the proper degree of punishment for an individual offense and a particular crime." *United States v. Cavera*, 550 F.3d 180, 189 (2nd Cir. 2008).

**B.  Examination of the Factors Set Forth in 18 U.S.C. § 3553(a).**

    **1.  Nature and Characteristics of the Offense and the History and Characteristics of Dr. Gupta**

        **a.  *History and Characteristics of Dr. Gupta***

In *Pepper*, *supra*, the United States Supreme Court endorsed the notion that post-*Booker* sentencing must focus as much on the offender, their individual background, and their need for services and rehabilitation as on the offense committed. According to the Court, "highly relevant— if not essential—to [the] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics. Permitting sentencing courts to consider the widest possible breadth of information about a defendant ensures that the punishment will suit not merely the offense but the individual defendant." *Pepper*, 131 S. Ct. at 1240 (internal citations omitted).

With the above statement from *Pepper* in mind, Dr. Gupta respectfully submits that his character and background are highly relevant to the Court's determination of an appropriate sentence. Born on December 16, 1970 in Royal Oak, Michigan, Dr. Gupta spent his childhood living with his mother and father. *See* Pre-sentence Report ("PSR") at ¶ 60. Before he was born, Dr. Gupta's parents lived in India, but moved to the United States to raise their family. *Id.* While both his parents were physicians, Dr. Gupta's mother chose not to work, in favor of raising their family, which consisted of Dr. Gupta and his younger sister. *Id.* at ¶ 60-61. Growing up, Dr. Gupta recalls a cultural difference between himself and his parents. *Id.* at ¶ 60. Specifically, in India, it is common to use corporal punishment as a form of discipline. *Id.* As a result, Dr. Gupta

remembered being locked out of the home for hours at a time and reported hands-on abuse throughout his upbringing. *Id.* Nonetheless, Dr. Gupta had a close bond with his family, which he maintains today. *Id.* at ¶ 61.

At the age of seventeen, Dr. Gupta moved out of his parents' home in Royal Oak, Michigan to attend school in Boston, Massachusetts. *Id.* at ¶ 63. Since 2002, he has lived in the Toledo/Sylvania, Ohio area. *Id.* While in Boston, Dr. Gupta earned his undergraduate degree from Boston University, as well as a master's degrees. *Id.* at ¶ 71. He then earned his Doctorate degree in 1997 from the American University of the Caribbean, School of Medicine. *Id.*

Until recently, Dr. Gupta was married to Shraddha Gupta. *Id.* at ¶ 62. However, because of the instant matter, the two divorced in February of 2021. Together, Dr. Gupta and Shraddha have two children, both of whom are adult age and live in the Chicago area for school. *Id.* Dr. Gupta's children mean the world to him and serve as a tremendous source of motivation to put his criminal past behind him. It is not lost on Dr. Gupta that, because of his own actions and choices, he now likely stands to miss many of the milestones that parents dream of being present for, such as their children graduating college, getting married, and starting their own families. Dr. Gupta is immensely proud of the adults that his children have grown to become and wants nothing more than to remain an active part of their lives. He realizes that the first step toward regaining the trust of his family is to modify his behavior such that he is no longer engaged in the type of conduct that brings him here before this Court.

Prior to his arrest, Dr. Gupta was a board-certified plastic surgeon by the American Board of Plastic Surgery. *Id.* at ¶ 72. As a result of his hard work, he owned three medical offices, two of which were located in Ohio, while the third was located in Michigan. *Id.* As troubling as his conduct was in this case, it must be stated that he has never engaged in any inappropriate conduct

whatsoever with his patients.  Nor have there been any allegations or even rumors of such conduct. However, as a result of the instant matter, Dr. Gupta voluntarily surrendered his medical license and has closed the offices. Dr. Gupta has been ready and willing to assist with any transitional needs of his patients, even while incarcerated.  He has worked with counsel and those who have access to records to ensure that patient records have been maintained and available for his patient's new physicians.  There is little doubt that aside from the instant conduct, Dr. Gupta has led an exemplary life and has helped countless people.

While incarcerated, Dr. Gupta has dealt with his own medical needs.  He is currently taking Crestor for his high cholesterol and a vitamin D supplement for his vitamin D deficiency. *Id*. at ¶ 64. Dr. Gupta also suffers physically from myopia (nearsightedness), Achilles' tendonitis, and hyperlipidemia (high blood pressure). Aside from his physical ailments, Dr. Gupta suffers from mental health issues that warrant consideration. As noted in the PSR, Dr. Gupta suffers from depression, and was prescribed Lexapro through his primary care physician. *Id.* at ¶ 66. While incarcerated, Dr. Gupta has been diligent in caring for his mental health issues, including addiction, which played a significant role in Dr. Gupta's criminal offenses. As will be explained more fully at the sentencing hearing, Dr. Gupta completed an initial assessment with Advanced Psychotherapy Services ("APS"), on April 10, 2020. *Id.* at ¶ 67. Since then, Dr. Gupta has engaged in weekly phone sessions aimed at discovering the genesis of his behavior and sexual addiction. *Id.; see also* Treatment Reports from Saraha Martincak,  M.Ed., LPC, LCDC III, GAMB, CSOTP, which will be marked as Exhibit "A."[1] At Sentencing, Ms. Martincak is expected to expound upon Dr. Gupta's treatment and the progress he has made.

---

[1] The undersigned intends to file this document under seal in the days leading up to Sentencing.

For most of his life, Dr. Gupta did not experience any issues with alcohol. However, around 2017, Dr. Gupta battled with binge drinking while out of town. *Id.* at ¶ 69. While his alcohol use was not problematic at home, it was during these out-of-town occurrences where he engaged in the criminal conduct for which he has pleaded "Guilty."

### b.  *Dr. Gupta's Remorse and Contrition*

Dr. Gupta completely accepts responsibility for his conduct in this case, as evidence by his plea of "Guilty." Dr. Gupta again conveyed his sincere remorse during his PSR interview. Here, Dr. Gupta stated,

> I take full responsibility for my actions in this case. I recognize the harm that I have caused by my poor choices, both to the victims of my conduct, my family, and the community. I have had a lot of time to reflect upon my behavior, and even though I am incarcerated, I have been able to engage with a treatment program that has helped me to better understand my conduct and the impact it has had on everyone involved. Looking back, I can clearly recognize that my compulsive behavior became a very dark mark on an otherwise productive and fulfilling life.

> I am deeply embarrassed, ashamed, and remorseful for my conduct. As a father, son, and husband, I have always tried to set a good example and make my family proud. I regret the effect my actions have had on my family's perception of me and their own reputation. I cannot undo what I have done, but I look forward to reuniting with my family and rebuilding the love and trust that I had spent my life cultivating. I remain thankful for the support of my family, even during the most difficult times of their lives. Finally, I apologize to the Court and the agents involved for the time and effort spent on my case.

PSR at ¶¶ 37, 38. At the present time, Dr. Gupta stands before this Honorable Court humbled, remorseful, and contrite. He understands that his conduct was wrong, and he is embarrassed and ashamed for putting himself and his loved ones in this untenable position. Dr. Gupta desperately wants to atone for his poor choices and serve as a positive example for his children. He is adamant that these offenses are not representative of his general character, and that he is committed to doing

whatever is necessary to move forward with his life and continue his efforts at being a positive and contributing member of society after his release.

Even when the Sentencing Guidelines were mandatory, courts recognized the significant mitigating effect of the facilitation of the administration of justice and the defendant's expression of remorse. See, e.g., *United States v. Rudolph*, 190 F.3d 720, 722-23 (6th Cir 1999); *United States v. Fagan*, 162 F.3d 1280, 1284-85 (10th Cir. 1998)("[b]ecause remorse is not a prohibited factor, but a factor already considered in the Sentencing Guidelines, a sentencing court may depart downward if it finds that remorse is present to an exceptional degree"); *United States v. Garcia*, 926 F.2d 125 (2d Cir. 1991); *United States v. Volpe*, 224 F.3d 72 (2d Cir. 2000)(noting that activities facilitating the proper administration of justice may form the basis for a downward departure). After the Guidelines were made advisory, these factors remain a relevant consideration for courts in determining a reasonable sentence. See 18 U.S.C. § 3553(a).

At sentencing, Dr. Gupta will candidly discuss his remorse, not only for committing these offenses, but also for the resultant harm that it has caused the victims, the victims' families, his family, and the resources spent by the Government and this Honorable Court. Since the inception of this case, more than eighteen months ago, Dr. Gupta has been incarcerated. This lengthy period of detention has had its intended effect and even without the prospect of additional time, Dr. Gupta recognizes that prison is not where he wants to be. Dr. Gupta has certainly learned a valuable lesson as a result of this case and submits that a substantial term of incarceration, outside the minimum sentence, is not necessary to ensure that he does not find himself in a similar predicament in the future.

As noted *supra*, Dr. Gupta has undergone substantial rehabilitative efforts since the inception of this matter. Shortly after his arrest and subsequent incarceration, Dr. Gupta began

treatment with Saraha Martincak, M.Ed., LPC, LCDC III, GAMB, CSOTP, in an effort to better understand his behavior and sexual addiction, and ensure that he has the skills necessary to address his addiction in the future. Courts in this circuit have recognized the importance of a defendant's rehabilitation efforts by holding that "extraordinary rehabilitation may serve as a proper basis for downward departure." *United States v. Sauer*, 6th Cir. No. 98-6066, 1999 U.S. App. LEXIS 29201 at *7 (Nov. 1, 1999) *citing United States v. Blake*, 1999 U.S. App. LEXIS 16224, No. 97-6406, 1999 WL 503531 at *2 (6th Cir. July 9, 1999)(unpublished)(finding atypical post-offense rehabilitation an appropriate basis for downward departure); *United States v. Rudolph*, 190 F.3d 720, 1999 WL 710287 at *3 (6th Cir. 1999)(finding extraordinary post-sentence rehabilitation an appropriate basis for downward departure).

Here, undersigned counsel recognizes that Dr. Gupta is facing a mandatory sentence of at least fifteen (15) years. However, undersigned respectfully submits that his extraordinary rehabilitative efforts cannot be minimized or diminished, and should be considered when determining an appropriate sentence in this matter, within the guidelines range.

### c. *Support of Family and Friends*

District courts have recognized the importance of a defendant's strong social support system in fashioning a sentence that is sufficient, but not greater than necessary to satisfy the principles and purposes of federal sentencing. See *United States v. Wachowiak*, 496 F.3d 744, 747-48 (7th Cir. 2007)(explaining that "[w]here the Court has found strong social support from family, friends, and others the Court has deemed a lower sentence appropriate"); see also *United States v. Smith*, 275 Fed.Appx. 184, 186 4th Cir. 2008) (relying on the defendant's strong family ties when imposing a sentence that varied 24 months below the calculated Guidelines range in a child pornography prosecution).

11

In anticipation of sentencing, the undersigned has received a copious number of letters from Dr. Gupta's friends, family, and colleagues, all wishing to make their support of Dr. Gupta known to this Honorable Court. Despite this charge and abhorrent decisions, these letters portray Dr. Gupta as a kind, hard-working, thoughtful, and supportive family man. *See* Letters of Support attached hereto as Exhibits "B" – "YY." Again, there is clearly more to Dr. Gupta than his criminal conduct.  The actions that have led him here are a fraction of who he is and what he has done.  The letters of support portray the best of Dr. Gupta.

Dr. Gupta has many different roles in life, from loving friend and family member, to trusted colleague and valuable mentor. However, his supporters make one thing clear: regardless of the role he has had in their lives, Dr. Gupta has always been a kind and compassionate man who goes to great lengths to help anyone he can. In their letters, Dr. Gupta's supporters routinely discuss the heartwarming and considerate gestures he routinely displayed towards them. Throughout his life, Dr. Gupta has maintained a number of close bonds with those who support him.  Each of them make it abundantly clear how near and dear they hold Dr. Gupta to their hearts.

As a family man, Dr. Gupta has made a lasting impression on the members of his family, both while growing up, as well as into adulthood. Monica Verma, Dr. Gupta's sister, recalled what it was like growing up with Dr. Gupta. *See* Letter of Support from Monica Verma attached hereto as Exhibit "B." Here, Monica noted that Dr. Gupta has guided her from adolescence through adulthood, which only made her a better, more empathetic person. *Id.* She recalled the number of times that Dr. Gupta served as the moral compass for her and her cousins, advising them that certain actions were wrong. *Id.* As she has started her own family, Monica stated that Dr. Gupta has served as a valuable mentor for her children, who will miss their uncle dearly while he is incarcerated. *Id.* Monica is confident that Dr. Gupta is truly remorseful for his actions and assures

this Court that he will be looked after, cared for, and brought back to becoming a force for good. *Id.*

Aside from growing up as an individual with a strong moral compass, Dr. Gupta's father, Raj Gupta, highlighted his son's giving nature. *See* Letter of Support from Dr. Raj Gupta attached hereto as Exhibit "C." In his letter, Dr. Gupta's father emphasized the number of selfless actions Dr. Gupta has displayed throughout his life, from volunteering in relief efforts for Bhopal, India after there was a poisonous gas leak which left thousands of people dead or blind, to voluntarily withdrawing from consideration for a residency program to improve his friend's chances of being accepted, because his friend needed the position to support himself. *Id.* "He has always carried deep empathy and a strong sense of how to make the world better through his contributions." *Id.* Like Monica, Dr. Gupta's father assured this Court that Dr. Gupta has the love and support needed to ensure that Dr. Gupta returns to being a productive and law-abiding member of society. *Id.*

Perhaps the most impacted individuals in Dr. Gupta's life are his ex-wife and children, who despite being heartbroken by the instant matter, know that Dr. Gupta's true identity is the loving and supportive father and husband they have known their whole lives – not the man who committed the instant offenses. Specifically, Ishani Gupta, Dr. Gupta's daughter explained that, "I [] cannot erase the wonderful memories and wonderful person that I had the privilege of calling my father," and "he checked all the boxes on the list of perfect father." *See* Letter of Support from Ishani Gupta attached hereto as Exhibit "D." During her upbringing, Dr. Gupta did everything he could to support his daughter in anything and everything that she did, and always went the extra mile to make it known how much he loved her:

> [m]y dad read every single one of my high school essays without hesitation. He read them through multiple times, sprinkling them with his scraggly handwriting in red pen. He held me when I cried. My dad took me to countless countries around the world, snapping Instagram photos at my request. My dad showed me the best

music on car rides to school, never ignoring my pleads to stop at Starbucks on the way. He listened to all my problems, even if I was saying the same thing over and over again. He got up early to make me chai and bring it to my bedside before I awoke. He let me shop to my heart's content, at his expense. He made sure that I knew he was proud of me, that he loved me, and built my security in every reaffirmed moment. He taught me to be strong, courageous, and resilient, every single day. I could go on all day on the countless ways that I witnessed his loving and sincere character. My dad was a good father, by all stretches of my imagination. He was not only a good man, but a great one.

*Id.* Ishani continued to highlight the great lengths Dr. Gupta went to in order to care for her, her brother, and her mother, including being by his ex-wife's side everyday after she had a stroke. *Id.*

Despite the two of them not always seeing eye-to-eye, or the actions that led to the instant matter, Kaartikeya Gupta, Dr. Gupta's son, still believes that Dr. Gupta is a good man with many great qualities. *See* Letter of Support from Kaartikeya Gupta attached hereto as Exhibit "E." When Kaartikeya was younger, he fell behind his classmates in school, causing him to believe that he was not smart enough to keep up with his peers. *Id.* At times, not even his teachers believed in him. *Id.* However, Dr. Gupta never wavered in his support of his son, sitting with him on countless occasions teaching him to read, and showing him that he was intelligent, and that he "just had to learn a little bit differently." *Id.* Dr. Gupta gave Kaartikeya hope for the future and taught him the joys of learning and challenging himself, principles that he still tries to instill in his daily life. *Id.* Kaartikeya is proud to say that he has now graduated in one of the top honors programs at his university, something that he does not think was possible without the help of his father. *Id.*

Shraddha Gupta, even as a person who remains significantly impacted by her ex-husband's conduct, is supportive of him. Throughout the thirty (30) years she has known Dr. Gupta, she saw him as an ideal husband, friend, and father. *See* Letter of Support from Shraddha Gupta attached hereto as Exhibit "F." Throughout their lives together, Dr. Gupta never failed to prove just how selfless of a man he was. Shraddha remembered that when Dr. Gupta graduated from residency

and finally had a night off, he received a call regarding a sick 8-year-old, who no doctor would see due to his lack of insurance. *Id.* Even though Dr. Gupta had the night off and could have declined helping, Dr. Gupta happily sacrificed his time off to help care for the child. *Id.* Shraddha explained that this is just one of many instances of his care for his patients, community, and family. *Id.*

A few years ago, Shraddha suffered a massive stroke, and doctors expected her to be in a wheelchair for a significant period of time. *Id.* However, Dr. Gupta devoted all of his time and attention to her and her recovery by encouraging therapy, motivating her, helping her walk, and challenging her to regain her cognitive ability. *Id.* Shraddha is confident that there is no way she would have recovered or walked again as soon as she did without Dr. Gupta. *Id.* The man Shraddha knows was an inspiration, a loving soul, and a hardworking and honest man. *Id.* Despite his bad conduct, Shraddha vowed that she will continue to love him and support him because of the person she know he is deep down. *Id.*

Dr. Gupta has always gone above and beyond to make his friends feel like family. Francesco Rizzo, a life-long friend of Dr. Gupta's, wrote that Dr. Gupta's care and empathy towards others has always been freely demonstrated. *See* Letter of Support from Francesco Rizzo attached hereto as Exhibit "G." Francesco noted that integrating his friends into his family has always been an integral part of who Dr. Gupta is, as he always made it a point to make all his friends feel welcomed by inviting them for holidays or other events. *Id.* However, Dr. Gupta's selflessness did not stop with his friends and family, as Francesco noted that he knows how important Dr. Gupta's patients were to him. *Id.* Francesco remembered that, while Dr. Gupta was attending his bachelor party, Dr. Gupta's tendency was to focus on how he was able to help people through his practice, not his own accomplishments or assets. *Id.* Finally, Francesco highlighted the

dedication Dr. Gupta has always had for his family, including helping his ex-wife recover from her stroke. *Id.*

Like Francesco, Scott Matasar also relayed how fortunate he feels to know and have a close relationship with Dr. Gupta. Scott recalled growing up as Dr. Gupta's friend, which involved plenty of time at the Gupta household where the two learned a great deal about each other's culture, holidays, and traditions. *See* Letter of Support from Scott Matasar attached hereto as Exhibit "H." As the two of them got older, their relationship matured and evolved. *Id.* Despite being in different states for college, the two continued to visit one another for various events. *Id.* As adults, both Dr. Gupta and Scott have remained critical parts of each other's lives, participating in and celebrating many of each other's life milestones. *Id.* Despite Dr. Gupta's conviction, Scott knows that this close family relationship will continue in the years to come, and Scott will continue to be a steady force in Dr. Gupta's life, doing all he can to support him when needed. *Id.*

A common theme amongst the letters received by undersigned counsel is Dr. Gupta's superb work-ethic, and the way in which he treats his colleagues, quickly turning them into friends. Dr. Marc Hoeksema met Dr. Gupta in 1997, when the two of them went through five years of residency together. *See* Letter of Support from Dr. Marc Hoeksema attached hereto as Exhibit "I." Because the two were the same level resident in the same program, they spent a great deal of time together, allowing their bond to quickly form. *Id.* This bond was only strengthened by the fact that their wives gave birth to their children around the same time. *Id.* Throughout their time in residency, Dr. Hoeksema remarked that Dr. Gupta was loyal and driven by a sense of excellence. *Id.* The two shared times of laughter, grief, and everything in between. *Id.* Dr. Hoeksema contended that he could not have made it throughout residency without Dr. Gupta. *Id.* These memories make it difficult for Dr. Hoeksema to reconcile the picture of Dr. Gupta he has in his

16

mind with what he has been accused of, because he knows that this behavior is inconsistent with Dr. Gupta's true character. *Id.*

Dr. Gupta's work-ethic, along with the way he treated his patients and staff is something that stood out in the mind of Mark Stutler, who worked with Dr. Gupta as a CPA. Upon starting his CPA practice, Dr. Gupta was among the first physicians who hired Mark. *See* Letter of Support from Mark Stutler attached hereto as Exhibit "J." During the time they worked together, Mark remembered numerous occasions where Dr. Gupta would perform surgery in the morning, cheerfully see patients in the afternoon and early evening, while still finding time to visit patients for a consultation at night. *Id.* "He was tireless, but always cheerful and did whatever was needed for his patients. I never heard a patient complaint." *Id.* This cheerful and hardworking demeanor is what Mark believes made Dr. Gupta not only a successful doctor, but business owner as well. He noted that the first employee that Dr. Gupta hired in 2004 to open his office was still an employee at the very end. *Id.* Dr. Gupta made it an effort to have a great staff that felt like a family. *Id.*

Despite all his success, Mark remarked that Dr. Gupta was extremely humble, and never considered himself better than others. *Id.* The last time Mark spoke to Dr. Gupta was a few months ago. *Id.* The only thing Dr. Gupta wanted to do was apologize to Mark and the rest of his staff, as he knows that his poor choices not only impacted himself and his family, but countless others who relied on Dr. Gupta's business for financial support. *Id.*

While his friends and family keep Dr. Gupta motivated to become a better person with each passing day, he relies on his faith to keep him humbled. Through his faith, he found ways to give back to his community. Anantkumar Dixit, the priest of Hindu Temple and Heritage Hall of Toledo wrote that Dr. Gupta and his family are staunch devotees of the Temple. *See* Letter of Support

from Anantkumar Dixit attached hereto as Exhibit "K." Through his involvement with the Temple, Dr. Gupta has displayed his desire to give back to the community by donating a considerable sum of money towards sustaining the Temple and volunteering his time and effort to various Temple events. *Id.*

When Anantkumar's daughter was interested in learning more about medicine, Dr. Gupta took her under his wing and allowed her to shadow him at his office. *Id.* He also spent time answering any questions she had. *Id.* This is just one of the countless times that Dr. Gupta helped in the Temple community, as he was always willing to support other community members. *Id.*

These letters confirm that Dr. Gupta is surrounded by people who genuinely care for him and strive to do everything in their power to ensure that he returns to a life of productive and law-abiding behavior. These individuals have conveyed their unwavering love and support for Dr. Gupta, as well as their sincere intentions to do whatever is needed to ensure that he remains wholly separated from the unlawful conduct that placed him in his current situation. These letters further convey the significant impact Dr. Gupta has had on countless members of his family, friends, colleagues, and community members, as well as the devastating effect a harsh sentence will have on the people that love Dr. Gupta. Simply put, the number of individuals Dr. Gupta has impacted in a positive way throughout his life cannot be understated. The letters make it clear that Dr. Gupta has spent the vast majority of his life giving to others, and making others feel welcomed and loved. The undersigned respectfully submits that this behavior cannot be ignored, even in the face of his illegal conduct.

The fact that Dr. Gupta retains the support of not only his family and friends, but also his colleagues and other current and past members of his community, is particularly compelling. It is not often that such strong letters of support come from individuals who have far less allegiance to

the offender when compared to family or life-long friends. However, undersigned has received, in addition to the letters referenced above, letters from neighbors, other medical professionals, and other past and present members of his communities. Under the circumstances, these supporters will likely never be forced to work or otherwise interact with Dr. Gupta in the future. Even so, and despite the lack of ties connecting them to Dr. Gupta, each supporter conveyed their unwavering support for him, and relayed the significant impact that he has had on their lives. This truly shows the kind and compassionate person that Dr. Gupta is and demonstrates that these offenses do not define him as a person or alter his supporters' admiration.

Dr. Gupta's supporters are confident that he can continue making positive strides after the conclusion of this matter. Many of them already recognize the positive changes that have happened to Dr. Gupta throughout the pendency of this case. They, along with the other supporters are confident that these positive changes will continue, not only during his incarceration, but after his release as well. It is respectfully submitted that his strong support system and demonstrable remorse all serve to reduce the likelihood that he would commit any future offenses.

Dr. Gupta is sincerely remorseful for his actions. He has used his time incarcerated to reflect on his past choices and understand why he put himself in the current predicament. This time has allowed Dr. Gupta to reevaluate his life and come to the realization that he must change his ways. Dr. Gupta wants nothing more than to be able to be with his family and be present for the future milestones of his children. As such, he is committed to leading a law-abiding lifestyle and becoming a productive member of society.

2. **Need for Sentence Imposed – To Reflect the Seriousness of the Offense, To Promote Respect for the Law, and To Provide Just Punishment for the Offense; To Afford Adequate Deterrence to Criminal Conduct, and To Protect the Public from Further Crimes of the Defendant.**

At the time of sentencing, it will be this Honorable Court's duty to impose a sentence sufficient, but not greater than necessary, to comport with the purposes of sentencing as set forth in 18 U.S.C. § 3553(a)(2)(A)-(D). These purposes include promoting respect for the law, which incorporates providing just punishment in light of the seriousness of the offense; affording adequate deterrence; protecting the public from further crimes by Dr. Gupta; and providing him with any needed rehabilitation and treatment.

### a. *Punishment and Deterrence*

When applying the above-referenced factors to the case at bar, it is apparent that a substantial term of incarceration, outside the minimum sentence of 188 months, is not necessary to achieve the sentencing goals outlined in 18 U.S.C. § 3553(a). Dr. Gupta is aware that under the relevant statutory provisions, he will be facing a substantial term of incarceration. Aside from this substantial term of incarceration, the undersigned respectfully submits that Dr. Gupta has already suffered – and will continue to suffer – significant hardship as a result of his case irrespective of whatever term of incarceration that this Honorable Court imposes. He has greatly tarnished his reputation in his community and has caused unnecessary pain and suffering to innocent third parties, including the victims and their families as well as his own family and friends. As a result of the instant matter, Dr. Gupta was stripped of his medical license, and he will likely never be able to practice medicine again.

In addition to facing a loss of liberty, Dr. Gupta will also be punished by the collateral consequences associated with having a federal felony conviction, including forfeiting certain constitutional rights, the loss of liberty, and being required to register as a sex offender upon his

release from prison.

The time that Dr. Gupta has been under Indictment in this case, his ongoing incarceration, and the potential sentence of incarceration that could be imposed, have had a dramatic impact on him. He has had ample time to reflect upon his conduct and the consequences for his wrongful behavior. Further, he has used his time while incarcerated to furnish a plan to change his ways and ensure he is never in a similar predicament. The prospect of a term of incarceration, beyond the time he has already spent in prison, is not lost upon him.

It is respectfully submitted that a term of incarceration beyond 188 months is not necessary to satisfy either general or specific deterrence, particularly in light of Dr. Gupta's familial responsibilities, history of gainful employment, the absence of any other criminal history, his extraordinary rehabilitative efforts, age, and his strong support system – all of which serve to reduce the likelihood of recidivism.

### b. *Age, Recidivism, and the Need for Incarceration*

As a fifty (50) year-old offender, Dr. Gupta has an exceptionally low risk of recidivism. The Sentencing Commission has itself recognized that recidivism rates decline dramatically with age. *See* U.S. Sentencing Commission, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, at Ex. 9 (May 2004) [*Measuring Recidivism Report*].  The research generated by the Commission has demonstrated that a twenty (20) year-old defendant in Criminal History Category I has a 29.5% chance of reoffending, whereas a fifty-one (51) year-old defendant with the same criminal history has only a 6.2% chance of recidivating. *Measuring Recidivism Report* at Ex. 9.  This Report also notes that "offender age is a pertinent characteristic," and suggests that consideration of a defendant's age "would improve [the] predictive power of the guidelines if incorporated into the criminal history computation." *Id.*

These statistics have been affirmed by more recent studies, wherein the Sentencing Commission researched recidivism among federal offenders, both generally, and those released since 2010. *See* U.S. SENTENCING COMM'N, RECIDIVISM AMONG FEDERAL OFFENDERS: A COMPREHENSIVE OVERVIEW (Mar. 2016)[2], and ("2016 Recidivism Report"); U.S. SENTENCING COMM'N, RECIDIVISM OF FEDERAL OFFENDERS RELEASED IN 2010 (Sept. 2021)[3]("2021 Recidivism Report").

In general, the 2016 study found that the rate of recidivism drops dramatically as the offender ages. For example, an offender between the ages of 21-25 years old at sentencing had a 65.6% rate of recidivism, where as an offender between the ages of 51-60 years old at sentencing had a 21.7% rate of recidivism. *2016 Recidivism Report.* This trend continues when analyzing an offenders age at release. For example, an offender who is released between the ages of 26-30 has a recidivism rate of 62.2%, whereas an offender who is released after the age of 60, like Dr. Gupta will be[4], has a recidivism rate of just 16.0%. *Id.*

When researching recidivism rates amongst offenders who have been released since 2010, the Sentencing Commission again found that the older an offender is, the less likely they are to be rearrested. *2021 Recidivism Report.* Specifically, "nearly three-quarters (72.5%) of offenders younger than age 21 upon release were rearrested during the study period compared to 15.9 percent of offenders aged 60 and older." *Id.*

In response to these statistics, a number of district courts have taken an offender's age into account when fashioning an appropriate sentence under 18 U.S.C. §3553(a). *See, e.g.*, *United*

---

[2] *https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2016/recidivism_overview.pdf*
[3] https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20210930_Recidivism.pdf
[4] At the time of sentencing, Dr. Gupta will be 50 years, 10 months, and 30 days old.

*States v. Hamilton*, 2009 WL 995576, at \*3 (2nd Cir. 2009)(holding that "the district court abused its discretion in not taking into account policy considerations with regard to age recidivism not included in the Guidelines"); *United States v. Holt*, 486 F.3d 9978, 1004 (7th Cir. 2007)(affirming a below-guidelines sentence where the district court's only reason for the variance was that the defendant's age made it unlikely that he would again be involved in another violent crime).

It is important to note that the same term of imprisonment – suggested by the Guidelines in this case – imposed on an older offender arguably amounts to a harsher punishment than that which is suffered by a young or middle-aged individual. Specifically, any sentence of incarceration imposed will constitute a greater proportion of an older offender's remaining life (as opposed to a middle-aged or youthful offender) and can amount to a life sentence. *See* Hannah T.S. Long, *The "Inequality" of Incarceration*, 31 Colum. J. L. & Soc. Probs. 321, 343-44 (1998)(suggesting that prison sentences be adjusted for life expectancy due to age and illness). Even a sentence of fifteen (15) years, the mandatory minimum, for a defendant in their mid-twenties pales in comparison to a similar sentence for a defendant like Dr. Gupta, who is fifty (50) years old.

Courts have also considered the costs attendant to the incarceration of older inmates. Experts have suggested that the cost of incarcerating prisoners over the age of fifty (50) to be two to four (4) times that of the general inmate population.[5] "In addition to the economic costs of keeping older prisoners incarcerated, it is important to consider whether the infringement upon the liberty interest of an older prisoner who is no longer dangerous is justified."[6]

---

[5] U.S. Dep't of Justice, National Institute of Corrections, *Correctional Health Care: Addressing the Needs of Elderly, Chronically Ill, and Terminally Ill Inmates*, at 11 (2004) (*Addressing the Needs of Elderly, Chronically Ill, and Terminally Ill Inmates*), *available at*: http://www.nicic.org/pubs/2004/018735.pdf; Oklahoma Department of Corrections, *Managing Increasing Aging Inmate Populations* (Oct. 2008), *available at*: http://www.doc.state.ok.us/adminservices/ea/Aging%20White%20Paper.pdf.
[6] William E. Adams, *The Incarceration of Older Criminals: Balancing Safety, Cost, and Humanitarian Concerns*, 19 Nova L. Rev. 465, 466 (1995).

Furthermore, a fifty (50) year-old inmate with Dr. Gupta's health problems such as high blood pressure and cholesterol is likely to suffer greater punishment than the average inmate because the Bureau of Prisons often fails to provide adequate or necessary medical treatment. An audit by the Office of the Inspector General found that the Bureau of Prisons often does not provide "required medical services to inmates." U.S. Dep't of Justice, Office of the Inspector General, Audit Division, *The Federal Bureau of Prisons' Efforts to Manage Health Care* 32, 34 (2008).[7] The Audit noted that preventive services are often not provided, chronic conditions (such as high blood pressure) and medication side effects are often not monitored, and unqualified persons are providing services. *Id*. at ii-xx, 32-34, 51-52. As one study has found, offenders' health problems before and during incarceration "accelerate their aging processes to an average of 11.5 years older than their chronological ages after age 50." U.S. Dep't of Justice, National Institute of Corrections, *Correctional Health Care: Addressing the Needs of Elderly, Chronically Ill, and Terminally Ill Inmates*, at 10 (2004), *available at* http://www.nicic.org/pubs/2004/018735.pdf.

The disparate effect that incarceration has on older offenders cannot be overstated. Offenders who committed their first significant offense after the age of fifty (50) "have problems adjusting to prison since they are new to the environment, which will cause underlying stress and probable stress-related health problems," and they are "easy prey" for more experienced inmates. *See Correctional Health Care: Addressing the Needs of Elderly, Chronically Ill, and Terminally Ill Inmates*, at 10. For older prisoners who are unfamiliar with prison culture, "the prison sentence represents nothing short of a disaster, a catastrophe, and, in consequence, they are often in a psychological state of trauma." Elaine Crawley & Richard Sparks, *Older Men in Prison: Survival, Coping, and Identity*, in *The Effects of Imprisonment* 343, 346-47 (Alison Liebling & Shadd

---

[7]Available at http://www.justice.gov/oig/reports/BOP/a0808/final.pdf.

Maruna eds., 2005).

Respectfully, an additional term of incarceration, beyond the minimum Guideline sentence, is not necessary to satisfy the sentencing objectives set forth in 18 U.S.C. § 3553, and would be a particularly harsh punishment for Dr. Gupta, who is fifty (50) years old and suffers from serious health problems that are unlikely to be adequately treated in prison.  Again, this is not to suggest that Dr. Gupta should not receive a prison sentence or to suggest that the Court should sentencing him below the 188 months set forth in the Guidelines.  However, as this Honorable Court considers the range within the Guidelines each month that Dr. Gupta is incarcerated beyond 188 months is a month of incarceration of an inmate who is in his sixties (60's) with a history of health problems who is punished at a disproportionate rate when compared to a younger inmate.

### c.  *The Effects of Sex Offender Treatment on Recidivism*

The effects of sex offender treatment on recidivism should also be noted. Recent studies indicate that treatment can effectively reduce recidivism in sexual offenders by more than 26%. *See* Martin Schmucker & Friedrich Losel, Th*e Effects of Sexual Offender Treatment on Recidivism: An International Meta-Analysis of Sound Quality Evaluations*, 11 J. Experimental Criminology 597 (2015). As aforementioned, on April 10, 2020, Dr. Gupta willingly, and of his own volition, began sex offender treatment. Since his initial assessment with Advanced Psychotherapy Services ("APS"), Dr. Gupta has engaged in weekly phone sessions with Saraha Martincak, M.Ed., LPC, LCDC III, GAMB, CSOTP. These sessions focus on treatment for, and recovery from, Dr. Gupta's sexual addiction. *See* Exhibit "A." Dr. Gupta intends to continue with his treatment regardless of the sentence imposed by this Honorable Court. Accordingly, an additional term of incarceration, beyond the minimum Guideline sentence, is not necessary to protect the public from future harm in satisfaction of 18 U.S.C. § 3553.

### d. *Collateral Consequences and the Need for Incarceration*

It is important to note that Dr. Gupta stands to suffer severe repercussions for his conviction separate and apart from any sentence imposed by the Court. He has damaged his relationships with his friends and family and significantly tarnished his reputation in the community. At just fifty (50) years old, Dr. Gupta still has a long life ahead of him. However, he faces significant difficulties as a result of his convictions in this case. As discussed *supra*, Dr. Gupta worked extremely hard to graduate from medical school, become a plastic surgeon, and open his own practices. However, as a result of the instant matter, Dr. Gupta was stripped of his medical license, and he will likely never be permitted to practice medicine again. As an additional consequence, his practices were forced to shut down because of the instant matter and he has practically no remaining assets. He is deeply saddened by the realization that he will never be able to continue down the career path he once had due to the nature of his charges and will be unable to help those that he had dedicated his life to serving.

Moreover, Dr. Gupta's relationships with the people he loves the most have been forever altered. Specifically, as a result of the instant matter, Dr. Gupta's wife of over twenty years divorced him. Likewise, while Dr. Gupta's children still support him, he realizes that he has betrayed their trust and must work everyday to try and restore the relationship he once had with them.

Dr. Gupta's children, who are in their early twenties, still have their full lives ahead of them. Dr. Gupta has already been forced to miss his son's college graduation due to his incarceration, and he is cognizant of the many more milestones he will miss while incarcerated. Specifically, Dr. Gupta wants nothing more than to be present for the milestone that most parents dream of seeing, including their children's graduations, weddings, the births of grandchildren, as

well as those grandchildren's first steps, words, etc. It is not lost on Dr. Gupta that even a minimum sentence would cause him to miss each and every one of these major life events. In addition to not being present for so many first milestones, Dr. Gupta also has come to the realization that he will likely not be there as his parents grow old and need additional support.  It is unlikely that his parents will live long enough to see him released from custody.  More impactfully though, this absence will also be a great detriment to his children. While Dr. Gupta is incarcerated, his children, who are innocent in all of this, will be left without their father to take part in these major life events – despite having a father that loves them very much and so desperately wants to be there for them.

 Furthermore, Dr. Gupta will be faced with the difficulties attendant to a felony conviction. This is particularly significant for someone who, like Dr. Gupta, has never been involved in any other criminal activity. Again, said convictions will also result in his loss of various constitutional rights and privileges. Dr. Gupta will also be subjected to a significant period of supervision upon his release from prison. Likewise, he will be required to register as a sex-offender. These conditions will severely limit Dr. Gupta's freedom and everyday life and serve as a constant reminder of his poor decisions.

These factors support the conclusion that a sentence beyond the mandatory minimum required by statute would have no impact on Dr. Gupta's overall danger to the community.  To the contrary, with counseling and the consequences weighing on Dr. Gupta, it is respectfully submitted that he no longer poses a danger to the community and certainly will not by the time he is released from custody as an elderly man.  Simply put, he is unlikely to engage in unlawful conduct in the future. Since the inception of this case, Dr. Gupta has had the opportunity to reflect upon his actions as well as the consequences that he would suffer should he commit any future criminal offenses. His conduct underlying the offenses is uncharacteristic of the way that he has tried to live his life.

He has admitted his guilt and is fully committed to doing whatever is necessary to atone for his behavior.  Accordingly, counsel submits that a substantial term of incarceration, beyond 188 months, is not necessary in order to fulfill the principles and purposes of sentencing contained in 18 U.S.C. § 3553.

## III.   <u>CONCLUSION</u>

Dr. Gupta respectfully requests that this Honorable Court consider the foregoing facts and circumstances, as well as additional arguments to be adduced at the sentencing hearing, in fashioning a sentence that is sufficient, but not greater than, that which necessary to comport with the principles and purposes of federal sentencing set forth in 18 U.S.C. § 3553(a).

Respectfully submitted,

/s/ Ian N. Friedman
IAN N. FRIEDMAN (0068630)
ERIC F. LONG (0093197)
MADELYN J. GRANT (0098165)
Counsel for Defendant
Friedman & Nemecek, L.L.C.
1360 East 9th Street, Suite 650
Cleveland, OH 44114
P: (216) 928-7700
F: (216) 820-4659
E: inf@fanlegal.com
E: efl@fanlegal.com
E: mjg@fanlegal.com

## List of Exhibits

**\*Exhibit A:**    Treatment Report from Saraha Martincak, M.Ed., LPC, LCDC III, GAMB, CSOTP

**Exhibit B:**    Letter of Support from Monica Verma

**Exhibit C:**    Letter of Support from Dr. Raj Gupta

**Exhibit D:**    Letter of Support from Ishani Gupta

**Exhibit E:**    Letter of Support from Kaartikeya Gupta

**Exhibit F:**    Letter of Support from Shraddha Gupta

**Exhibit G:**    Letter of Support from Francesco Rizzo

**Exhibit H:**    Letter of Support from Scott Matasar

**Exhibit I:**    Letter of Support from Marc Hoeksema, MD, FACS

**Exhibit J:**    Letter of Support from Mark Stutler

**Exhibit K:**    Letter of Support from Anantkumar Dixit

**Exhibit L:**    Letter of Support from Arvind Agarwalla

**Exhibit M:**    Letter of Support from Atul Agnihotri

**Exhibit N:**    Letter of Support from Digvijay Bansal

**Exhibit O:**    Letter of Support from Shashi Bansal

**Exhibit P:**    Letter of Support from Vikram Bedi

**Exhibit Q:**    Letter of Support from Ankit Chowdhary

**Exhibit R:**    Letter of Support from Paresh Dalwalla

**Exhibit S:**    Letter of Support from Srikanth Dasari

**Exhibit T:**    Letter of Support from Gloria Dilao

**Exhibit U:**    Letter of Support from Brenda Dymarkowski

**Exhibit V:**    Letter of Support from Doug Dymarkowski

**Exhibit W:**    Letter of Support from Gayatri & Surendra Garg

**Exhibit X:**    Letter of Support from Alka Gupta

**Exhibit Y:**    Letter of Support from Anshuman Gupta

**Exhibit Z:**    Letter of Support from Anuradha Gupta

**Exhibit AA:**    Letter of Support from Hemant Gupta

**Exhibit BB:**    Letter of Support from Andrew K. Huie

**Exhibit CC:**    Letter of Support from James Hunyadi, M.D.

**Exhibit DD:**    Letter of Support from Inger (LNU)

**Exhibit EE:**    Letter of Support from Mihir Kiri

**Exhibit FF:**    Letter of Support from Anitha Kosanam

**Exhibit GG:**    Letter of Support from Rocky Mehta

**Exhibit HH:**    Letter of Support from Sangeeta Mehta

**Exhibit II:**    Letter of Support from Vijay Mittal, MD, MS, FACS

**Exhibit JJ:**    Letter of Support from Harshavardhan Neotia

**Exhibit KK:**    Letter of Support from Parthiv Neotia

**Exhibit LL:**    Letter of Support from Nirav Raj D. Parikh

**Exhibit MM:**    Letter of Support from Dipan L. Patel

**Exhibit NN:**    Letter of Support from Annie Pipatjarasgit

**Exhibit OO:**    Letter of Support from Tommy Pipatjarasgit

**Exhibit PP:**    Letter of Support from Niru Prasad, M.D.

**Exhibit QQ:**    Letter of Support from Vijendra Raghavendra

**Exhibit RR:**    Letter of Support from Meena Ramakrishnan

**Exhibit SS:**    Letter of Support from Inder Jit Saini, MD

**Exhibit TT:**   Letter of Support from Chandrashekar Sharma

**Exhibit UU:**   Letter of Support from Priyam Sharma

**Exhibit VV:**   Letter of Support from Shakuntla Sharma

**Exhibit WW:** Letter of Support from Ken Switzer

**Exhibit XX:**   Letter of Support from Devendra Verma

**Exhibit YY:**   Letter of Support from Shishir Verma


***Counsel will seek leave of Court to file this document separate and under seal.***